UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

SEP 2 2 2006

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| MERRYMAN EXCAVATION, INC. | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| Vs. | ) | No. |
| | ) | |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION 150, AFL-CIO | ) | 06CV5160 |
| | | JUDGE KENDALL |
| | | MAG. JUDGE MASON |
| MID AMERICA REGIONAL BARGAINING ASSOCIATION | ) | |
| MIDWEST OPERATING ENGINEERS FUND | ) | |
| | ) | |
| STEVEN SYSCO | ) | |
| | ) | |
| CHARLES AUGUST | ) | |
| | ) | |
| MELINDA HENSEL | ) | |
| | ) | |
| JOHN RABINE | ) | |
| | ) | |
| RAY HERRON | ) | |
| | ) | |
| MICHAEL KRESGE | ) | |
| | ) | |
| RICHARD DUNLAP | ) | |
| | ) | |
| TIM GORMAN | ) | |
| | ) | |
| TIM SCULLY | ) | |
| | ) | |
| JOESEPH BENSEN | ) | |
| | ) | |
| JOHN VIGNOCCHI | ) | |
| | ) | |
| Defendants | ) | |

**VERIFIED COMPLAINT AT LAW**

1

Now comes the plaintiff, MERRYMAN EXCAVATION, INC., by and through

its attorneys, Robert T. Hanlon, of Counsel to Madsen, Sugden, & Gottemoller and

Ungaretti & Harris, and complains against the defendants as follows:

**Nature of Actions**

1. Counts I – VIII Plaintiff seeks to have declared void six separate grievance awards

totaling $88,101.09 granted on August 2, 2006 by a Joint Grievance Committee due to a

lack of jurisdiction of the Joint Grievance Committee and plaintiff seeks to terminate

further proceedings with regard to two grievances where the Joint Grievance Committee

ended in a deadlock. Plaintiff also seeks to obtain a preliminary injunction to enjoin the

Defendant, the Local 150 International Union of Operating Engineers, AFL-CIO and its

agents from using any the August 2nd 2006 decisions of the Joint Grievance Committee

to Strike any of Plaintiffs jobs and from using any the August 2nd 2006 decisions of the

Joint Grievance Committee to place liens upon any property or contract or to otherwise

seek enforcement of the judgments of the August 2nd 2006 Joint Grievance Committee.

| Summary of Awards By Joint Grievance Committee | | |
|---|---|---|
| Against Merryman Excavation, Inc. | | |
| | Award | |
| *06 -30 | $822.88 | |
| *06 -31 | | Unable to reach a decision |
| *06 -32 | $451.28 | |
| *06 -33 | $451.28 | |
| *06 -34 | $8,046.16 | |
| *06 -35 | $77,426.96 | |
| *06 -36 | | Settled/Compromised |
| *06 -37 | | Settled/Compromised |
| *06 -38 | $902.53 | |
| *06 -40 | | Unable to reach a decision |
| Total | $88,101.09 | |

## Jurisdiction and Venue

3. Jurisdiction is proper in this court under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

4. A substantial portion of the events giving rise to this claim occurred in Cook County, State of Illinois. Venue is, therefore properly placed in this Court, pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 185.

## Parties

5. Merryman Excavation, Inc. is an Illinois Corporation with its principal place of business in Woodstock, Illinois and is engaged in the business of installing underground sewer pipe.

6. Local 150, International Union of Operating Engineers, AFL-CIO (hereinafter the "Local 150") is a Labor Organization purporting to represent employees throughout Illinois, Iowa and Indiana, including employees working in Boone, Cook, DuPage, Kane, Lake, McHenry and Winnebago Counties, Illinois. Its principal offices are located in Countryside, Illinois.

7. Mid-America Regional Bargaining Association ("MARBA") is an Illinois Not-for-profit corporation having its principal place of business 2720 River Road, Suite 222, Des Plaines, Illinois.

## FACTS COMMON TO ALL COUNTS

8. On or about April 1, 2000 Merryman Excavation entered into a memorandum

of Agreement, a copy of which is attached hereto and incorporated herein as Exhibit "A"

with the Local 150, incorporating a separate master agreement previously entered

between the Local 150 and MARBA hereinafter the "Master Agreement;" the Master

Agreement has a maturity date of May 31, 2007.


9. On or about March 6, 2006, Attorney, Robert Hanlon, dispatched a letter

informing the Local 150 that Merryman Excavation, Inc. Board of Directors has

authorized Robert T. Hanlon to be the sole and exclusive agent to interface with the Local

150 for all union related matters for Merryman Excavation, Inc. and further requested in

that letter that all correspondences be placed in writing and submitted to him. (Copy

attached hereto and incorporated herein as Exhibit B).


10. The Master Agreement provides:

> "In the event that grievance cannot be resolved within
> seven (7) working days of the STEP ONE conference, it shall be
> reduced to writing and referred for conference and resolution by
> designated officials of the union and the Contractor at a pre-
> grievance hearing to be held at the offices of Local 150, 6200
> Joliet Road, Countryside, Illinois, unless another location is
> mutually agreed to."

Mid-America Regional Bargaining Association Heavy and Highway and Underground

Agreement, dated June 1, 2001, Article XIII, Section 1, page 40. A copy of which is

attached hereto and incorporated herein as Exhibit C.

11. The term "conference" is defined as:

A meeting of several persons for deliberation, for the interchange of opinion, or for the removal of differences or disputes. Blacks Law Dictionary 5th Edition, page 268.

12. The Master Agreement provides:

"In the event that grievance cannot be resolved by STEP TWO, the written grievance shall be submitted within fifteen (15) days to the Joint Grievance Committee created in this article."

Mid-America Regional Bargaining Association Heavy and Highway and Underground Agreement, dated June 1, 2001, Article XIII, Section 1, page 41. A copy of which is attached hereto and incorporated herein as Exhibit C.

13. The master agreement provides for a Joint Grievance Committee consisting of an equal number of members representing Employers and the Union wherein the agreement reads:

"the union and the Association have created a Joint Grievance Committee to resolve grievances under this agreement. *This committee shall consist of an equal number of members representing Employers and the Union.*" (emphasis added)

Mid-America Regional Bargaining Association Heavy and Highway and Underground Agreement, dated June 1, 2001, Article XIII, Section 1, page 41, a copy of which is attached hereto and incorporated herein as Exhibit C.

5

14. On or about August 2, 2006, a meeting of the Joint Grievance Committee was held where the Joint Grievance Committee was comprised of a disproportionate number of union representatives; wherein the union members present consisted of Steven Cisco, Charles August, Michael Kresge, Tim Gorman, Richard Dunlap and Melinda Hensel; and those purporting to be the employer's representatives consisted only of Tim Scully and Joseph Benson as to eight of the ten grievances and consisted of only three purported representatives, Tim Scully, Joseph Benson, and Joeseph Vignocchi, for two of the ten grievances. In the executive session associated with all grievances, Attorney Melinda Hensel, Member of and Legal Counsel for the Local 150, was present and advising the Local 150 members as well. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D, at page 1 at lines 12-8 and page 170 lines 5-12.

15. Joseph Vignocchi belongs to the Lake County Contractors Association. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D, at page 16 at lines 5-8.

16. Joseph Bensen belongs to the Illinois Road Builders Association. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D page 16 at lines 5-9.

6

17. Tim Scully belongs to the Underground Contractors Association.  See

Transcript of Joint Grievance Committee which is attached hereto and incorporated

herein as Exhibit D, at page 16 at lines 5-10.

18. As of August 2, 2006, the date of the Joint Grievance Committee meeting,

Merryman Excavation, Inc., did not belong to Lake County Contractors Association; and

did not belong to the Illinois Road Builders Association; and did not belong to the

Underground Contractors Association and did not belong to MARBA.

19. The Procedural Rules of the Joint Grievance Committee also provide for as

follows:

> "Grievances are not properly before the committee unless the
> Parties have actually been engaged in an attempt to resolve the
> grievance."

Procedural Rules of the Joint Grievance Committee, item 1 Pre-hearing Investigation,

Resolution.  A copy of the Procedural Rules is attached hereto and incorporated herein as

Exhibit E.

20. The Master Agreement provides:

> "Neither the Joint Grievance Committee nor an arbitrator shall
> have any authority to add to, detract from, or in any way alter the
> provisions of this Agreement or make a new Agreement."

Mid-America Regional Bargaining Association Heavy and Highway and Underground

Agreement, dated June 1, 2001, Article XIII, Section 1, page 42, a copy of which is

attached hereto and incorporated herein as Exhibit F.

21. On August 2, 2006, Ten Grievances were considered by the Joint Grievance Committee and enumerated as follows:

06-30 which is attached hereto and incorporated herein as Exhibit G,

06-31 which is attached hereto and incorporated herein as Exhibit H,

06-32 which is attached hereto and incorporated herein as Exhibit I,

06-33 which is attached hereto and incorporated herein as Exhibit J,

06-34 which is attached hereto and incorporated herein as Exhibit K,

06-35 which is attached hereto and incorporated herein as Exhibit L,

06-38 which is attached hereto and incorporated herein as Exhibit M, and

06-40 which is attached hereto and incorporated herein as Exhibit N.

22. On August 2, 2006, the Plaintiff, Merryman Excavation, Inc., by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D, at: Page 18 lines 23-24; Page 19 lines 1; Page 30 line 24; Page 31, lines 1-2; 46 at lines 1-15; Page 48 at lines 4-9; Page 50 at lines 4-7; Page 57 at lines 15-19; Page 58 at lines 12-13, Page 65 at lines 19-24, Page 66 at lines 1-3; Page 74 at lines 8-9; Page 77 at lines 23-24; Page 92 at lines 6-22; 128 at lines 17-24; Page 151 at lines 6-7 157 at lines 16 – 24; and page 158 at lines 10-11.

<u>**Count I Greivance #06-30,**</u>
<u>**An Action seeking Declaratory Relief**</u>

23. Restate and re-allege paragraphs 1-22 and incorporate said paragraphs as if fully set out in this Count I.

8

## Additional Facts Unique to Count I

24. On or about April 21, 2006, beyond seven (7) working days from the date Charles August claims to have had a Step One Conference, the Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, advising Merryman Excavation Inc., that the Local 150 was proceeding to a STEP TWO conference, on or about May 17, 2006. Said letter was received by MARBA on April 24, 2006.

25. On May 17, 2006 a meeting was held at the offices of the Local 150 and attended by Attorney Robert T. Hanlon.

26. On July 20, 2006, more than the required 15 days, some 64 days after the alleged "Step Two" conference or meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit O).

27. On August 2, 2006, grievance # 06-30 whereby the Local 150 was seeking $822.88 was considered by the Joint Grievance Committee.

28. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See Transcript of Joint Grievance Committee which is attached

9

hereto and incorporated herein as Exhibit D, on page 18 at lines 23-24 and on page 19 line 1.

29. The Committee determined that Merryman Excavation, Inc. shall pay $822.88 to the Local 150 Assistance Fund. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D, at page 25 at lines 17 – 23. A copy of the decision letter is attached as Exhibit "F". Mr. Cisco also noted Merryman Excavation Inc.'s objection for the record. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D, at page 26, Lines 1-5.

30. The Committee's exercise of jurisdiction is beyond the power of the Joint Grievance Committee it relates to Grievance # 06-30 because:

A. The grievance was untimely with regard to the presentation of a written grievance within seven days from the alleged Step One date.

B. The Grievance was untimely with regard to submission to MARBA for Step Three from the Step Two date.

C. There was no actual meaningful attempt to resolve the grievance.

D. There was a disproportionate number of union members representing the Union at the Joint Grievance Committee contrary to the plain language of the Agreement; wherein it reads:

> "the union and the Association have created a Joint Grievance Committee to resolve grievances under this agreement. ***This committee shall consist of an equal number of members representing Employers and the Union.***" (emphasis added)

E. The award directing payment to the Local 150 Assistance Fund is contrary to

the plain meaning of the language of the agreement; wherein it reads:

> "The Employer agrees to compensate the bargaining unit member who would have worked but for the Employer's violation of this Section at the double (2x) time rate for all hours the bargaining unit member would have worked but for the Employer's violation."

Mid-America Regional Bargaining Association Heavy and Highway and

Underground Agreement, dated June 1, 2001, Article I, Section 11, page 9. A

copy of which is attached hereto and incorporated herein as Exhibit P.

31. On September 11, 2006, the Local 150 by its agent Steven Cisco dispatched a

letters to the plaintiff, Merryman Excavation, Inc. threatening enforcement of the Joint

Grievance Committee decision as to Grievance #06-30.

32. That if the Local 150, carries through on its threats to enforce the judgment of

the Joint Grievance Committee as to Grievance #06-30, the plaintiff will suffer

irreparable harm.

Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable

Court grant the following relief:

A) Declare that the Award by the Joint Grievance Committee with regard

to Grievance # 06-30 to be Null and Void.

B) Enter a Temporary Restraining Order restraining the Defendant Local

150, International Union of Operating Engineers, AFL-CIO from using

the Joint Grievance Committee award in Grievance #06-30 for any

purpose.

C) For such further and other relief as this court deems just and equitable.

## Count II Grievance #06-31,
## An Action seeking Declaratory Relief

33. Restate and re-allege paragraphs 1-22 and incorporate said paragraphs as if

fully set out in this Count II.

## The Facts Unique to this Count II

34. According to Charles August, Charles August left a telephone message for

Attorney Robert T. Hanlon, One of Plaintiff's Attorneys, and designated business

representative for Merryman Excavation, Inc. which went unanswered. But See

paragraph 10, where Attorney Hanlon requested Mr. August to place his comments in

writing.

35. On or about April 21, 2006, beyond seven (7) working days from the date

Charles August claims he left a telephone message for Attorney Hanlon to call him, the

Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, with the

knowledge that Patrick Merryman was not the person authorized by the company to

address any grievance matter, that the Local 150 was proceeding to a STEP TWO

conference, on or about May 17, 2006.

36. On May 17, 2006 a meeting was held at the offices of the Local 150 and

attended by attorney Robert T. Hanlon, which is the first and only time the grievance was

discussed between the parties, during said meeting, Charles August simply read his letter of April 21, 2006. Robert T. Hanlon, offered to compromise the $451 claim for $200, and that offer was rejected.

37. On July 20, 2006, some 64 days after the alleged "Step Two" conference meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit Q).

38. The <u>Procedural Rules of the Joint Grievance Committee</u> also provides for as follows:

> "Grievances are not properly before the committee unless the Parties have actually been engaged in an attempt to resolve the grievance."

<u>Procedural Rules of the Joint Grievance Committee</u>, item 1 Pre-hearing Investigation, Resolution. A copy of the Procedural Rules is attached hereto and incorporated herein as Exhibit E.

39. While the rules require an actual attempt by the parties to resolve the dispute only the Plaintiff's representative made an attempt to settle or resolve the matter and the Local 150 made no attempt to settle the matter. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D, at page 28, Lines 10-16.

40. Mr Charles August stated during the Joint Grievance hearing that Robert Hanlon, Merryman's Counsel, had made a request for the out of work list and that the Local 150 rejected the request. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D, at page 28, Lines 10-15.

41. The Joint Greivance Committee Co-Chairman Joseph Vignocchi stated that he had been on the committee for 18 years. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit F, at page 18, Lines 11-14.

42. After Carol Lord articulated that the Joint Greivence Committee was unable to come to a decision with regard to Grievance 06-31, Mr Joseph Vignocchi stated:

"So for you, Mr. Hanlon, that's called a win."

"It's a draw. Its as good as we get."

See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit F, at page 34, Lines 18-24 and page 35, lines 1-4.

43. The Statements of Mr. Vignocchi demonstrate that the voting members of the Union do not act as impartial judges but advocates of the Local 150, the very party to the grievance. Accordingly, the parties voting on behalf of the Local 150 have systematically over a protracted period, breached their duty of fairness to the parties before the Joint Grievance Committee, including Merryman Excavation, Inc.

14

44. On August 2, 2006, the Grievance #06-31 was considered by the Joint Grievance Committee.

45. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit F page 31 at lines 1-10.

46. The Joint Grievance Committee could not reach a decision as it relates to Grievance #06-31.

47. The Committee's exercise of jurisdiction was beyond the power of the Joint Grievance Committee it relates to Grievance # 06-31 because:

A. There was no Step One conference.

B. The grievance was untimely with regard to the presentation of a written grievance within seven days from the alleged Step One date.

C. The Grievance was untimely with regard to submission to MARBA for Step Three from the Step Two date.

D. There was no actual meaningful attempt to resolve the grievance by the Local 150.

E. There was a disproportionate number of union members representing the Union at the Joint Grievance Committee which is contrary to the plain meaning of the Master Agreement wherein it reads:

"the union and the Association have created a Joint
Grievance Committee to resolve grievances under this
agreement. ***This committee shall consist of an equal
number of members representing Employers and the
Union.***" (emphasis added)

Mid-America Regional Bargaining Association Heavy and Highway and

Underground Agreement, dated June 1, 2001, Article XIII, Section 1, page 41.

A copy of which is attached hereto and incorporated herein as Exhibit C.


Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable

Court grant the following relief:

    A)  Declare that Joint Grievance Committee had no jurisdiction to hear to

          Grievance # 06-31 and that the arbitration provision is inoperable with

          regard to Grievance # 06-31 and;

    B)  Restrain or enjoin the Local 150 from pursuing any further remedy as

          it relates to Grievance # 06-31.

    C)  For such further and other relief as this court deems just and equitable.


## FACTS COMMON TO COUNTS III – VIII

48. The Procedural Rules for Joint Grievance Committee requires at least three

voting members each representing the Union and the Contractors and only allows for

reduction in the number of voting members on each side of the committee to fall below

three, under exceptional circumstances, and by agreement of the Parties, not the

Committee members, wherein the procedural rules read:

    "Quota

The presence of three Committee members representing the Union and three Committee members representing the Employers shall constitute a quorum for transacting the business of the Joint Grievance Committee. By agreement of both **PARTIES**, under extenuating circumstances, a lesser number of equal representatives may be used."        (Emphasis Added.)

Procedural Rules of the Joint Grievance Committee, item 2 Committee Participants,

Quota. A copy of the Procedural Rules is attached hereto and incorporated herein as

Exhibit G.

49. Over the objection of Merryman Excavation Inc.'s business representative and attorney, Robert Hanlon, the Joint Grievance Committee was reduced to two voting members each, when the defendant, Steven Cisco made a motion, before the committee, to reduce the panel to two voting members each, seconded By John Vignocchi and adopted by the Committee. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 35 at lines 8-22 and Page 36 lines 1-10.

50. Mr. Steven Cisco addressing the plaintiff's objection stated:

"This is between the Committee."

See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 35 at line 15.

51. No extenuating circumstance was given for Mr. Vignocchi's need to leave the Joint Grievance Committee. The plaintiff Merryman Excavation, Inc., did not agree to

17

reduction in the voting members of the Joint Grievance Committee and objected to the reduction in number of voting members on the Joint Grievance Committee.

52. Immediately after the committee approved the reduction in the number of voting representatives on each side, Mr. John Vignocchi left the room. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 35 at lines 7-24.

Count III Greivance #06-32,
An Action seeking Declaratory Relief

53. Restate and re-allege paragraphs 1-22 and 48 - 52 and incorporate said paragraphs as if fully set out in this Count III.

**FACTS UNIQUE TO THIS COUNT III**

54. According to Charles August, Charles August left a telephone message for Attorney Robert T. Hanlon, One of Plaintiff's Attorneys, and designated business representative for Merryman Excavation, Inc. which went unanswered. See: Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit F at page 38 line 12. But See paragraph 10, where Attorney Hanlon requested Mr. August to place his comments in writing.

55. On or about April 24, 2006, Charles August of the Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, advising Merryman Excavation Inc. that the Local 150 was proceeding to a STEP TWO conference, on or about May 17, 2006

and claimed that Charles August left a telephone message for Attorney Hanlon to call him, apparently in lew of Step One.

56. On May 17, 2006 a meeting was held at the offices of the Local 150 and attended by attorney Robert T. Hanlon, which is the first and only time the grievance was discussed between the parties.

57. On July 20, 2006, some 64 days after the alleged "Step Two" conference meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit R).

58. On August 2, 2006, the grievance was considered by the Joint Grievance Committee.

59. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit F on page 41 at lines 1-8.

60. The Joint Grievance Committee of August 2, 2006 determined that Merryman Excavation, Inc. shall pay $451.28 to the Local 150 Assistance Fund as opposed to the

19

particular operator who was on the out of work list. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D on page 42 at line 1-6.

61. The Joint Grievance Committee's exercise of jurisdiction is beyond the power of the Joint Grievance Committee it relates to Grievance # 06-32 because:

A. There was no Step One conference.

B. The grievance was untimely with regard to the presentation of a written grievance within seven days from the alleged Step One date.

C. The Grievance was untimely with regard to submission to MARBA for Step Three from the Step Two date in contract to the plain meaning of the language of the Master Agreement wherein it reads:

> "In the event that grievance cannot be resolved by STEP TWO, the written grievance shall be submitted within fifteen (15) days to the Joint Grievance Committee created in this article."

<u>Mid-America Regional Bargaining Association Heavy and Highway and Underground Agreement</u>, dated June 1, 2001, Article XIII, Section 1, page 41. A copy of which is attached hereto and incorporated herein as Exhibit C.

D. There was no actual meaningful attempt to resolve the grievance.

E. There was a disproportionate number of union members at the Joint Grievance Committee in contrast to the plain language of the contract which reads:

> "the union and the Association have created a Joint Grievance Committee to resolve grievances under this agreement. ***This committee shall consist of an equal number of members representing Employers and the Union.***"

<u>Mid-America Regional Bargaining Association Heavy and Highway and</u>

<u>Underground Agreement</u>, dated June 1, 2001, Article XIII, Section 1, page 41.

A copy of which is attached hereto and incorporated herein as Exhibit C.

F. Over the objection of Merryman Excavation, Inc., there was an insufficient

number of voting members present at the Joint Grievance Committee, without

agreement of Merryman Excavation, Inc.

G. The award directing payment to the Local 150 Assistance Fund is contrary to

the plain meaning of the language of the agreement. Wherein it reads:

> "The Employer agrees to compensate the bargaining unit
> member who would have worked but for the Employer's
> violation of this Section at the double (2x) time rate for all
> hours the bargaining unit member would have worked
> but for the Employer's violation."

<u>Mid-America Regional Bargaining Association Heavy and Highway and</u>

<u>Underground Agreement</u>, dated June 1, 2001, Article I, Section 11, page 9. A

copy of which is attached hereto and incorporated herein as Exhibit P.

62. On September 11, 2006, the Local 150 by its agent Steven Cisco dispatched a

letters to the plaintiff, Merryman Excavation, Inc. threatening enforcement of the Joint

Grievance Committee decision as to Grievance #06-32.

63. That if the Local 150, carries through on its threats to enforce the judgment of

the Joint Grievance Committee as to Grievance #06-32, the plaintiff will suffer

irreparable harm.

21

Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable Court grant the following relief:

A) Declare that the Award by the Joint Grievance Committee with regard to Grievance # 06-32 to be Null and Void.

B) Enter a Temporary Restraining Order restraining the Defendant Local 150, International Union of Operating Engineers, AFL-CIO from using the Joint Grievance Committee award in Grievance #06-30 for any purpose.

C) For such further and other relief as this court deems just and equitable.

## Count IV Greivance #06-33, ## An Action seeking Declaratory Relief

64. Restate and re-allege paragraphs 1-22 and 48 - 52 and incorporate said paragraphs as if fully set out in this Count IV.

## FACTS UNIQUE TO THIS COUNT IV

65. According to Charles August, On April 19, 2006 Charles August left a telephone message for Attorney Robert T. Hanlon, one of Plaintiff's Attorneys, and designated business representative for Merryman Excavation, Inc. which went unanswered. See: Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D at page 38 line 12. But See paragraph 10, where Attorney Hanlon requested Mr. August to place his comments in writing.

66. On or about May 17, 2006, the Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, advising Merryman Excavation Inc. that the Local 150 was proceeding to a STEP TWO conference, on or about June 15, 2006.

67. On June 15, 2006 a meeting was held at the offices of the Local 150 and was not attended by Merryman Excavation, Inc.

68. On July 20, 2006, some 35 days after the alleged "Step Two" conference meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit S).

69. On August 2, 2006, the grievance was considered by the Joint Grievance Committee.

70. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit F on page 46 at lines 3-15.

71. The Committee determined that Merryman Excavation, Inc. shall pay $451.28 to the Local 150 Assistance Fund as opposed to the particular operator who was on the

out of work list. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto

and incorporated herein as Exhibit F on page 42 at line 1-6.

72. The Committee's exercise of jurisdiction is beyond the power of the Joint

Grievance Committee it relates to Grievance # 06-33 because:

A. There was no Step One conference.

B. The grievance was untimely with regard to the presentation of a written

grievance within seven days from the alleged Step One date.

C. There was no step two conference.

D. The Grievance was untimely with regard to submission to MARBA for Step

Three from the Step Two date.

E. There was no actual meaningful attempt to resolve the grievance.

F. There was a disproportionate number of union members at the Joint Grievance

Committee.

G. There was an insufficient number of voting members present at the Joint

Grievance Committee, without agreement of Merryman Excavation, Inc.

H. The award directing payment to the Local 150 Assistance Fund is contrary to

the plain meaning of the language of the agreement. Wherein it reads:

> "The Employer agrees to compensate the bargaining unit
> member who would have worked but for the Employer's
> violation of this Section at the double (2x) time rate for all
> hours the bargaining unit member would have worked
> but for the Employer's violation."

<u>Mid-America Regional Bargaining Association Heavy and Highway and</u>

<u>Underground Agreement</u>, dated June 1, 2001, Article I, Section 11, page 9. A

copy of which is attached hereto and incorporated herein as Exhibit P.

73. On September 11, 2006, the Local 150 by its agent Steven Cisco dispatched a letters to the plaintiff, Merryman Excavation, Inc. threatening enforcement of the Joint Grievance Committee decision as to Grievance #06-33.

74. That if the Local 150, carries through on its threats to enforce the judgment of the Joint Grievance Committee as to Grievance #06-33, the plaintiff will suffer irreparable harm.

Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable Court grant the following relief:

        A) Declare that the Award by the Joint Grievance Committee with regard to Grievance # 06-33to be Null and Void.

        B) For such further and other relief as this court deems just and equitable.

<u>Count V Greivance #06-34,</u>
<u>An  Action seeking Declaratory Relief</u>

75. Restate and re-allege paragraphs 1-22 and 48 - 52 and incorporate said paragraphs as if fully set out in this Count IV.

**<u>FACTS UNIQUE TO THIS COUNT V</u>**

76. According to Mike Kresge he "did step 1 with Joe Merryman".  See: <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D at page 52 line 19.  But See paragraph 10, where Attorney Hanlon

requested the Local 150 place its comments in writing and that Robert Hanlon was the sole person authorized by Merryman Excavation, Inc. to deal with all grievance related matters.

77. On or about May 17, 2006, the Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, advising Merryman Excavation Inc. that the Local 150 was proceeding to a STEP TWO conference, on or about June 15, 2006, without copy to Robert Hanlon.

78. On June 15, 2006 a meeting was held at the offices of the Local 150 which was not attended by any Merryman Excavation, Inc. Employee.

79. On July 20, 2006, some 35 days after the alleged "Step Two" conference meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit T).

80. On August 2, 2006, the grievance was considered by the Joint Grievance Committee.

81. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint

Grievance Committee. See <u>Transcript of Joint Grievance Committee</u> which is attached

hereto and incorporated herein as Exhibit D on Page 65 at lines 19-24.

82. The Committee determined that Merryman Excavation, Inc. shall pay

$8,046.16 to the Local 150 Assistance Fund as opposed to the particular operator who

was on the out of work list. See <u>Transcript of Joint Grievance Committee</u> which is

attached hereto and incorporated herein as Exhibit D on page 66 at line 16.

83. The Committee's exercise of jurisdiction is beyond the power of the Joint

Grievance Committee it relates to Grievance # 06-34 because:

A. There was no Step One conference.

B. The grievance was untimely with regard to the presentation of a written

grievance within seven days from the alleged Step One date.

C. The Grievance was untimely with regard to submission to MARBA for Step

Three from the Step Two date.

D. There was no actual meaningful attempt to resolve the grievance.

E. There was a disproportionate number of union members at the Joint Grievance

Committee.

F. Over the Plaintiff's Objection, there was an insufficient number of voting

members present at the Joint Grievance Committee, without agreement of

Merryman Excavation, Inc. See <u>Transcript of Joint Grievance Committee</u>

which is attached and incorporated herein as Exhibit D on Page 35 at

lines 8-14.

G. The award directing payment to the Local 150 Assistance Fund is contrary to
the plain meaning of the language of the agreement. Wherein it reads:

> "The Employer agrees to compensate the bargaining unit
> member who would have worked but for the Employer's
> violation of this Section at the double (2x) time rate for all
> hours the bargaining unit member would have worked
> but for the Employer's violation."

Mid-America Regional Bargaining Association Heavy and Highway and

Underground Agreement, dated June 1, 2001, Article I, Section 11, page 9. A

copy of which is attached hereto and incorporated herein as Exhibit P.

Because the Joint Grievance Committee directed payment to the Local 150

Assistance Fund as opposed to the member who would have worked on that

particular day.

84. On September 11, 2006, the Local 150 by its agent Steven Cisco dispatched a

letters to the plaintiff, Merryman Excavation, Inc. threatening enforcement of the Joint

Grievance Committee decision as to Grievance #06-34.

85. That if the Local 150, carries through on its threats to enforce the judgment of

the Joint Grievance Committee as to Grievance #06-34, the plaintiff will suffer

irreparable harm.

Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable

Court grant the following relief:

A) Declare that the Award by the Joint Grievance Committee with regard

to Grievance # 06-34to be Null and Void.

28

B) Enter a Temporary Restraining Order restraining the Defendant Local 150, International Union of Operating Engineers, AFL-CIO from using the Joint Grievance Committee award in Grievance #06-30 for any purpose.

C) For such further and other relief as this court deems just and equitable.

### Count VI Greivance #06-35, An Action seeking Declaratory Relief

86. Restate and re-allege paragraphs 1-22 and 46 - 50 and incorporate said paragraphs as if fully set out in this Count VI.

### FACTS UNIQUE TO THIS COUNT VI

87. According to Mike Kresge he "did Step 1 with Joe Merryman". See: Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D at page 69 line 12. But See paragraph 10, where Attorney Hanlon requested the Local 150 place its comments in writing and that Robert Hanlon was the sole authorized person by Merryman Excavation, Inc. to deal with all grievance related matters.

88. On or about May 17, 2006, the Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, advising Merryman Excavation Inc. that the Local 150 was proceeding to a STEP TWO conference, on or about June 15, 2006, without copy to Robert Hanlon.

89. On June 15, 2006 a meeting was held at the offices of the Local 150 which was not attended by any Merryman Excavation, Inc. Employee.

90. On July 20, 2006, some 35 days after the alleged "Step Two" conference meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit T).

91. On August 2, 2006, the grievance was considered by the Joint Grievance Committee.

92. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on Page 77 at lines 23-24.

93. On August 2, 2006, the Local 150 asked the Joint Grievance committee to Vote on a $137,510.76 claim. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 70 at line 14-17. Also see Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 86 at line 21.

94. Mr. Steven Cisco demonstrated bias against Merryman Excavation, Inc., when he stated: "$137,000 is light money because he should have had actually three guys out there." See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 87 at line 5-6.

95. There was no intervening discussion to demonstrate how the judgment of the committee took a $137,510.76 claim and converted it into a $77,426.96 when it rendered its judgment. The Decision of the Joint Grievance Committee is Arbitrary Capricious and violative of Plaintiff's due process rights. Id and See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 88 at lines 10-15.

96. The Committee determined that Merryman Excavation, Inc. shall pay $77,426.96 to the Local 150 Assistance Fund as opposed to the particular operator who was on the out of work list. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 88 at lines 10-15.

97. The Committee's exercise of jurisdiction is beyond the power of the Joint Grievance Committee as it relates to Grievance # 06-35 because:

A. There was no Step One conference.

B. The grievance was untimely with regard to the presentation of a written grievance within seven days from the alleged Step One date.

C. There was no "Step Two" conference

31

D. The Grievance was untimely with regard to submission to MARBA for Step Three from the alleged Step Two date.

E. There was no actual meaningful attempt to resolve the grievance.

F. There was a disproportionate number of union members at the Joint Grievance Committee.

G. Over the Plaintiff's Objection, there was an insufficient number of voting members present at the Joint Grievance Committee, without agreement of Merryman Excavation, Inc. See See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D on Page 35 at lines 8-14.

H. The award amount granted by the Joint Grievance Committee was arbitrary capricious and unreasonable.

I. The award directing payment to the Local 150 Assistance Fund is contrary to the plain meaning of the language of the agreement. Wherein it reads:

> "The Employer agrees to compensate the bargaining unit member who would have worked but for the Employer's violation of this Section at the double (2x) time rate for all hours the bargaining unit member would have worked but for the Employer's violation."

<u>Mid-America Regional Bargaining Association Heavy and Highway and Underground Agreement</u>, dated June 1, 2001, Article I, Section 11, page 9. A copy of which is attached hereto and incorporated herein as Exhibit P. Because the Joint Grievance Committee directed payment to the Local 150 Assistance Fund as opposed to the member who would have worked on that particular day.

98. On September 11, 2006, the Local 150 by its agent Steven Cisco dispatched a letters to the plaintiff, Merryman Excavation, Inc. threatening enforcement of the Joint Grievance Committee decision as to Grievance #06-35.

99. That if the Local 150, carries through on its threats to enforce the judgment of the Joint Grievance Committee as to Grievance #06-35, the plaintiff will suffer irreparable harm.

Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable Court grant the following relief:

A) Declare that the Award by the Joint Grievance Committee with regard to Grievance # 06-35to be Null and Void.

B) Enter a Temporary Restraining Order restraining the Defendant Local 150, International Union of Operating Engineers, AFL-CIO from using the Joint Grievance Committee award in Grievance #06-30 for any purpose.

C) For such further and other relief as this court deems just and equitable.

## Count VII Greivance #06-38, An Action seeking Declaratory Relief

100. Restate and re-allege paragraphs 1-22 and 46 - 50 and incorporate said paragraphs as if fully set out in this Count VII.

## FACTS UNIQUE TO THIS COUNT VII

101. The Local 150 had no "Step One" conference with Merryman Excavation, Inc as it relates to Grievance # 06-38.

102. On or about May 30, 2006, the Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, advising Merryman Excavation Inc. that the Local 150 was proceeding to a STEP TWO conference, on or about June 15, 2006, without copy to Robert Hanlon. But see paragraph 10, where Attorney Hanlon requested the Local 150 place its comments in writing and that Robert Hanlon was the sole authorized person by Merryman Excavation, Inc. to deal with all grievance related matters.

103. On June 15, 2006 a meeting was held at the offices of the Local 150 which was not attended by any Merryman Excavation, Inc. Employee.

104. On July 20, 2006, some 35 days after the alleged "Step Two" conference meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit U).

105. On August 2, 2006, the grievance was considered by the Joint Grievance Committee.

106. Grievance 06-38 is a grievance for discharge.

107. The <u>Procedural Rules of the Joint Grievance Committee</u> provide as follows:

"Order of Presentation"

"At sessions of the Joint Grievance Committee, except discharge cases, the grieving party shall present its case first, and the responding party second. In discharge cases, the employer shall go first."

<u>Procedural Rules of the Joint Grievance Committee</u>, item 4 Hearing Protocol. A copy of the Procedural Rules is attached hereto and incorporated herein as Exhibit E.

108. In the case of Grievance #06-38 the Union presented its case first at the direction of Mr. Cisco.

109. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D on Page 128 at lines 22-24.

110. The Committee determined that Merryman Excavation, Inc. shall pay $660.62 to John Rabine and $241.91 to the Midwest Operating Engineers Fund. See <u>Transcript of Joint Grievance Committee</u> which is attached hereto and incorporated herein as Exhibit D on page 132 at lines 1-6.

35

111. The Committee's exercise of jurisdiction is beyond the power of the Joint Grievance Committee because:

A.  There was no Step One conference.

B.  The grievance was untimely with regard to the presentation of a written grievance within seven days from the alleged Step One date.

C.  The Grievance was untimely with regard to submission to MARBA for Step Three from the Step Two date.

D.  There was no actual meaningful attempt to resolve the grievance.

E.  There was a disproportionate number of union members at the Joint Grievance Committee.

F.  Over the Plaintiff's Objection, there was an insufficient number of voting members present at the Joint Grievance Committee, without agreement of Merryman Excavation, Inc.  See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on Page 35 at lines 8-14.

G.  The Joint Grievance Committee did not follow its own procedural rules.

H.  The award directing payment to the Local 150 Assistance Fund is contrary to the plain meaning of the language of the agreement. Wherein it reads:

> "Neither the Joint Grievance Committee nor an arbitra-
> tor shall have any authority to add to, detract from, or in
> any way alter the provisions of this Agreement or make
> a new Agreement."

Mid-America Regional Bargaining Association Heavy and Highway and Underground Agreement, dated June 1, 2001, Article I, Section 11, page 9.  A copy of which is attached hereto and incorporated herein as Exhibit P.

112. On September 11, 2006, the Local 150 by its agent Steven Cisco dispatched a letters to the plaintiff, Merryman Excavation, Inc. threatening enforcement of the Joint Grievance Committee decision as to Grievance #06-38.

113. That if the Local 150, carries through on its threats to enforce the judgment of the Joint Grievance Committee as to Grievance #06-38, the plaintiff will suffer irreparable harm.

Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable Court grant the following relief:

A) Declare that the Awards granted by the Joint Grievance Committee with regard to Grievance # 06-38 in the amounts of $660.62 payable to John Rabine and $241.91payable to the Midwest Operating Engineers Fund to be Null and Void.

B) For such further and other relief as this court deems just and equitable.

### Count VIII Greivance #06-40, An Action seeking Declaratory Relief

114. Restate and re-allege paragraphs 1-22 and 46 - 50 and incorporate said paragraphs as if fully set out in this Count VIII.

### FACTS UNIQUE TO THIS COUNT VIII

115. The Local 150 had no "Step One" conference with Merryman Excavation, Inc., as it relates to Grievance # 06-40.

116. On or about May 30, 2006, the Local 150 sent a letter, not to Attorney Hanlon, but to Patrick Merryman, advising Merryman Excavation Inc. that the Local 150 was proceeding to a STEP TWO conference, on or about June 15, 2006, without copy to Robert Hanlon. But see paragraph 10, where Attorney Hanlon requested the Local 150 place its comments in writing and that Robert Hanlon was the sole authorized person by Merryman Excavation, Inc. to deal with all grievance related matters.

117. On June 15, 2006 a meeting was held at the offices of the Local 150 which was not attended by any Merryman Excavation, Inc. Employee.

118. On July 20, 2006, some 35 days after the alleged "Step Two" conference meeting, Carol Lord, the Committee Secretary of MARBA sent a notice to the Plaintiff, Merryman Excavation Inc. indicating that a STEP THREE conference before the Joint Grievance Committee would be held on August 2, 2006. (Copy of said notice attached hereto and incorporated herein as Exhibit V).

119. On August 2, 2006, the grievance was considered by the Joint Grievance Committee.

120. Grievance 06-40 is a grievance for the discharge of Ray Herron.

121. The Procedural Rules of the Joint Grievance Committee provide as follows:

"Order of Presentation"

"At sessions of the Joint Grievance Committee, except discharge cases, the grieving party shall present its case first, and the responding party second. In discharge cases, the employer shall go first."

Procedural Rules of the Joint Grievance Committee, item 4 Hearing Protocol. A copy of the Procedural Rules is attached hereto and incorporated herein as Exhibit E.

122. In the case of Grievance #06-40 the Union presented its case first.

123. On August 2, 2006, the Plaintiff, Merryman Excavation, by its business representative and attorney, Robert Hanlon, objected to the jurisdiction of the Joint Grievance Committee. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on Page 128 at lines 22-24.

124. The Committee determined that Merryman Excavation, Inc. shall pay $660.62 to John Rabine and $241.91 to the Midwest Operating Engineers Fund. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on page 132 at lines 1-6.

125. The Committee's exercise of jurisdiction is beyond the power of the Joint Grievance Committee because:

A. There was no Step One conference.

B. The grievance was untimely with regard to the presentation of a written grievance within seven days from the alleged Step One date.

C. The Grievance was untimely with regard to submission to MARBA for Step Three from the Step Two date.

D. There was no actual meaningful attempt to resolve the grievance.

E. There was a disproportionate number of union members at the Joint Grievance Committee.

F. Over the Plaintiff's Objection, there was an insufficient number of voting members present at the Joint Grievance Committee, without agreement of Merryman Excavation, Inc. See Transcript of Joint Grievance Committee which is attached hereto and incorporated herein as Exhibit D on Page 35 at lines 8-14.

G. The Joint Grievance Committee did not follow its own procedural rules.

H. The award directing payment to the Local 150 Assistance Fund is contrary to the plain meaning of the language of the agreement. Wherein it reads:

"

Mid-America Regional Bargaining Association Heavy and Highway and Underground Agreement, dated June 1, 2001, Article I, Section 11, page 9. A copy of which is attached hereto and incorporated herein as Exhibit P.

126. The Local 150 dispatched a letters to the plaintiff, Merryman Excavation, Inc. seeking arbitration of the grievance #06-40.

127. That if is forced to arbitrate as to Grievance #06-40, the plaintiff will suffer irreparable harm.

Wherefore, the Plaintiff, Merryman Excavation, Inc., prays that this honorable Court grant the following relief:

A) Declare that the Joint Grievance Committee lacked any power to hear Grievance # 06-40

B) Issue a temporary restraining order restraining the Local 150 from entering any arbirtration of Grievance #06-40.

C) For such further and other relief as this court deems just and equitable.

Respectfully submitted,

By Merryman Excavation, Inc.
By its President, Patrick Merryman

STATE OF ILLINOIS       )
                        )SS
COUNTY OF MCHENRY       )

After being first duly sworn, Patrick Merryman, President of Merryman Excavation, Inc., deposes on oath, states that he is authorized to sign this petition and that he signed and delivered the foregoing instrument as his free and voluntary act and the free and voluntary act of Merryman Excavation, Inc. for the purposes set forth therein.

MERRYMAN EXCAVATION, INC.

By_____
By Patrick Merryman
Its: President

Subscribed and Sworn to before me this
_____ day of _____ 2006

_____
Notary Public

OFFICIAL SEAL
MARY J TORTORICH
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/26/09

STATE OF ILLINOIS     )
                         )SS
COUNTY OF MCHENRY  )

     I, ROBERT T. HANLON, one of the plaintiff's attorneys have read the attached and to the best of my knowledge and information, believe it is well grounded in fact and is warranted by existing law.

ROBERT T. HANLON

Of Counsel to
MADSEN, SUGDEN & GOTTEMOLLER
Attorneys for Plaintiff
One North Virginia Street
Crystal Lake, IL 60014
(815)459-5152

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MERRYMAN EXCAVATION, INC.      )
                                     )
                    Plaintiff     )
                                     )
             Vs.               )     No.
                                     )
INTERNATIONAL UNION OF OPERATING  )
ENGINEERS, LOCAL UNION 150,      )
AFL-CIO, et al.                      )
                    Defendants   )

### List of Exhibits Attached to Complaint

| | |
|---|---|
| Exhibit A: | Memorandum of Agreement dated April 1, 2000 |
| Exhibit B: | Letter from Robert Hanlon to Charles August dated March 6, 2006 |
| Exhibit C: | Pages 40 and 41 of Master Agreement |
| Exhibit D: | Transcript of Joint Grievance Committee dated August 2, 2006 |
| Exhibit E: | Procedural Rules |
| Exhibit F: | Pages 42 and 43 of Master Agreement |
| Exhibit G: | Grievance Letter dated April 21, 2006 re: 06-080 |
| Exhibit H: | Grievance Letter dated April 21, 2006 re: 06-081 |
| Exhibit I: | Grievance Letter dated April 24, 2006 re 06-082 |
| Exhibit J: | Grievance Letter dated May 17, 2006 re: 06-102 |
| Exhibit K: | Grievance Letter dated May 17, 2006 from Steven Cisco to Patrick Merryman |
| Exhibit L: | Grievance Letter dated May 17, 2006 re 06-106 |
| Exhibit M: | Grievance Letter dated May 30, 2006 re John Rabine |
| Exhibit N: | Grievance Letter dated May 30, 2006 re 06-119 |
| Exhibit O: | Letter dated July 20, 2006 re 06-30 |
| Exhibit P: | Pages 8 and 9 of Master Agreement |
| Exhibit Q: | Letter dated July 20, 2006 re 06-31 |
| Exhibit R: | Letter dated July 20, 2006 re 06-32 |
| Exhibit S: | Letter dated July 20, 2006 re 06-33 |
| Exhibit T: | Letter dated July 20, 2006 re 06-34 |
| Exhibit U: | Letter dated July 20, 2006 re 06-35 |
| Exhibit V: | Letter dated July 20, 2006 re 06-38 |
| Exhibit W: | Letter dated July 20, 2006 re 06-40 |

# EXHIBIT A

## Exhibit A

### MEMORANDUM OF AGREEMENT

OFFICE  815-337-1700
FAX  815-337-1766

THIS AGREEMENT made and entered into by and between   MERRYMAN EXCAVATING

   P.O. BOX 905, WOODSTOCK, IL. 60098      , its successors and assigns, hereinafter referred to as the "EMPLOYER", First Party, and LOCAL 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, hereinafter referred to as the "UNION", Second Party.

THIS AGREEMENT is made in consideration of the instant promises of the First and Second Parties and the parties do hereby agree as follows:

1. The EMPLOYER recognizes the UNION as the sole and exclusive bargaining representative for and on behalf of the employees of the EMPLOYER within the territorial and occupational jurisdiction of the UNION. Prior to recognition, the EMPLOYER was presented and reviewed valid written evidence of the UNION's exclusive designation as bargaining representative by the majority of appropriate bargaining unit employees of EMPLOYER.

2. The Parties agree that the EMPLOYER is part of a single bargaining unit made up of all employers party to the Master Agreement adopted herein.

3. The Parties do hereby adopt the Master Agreement dated   JUNE 1, 1995

entered into by and between the UNION and the  MID AMERICA REGIONAL BARGAINING ASSOCIATION

(ILLINOIS HEAVY & HIGHWAY & UNDERGROUND)      and the parties do hereby mutually agree to be bound by the terms and conditions of that Master Agreement and the Agreement and Declaration of Trust of the Midwest Operating Engineers Pension Plan, Midwest Operating Engineers Welfare Plan, Local 150 I.U.O.E. Vacation Savings Plan and the Local 150 Apprenticeship Fund, and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein. The Employer acknowledges that he has received a copy of the aforesaid Master Agreement, that he has reviewed same and that he is aware of the obligations arising thereunder.

4. This Agreement and the adoption of the Master Agreement and the Agreements and Declarations of

Trust referred to in paragraph 3 above, shall be effective as of   APRIL 1, 2000

    , and remain in effect to and including the expiration date of the Master Agreement adopted herein. This Agreement shall continue in effect from year to year thereafter and specifically adopt

any Master Agreement entered into between the Union and   MID AMERICA REGIONAL BARGAINING

ASSOCIATION (ILLINOIS HEAVY & HIGHWAY & UNDERGROUND)     subsequent to the expiration date of the Master Agreement herein adopted unless notice of termination or amendment is given in the manner provided herein.

5. Either Party desiring to amend or terminate this Memorandum of Agreement must notify the other in writing at least three (3) calendar months prior to the expiration of the Master Agreement adopted herein.

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Agreement the

  1st   day of  APRIL    XX 2000

MERRYMAN EXCAVATING
    Employer

By _____

  PAT MERRYMAN

  PRESIDENT
    Title

LOCAL 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO

By _____

  WILLIAM E. DUGAN

  STEVEN H. CISCO

  PHYLLIS MARTIN

    Below this line for office use only

Form 150

REPRESENTATIVE'S COPY

| NO: Fringe Benefits - Unincorporated Owner/Operator |
| YES: Fringe Benefits - Bargaining Unit Employees |
| YES: Fringe Benefits - Employees Qualified Under 188 Hour Contribution Clause |

# EXHIBIT B

**Exhibit B**



*Law Offices of*
**ROBERT T. HANLON & ASSOCIATES, P.C.**
121 S. Wilke Rd., Suite 209
Arlington Heights, IL 60005

847-577-1434
Fax 847-577-1461

Robert Thomas Hanlon

March 6, 2006

Mr. Charles A. August
Business Agent, Local 150, International
Union of Operating Engineers
28872 Rt. 120
Lakemore, Illinois 60050

Via Certified Mail #7004 2510 0001 9777 8820

Re: Delivery of Checks to Merryman Excavation, Inc. and Point of Contact.

Dear Mr. August,

Please be advised that I represent Merryman Excavation, Inc. as it relates to the matters discussed herein.

On the Morning of February 17, 2006, in your capacity as a Local 150, International Union of Operating Engineers (hereinafter the "Local 150") representative, you delivered two checks to Merryman Excavation, Inc. One of those checks was drawn on the account of Christopher P. Hughes and made payable to "Merryman Excavation" for $297.44. The second check presented by you is check #22608, dated 2-06-06, drawn upon the account of Merryman Excavation, Inc. and made payable to Chris Hughes in the amount of $297.45, which had not been cashed by Mr. Hughes. (See Exhibit A)

It was reported to me, that you indicated that the check drawn on Mr. Hughes account was a reimbursement check for overpayment of wages; and that the check from Merryman Excavation, Inc., referenced above, had been issued in error. Merryman Excavation, Inc. is reviewing its systems to avoid a similar situation in the future.

However, these checks did not accompany any writing from either the Local 150 or from Mr. Hughes. While we may be in agreement that the payment to Mr. Hughes was, in fact, an overpayment, we wish to confirm the Local 150 will agree to reimburse Merryman Excavation Inc. for any franchise fee/journeyman administration fee that may have been delivered to the Local 150 in connection with these payments as well as any benefits paid on Mr. Hughes behalf.

# EXHIBIT C

## Exhibit C

The Employer will obtain all employees used in the performance of such work through the Referral Offices of the Local Union in accordance with the non discriminatory provisions governing the operation of the Local Union's Referral Offices set out in the current effective Addendum No. 1 to this Agreement as if set forth in full herein. Furthermore, subsequent to referral and hire the Employer shall make and maintain all work assignments of preferred employees in full compliance with the provisions of said Addendum No. 1. Employer maintains the right to assignment of preferred employees to other assignments.

### ARTICLE XIII
### SECTION 1 - GRIEVANCES AND ARBITRATION

For the purpose of this Agreement, the term "grievance" is any claim or dispute involving an interpretation or application of the Agreement by an employee, or an Employer, or the Union, or the Association that one of the other of the aforesaid persons or organization is violating or has violated this Agreement.

**STEP 1.** A grievance shall first be taken up between the Union's Business Representative assigned to the job and a designated representative of the Employer. The Union must file the grievance within forty-five (45) days of the date of occurrence giving rise to the grievance or when the affected employee knew or reasonably should have known of the existence of the grievance. Grievances not filed within the forty-five (45) day period are deemed waived and are not subject to being processed through this procedure.

The above forty-five (45) day limit may be waived for violations of Article III Section 1 - Work Day, Work Week, Eight Hour Guarantee, Show Up Pay, Call Off and Prep Time, also, Article III Sections 2 and 3. The liability shall be for three (3) years of the violation, verified by audit.

40

Audit fees shall be paid for by the Company, along with a 10% penalty payable to the Union.

**STEP 2.** In the event the grievance cannot be resolved within seven (7) working days of the STEP ONE conference, it shall be reduced to writing and referred for conference and resolution by designated officials of the Union and the Contractor at a pre-grievance hearing to be held at the office of Local 150, 6200 Joliet Road, Countryside, Illinois, unless another location is mutually agreed to.

**STEP 3.** In the event the grievance cannot be resolved by STEP TWO, the written grievance shall be submitted within fifteen (15) days to the Joint Grievance Committee created in this Article.

The Union and Association have together created a Joint Grievance Committee to resolve grievances arising under this Agreement. This Committee shall consist of an equal number of members representing Employers and the Union. The Union or Association may appoint alternate members.

The Joint Grievance Committee shall have the power to resolve all grievances before it and shall have the right to examine all records of the Employers and employees as is reasonably necessary to resolve the grievance.

Where the Joint Grievance Committee, by majority vote, resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this Agreement.

If the Joint Grievance Committee is unable to resolve a grievance by majority vote, the grievance may be submitted within thirty (30) days to a neutral arbitrator. If the Union and the Association or the Employer, as the case may be, cannot agree on an arbitrator, then an arbitrator shall be selected in accordance with the rules and proce-

41

# EXHIBIT D

**<u>Exhibit D  Transcript of Joint Grievance Committee</u>**

<pre>
 1              JOINT GRIEVANCE COMMITTEE

 2   INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150

 3                        AND

 4      MID-AMERICA REGIONAL BARGAINING ASSOCIATION

 5

 6              WEDNESDAY, AUGUST 2, 2006

 7                 MORNING SESSION

 8

 9   FOR MARBA:        John Vignocchi, Joe Benson,
                       Tim Scully.
10

11

12   FOR THE UNION:    Steve Cisco, Melinda Hensel,
                       Chuck August, Tim Gorman,
13                     Mike Kresge, Rick Dunlap.

14                          .

15                 COMMITTEE SECRETARY

16                     Carol Lord

17

18

19   ALSO PRESENT:     MERRYMAN EXCAVATION, INC.
                       Mr. Robert Hanlon
20

21                     Mr. John Rabine, Local 150

22                     Mr. Ray Herron, Local 150

23

24                  *     *     *
</pre>

1

# I N D E X

2                                                              PAGES

3   WEDNESDAY, AUGUST 2, 2006
         Morning Session                                     1-132
4        Afternoon Session                                  133-171

5

6   GRIEVANCE NUMBER                                         PAGES

7        06-30                                                9-26

8        06-31                                               26-35

9        06-32                                               36-42

10       06-33                                               42-50

11       06-34                                               50-66

12       06-35                                               67-88

13       06-36                                               88-96

14       06-37                                               97-99

15       06-38                                              99-132

16       06-40                                             135-170

17

18

19                      E X H I B I T S

20  EXHIBIT                                                  PAGE

21       A                                                    15

22

23

24

```
 1              (Prior proceedings were had and not

 2               reported.)

 3         MR. CISCO:  All his correspondence --

 4         MR. BENSON:  Well, we can move you out of

 5    the room till they're done talking.  We can do that

 6    too.

 7         MR. CISCO:  All this correspondence from

 8    him, from counsel --

 9         MS. HENSEL:  He's on the record.  Did you

10    want to continue?

11         MR. CISCO:  I said off the record.

12         MR. KRESGE:  We object to being recorded

13    too, don't we?

14         MR. CISCO:  I said off the record.  All the

15    correspondence --

16         THE COURT REPORTER:  Are we off the record

17    or on?

18         MR. HANLON:  They've got off.

19              (Discussion off the record.)

20         MR. HANLON:  We have a court reporter that's

21    present here today.  Could you just simply identify

22    yourself by name so that the court reporter can take

23    down your name for the record.

24         MR. CISCO:  Excuse me.  Excuse me, please.
```

1    At this moment, she is the chairman of this grievance

2    board.  She will handle our board our way, not your

3    way.  So, please, would you mind?

4            Carol, please take over.

5            MS. LORD:  We do self-introductions of all

6    the Committee members at the end.

7            This is a Joint Grievance Committee composed

8    of an equal number of Union and management

9    representatives that will hear and decide the dispute

10   before them.  Each party will have an opportunity to

11   present all the testimony and evidence before them.

12   Each party will also have a chance to refute the

13   evidence the other party presents.  We do ask that

14   all the parties direct their comments to the

15   Committee and not across the table to each other.

16   After the Committee has heard all the evidence and

17   testimony, we'll ask the interested parties to leave

18   the room, and the Committee will go into executive

19   session.  We'll do self-introductions first, and then

20   I'll read the case into the record.

21           I'm Carol Lord from MARBA.  I serve as

22   secretary to the Committee.

23           MR. VIGNOCCHI:  I'm John Vignocchi,

24   co-chairman, MARBA.

1          MR. BENSON:  Joseph Benson, co-chairman,

2     MARBA.

3          MR. SCULLY:  Tim Scully, MARBA.

4          MR. HANLON:  Rob Hanlon, Merryman

5     Excavation.

6          MR. KRESGE:  Mike Kresge, Local 150.

7          MR. GORMAN:  Tim Gorman, Local 150.

8          MR. AUGUST:  Chuck August, Local 150.

9          MS. HENSEL:  Melinda Hensel, Local 150.

10          MR. CISCO:  Before I introduce myself, Bob,

11     are you an employee of Merryman Excavating or are you

12     outside counsel for Merryman Excavating?  Repeat your

13     title fully.  In what capacity are you appearing?

14          MR. HANLON:  I said I'm the designated

15     business representative for Merryman Excavation.

16          MR. CISCO:  That does not answer my

17     question.  Are you an employee of Merryman

18     Excavating?

19          MR. HANLON:  Yes, I believe I'm an employee

20     of Merryman Excavation today.

21          MR. CISCO:  You are on Merryman Excavating's

22     payroll?

23          MR. HANLON:  Yes.

24          MR. CISCO:  And have been?

1          MR. HANLON:  Yes, it's my understanding.

2          MR. CISCO:  Okay.  Steve Cisco.

3          MR. DUNLAP:  Rick Dunlap with the Operating

4     Engineers --

5          MR. CISCO:  Wait.  I'm not done.  I'm not

6     done, Rick.

7          How long have you been on the payroll, Bob?

8          MR. HANLON:  Do you ask these questions of

9     all the people who come before this Committee?

10         MR. CISCO:  Yes, I do, sometimes I do, and

11    I'm entitled to.

12         MR. HANLON:  I've been receiving checks from

13    Merryman Excavation since I want to say December of

14    last year.

15         MR. CISCO:  As an employee or outside

16    counsel?

17         MR. HANLON:  Both.

18         MR. CISCO:  You have been an employee of

19    Merryman Excavating for how long?

20         MR. HANLON:  I don't know the exact start

21    date.

22         MR. CISCO:  Approximately?

23         MR. HANLON:  A couple weeks.

24         MR. CISCO:  Steve Cisco,

1  recording-corresponding secretary, Local 150,

2  chairman of the labor.

3        MR. DUNLAP:  Rick Dunlap, business agent,

4  Local 150.

5        MR. RABINE:  John Rabine, operating

6  engineer, 150.

7        MR. HERRON:  Ray Herron, operating engineer,

8  150.

9        MR. HANLON:  Can I ask who the members of

10  the Committee are that will be voting on this matter

11  for the Union?

12        MR. CISCO:  Each case will be different.

13  It'll be three from each.

14        MR. HANLON:  Can you tell me who those three

15  are going to be?

16        MR. CISCO:  It'll be in the record.  It'll

17  be all in the record who voted.

18        MR. HANLON:  Well, I just wish to raise an

19  objection to Mr. August voting.  As you may be aware,

20  there's a pending --

21        MR. CISCO:  Anybody who brings a case in

22  front of you, you will eventually be excused from

23  this room; and anybody that testified against

24  Merryman or for Merryman, we will go in executive

1    session, and they all will leave the room.

2          MR. HANLON:  Well, that's not really

3    answering my question.  I've raised an objection due

4    to bias because of pending litigation.

5          MR. CISCO:  You know what, these are our

6    rules.  Raise your objections later.  These are our

7    rules.  Live with our rules.

8          MR. HANLON:  Okay.  I thought it was

9    Ms. Lord who runs this Committee, you told that to me

10   earlier, and I'm addressing the Committee.

11         MR. CISCO:  We will have three people from

12   labor vote and three from management.

13         MR. VIGNOCCHI:  That's exactly right, three

14   from management, three from labor.

15         MR. HANLON:  Sure.  I just want to make it

16   clear for the record that we object that Mr. August

17   be one of those voting members due to the prospect

18   for bias due to pending litigation.

19         MR. CISCO:  We hear your objections.

20   They're noted.  Let's move on.

21         MR. VIGNOCCHI:  And you do know that

22   Mr. August, if he wrote up any of these grievances,

23   will not be voting on his own grievance.  You

24   understand that?

1          MS. LORD:   Interested parties are excused

2    from the room.

3          MR. HANLON:   I understand that.

4          MS. LORD:   Ready to hear the first

5    grievance?

6          MR. CISCO:   What's the first grievance?

7          MS. LORD:   The first grievance is 06-31.

8    It's a letter dated April 21, 2006 to Merryman

9    Excavation.

10          MR. HANLON:   Can I ask something?   On the

11    agenda it says 06-30, and you said 31.   Are we

12    skipping No. 30?

13          MS. LORD:   I'm sorry.   You are correct.

14                      *    *    *

15    GRIEVANCE NO. 06-30 IS AS FOLLOWS:

16          MS. LORD:   The first grievance is 06-30.

17    It's a letter dated April 21, 2006 to Merryman

18    Excavation regarding violations of the MARBA Heavy

19    and Highway and Underground Agreement:   Article I,

20    Section 1, Bargaining Unit; Article I, Section 6, No

21    Discrimination; Article I, Section 11, Assignment of

22    Work; Article XII, Hiring.

23          (Reading) Dear Mr. Merryman:   We are advised

24    that your Company is in violation of various articles

1  and sections, including but not limited to those

2  captioned above, of the MARBA Heavy and Highway and

3  Underground Agreement, to which your Company and this

4  Union are parties by virtue of a Memorandum of

5  Agreement signed April 1, 2000.

6        (Reading) We are further advised that the

7  above-stated violations occurred on or about April 10

8  and April 11, 2006, and are ongoing on your

9  construction site located in Wonder Lake, Illinois,

10 within Local 150's jurisdictional territory.  The

11 amount sought is $822.88, with a note that it's

12 ongoing.

13       (Reading) The pre-grievance meeting was

14 scheduled for May 17, 2006.  It is in the best

15 interest of your Company to negotiate a settlement at

16 the pre-grievance hearing.  Many grievances are

17 resolved at this meeting.  If you do not attend the

18 pre-grievance hearing and this matter remains

19 unresolved, it will be automatically scheduled for

20 the next meeting of the Joint Grievance Committee.

21       (Reading) This Union shall continue to hold

22 your Company liable for all appropriate remedies,

23 including but not limited to any back wages and

24 fringe benefits lost by all affected members of the

1    bargaining unit who would be working had you honored

2    our Agreement.  Signed by Steven Cisco.

3         MR. CISCO:  There was a pre-grievance held

4    on this.  There was no resolution at the

5    pre-grievance.  For the record, Robert Hanlon here

6    represented Merryman as legal counsel.  For the

7    record, he submitted his business card at 121 South

8    Wilke, Suite 209, Arlington Heights, Illinois, and he

9    was an attorney at law.  He was not an employee of

10   Merryman at the time.

11        Whose grievance is this?

12        MR. AUGUST:  Mine, Steve.

13        MR. CISCO:  Chuck?

14        MR. AUGUST:  At the pre-grievance,

15   Mr. Hanlon also brought a gentleman by the name of

16   Keith, who he would not give us his last name, and we

17   spent 20 minutes talking about whether I had phone

18   conversations, one or two, with him.  After that

19   portion of it, I would like to read what I have here.

20        (Reading) On April 10th, I was up on the

21   Wonder Lake project.  I was carding the people out

22   there.  I ran into Ryan Wilson, a 139 apprentice, who

23   was running a 953C Cat loader for Merryman

24   Excavating.  He stated he was related to the

1   Merrymans and stated Bob Darling was transferring him

2   into Local 150 in July.  I explained the transfer

3   process to him and that there were too many qualified

4   150 operators on the out-of-work list at this time.

5   He needed to go back up to Wisconsin.  I called

6   Mr. Hanlon, spoke to him, and made him aware of the

7   situation.

8           (Reading) On Tuesday, the 11th, I was back

9   out on the Wonder Lake project.  I came across

10  Mr. Wilson again.  He was running the 953C loader.  I

11  spoke to Mr. Wilson.  He pulled out Mr. Hanlon's

12  card, which was an attorney, and said, "Call him."  I

13  informed Mr. Wilson that I had spoke to Mr. Hanlon

14  yesterday and that I would be filing a grievance.

15  Ryan Wilson stated he never complained about the 150

16  operators working in Wisconsin.  I said, "How could

17  you, you just got into 139 in November."

18          (Reading) On April 11th, that afternoon

19  Mr. Hanlon called and stated Merryman Excavating was

20  transferring shares of stock to Ryan Wilson to make

21  him an owner in Merryman Excavating, and Local 150

22  had better not refuse induction as an owner-operator.

23  I asked how Local 150 would have knowledge of this,

24  possibly by osmosis, because I spoke with him

1    yesterday and he did not say anything about

2    ownership, just inquired about the transfer.

3    Mr. Hanlon said he was busy with a jury trial, but

4    paperwork would be forthcoming.

5         To this date, I don't have any other

6    paperwork from Mr. Hanlon in regards to that.

7         MR. CISCO:  Chuck, are you done?  Anything

8    else to this before we ask you some questions?

9         MR. AUGUST:  No, I'm done at this time,

10   Steve.

11        MR. CISCO:  So the bottom line here is that

12   somebody sends you a job, it's not dispatched out out

13   of a 150 hiring hall, is that correct?

14        MR. AUGUST:  ·Oorrect.

15        MR. CISCO:  And you are seeking --

16        MR. AUGUST:  The two days.

17        MR. CISCO:  -- two days' pay for this

18   violation of hiring hall, two days for operating?

19        MR. AUGUST:  Correct.

20        MR. CISCO:  That's all we've got.

21        MS. LORD:  Are there any further questions?

22        MR. BENSON:  What is the deal with 139?

23        MR. CISCO:  They've got to come -- off the

24   record.

1          The Union procedure is they have to come in

2     and apply if they were seeking work in our

3     jurisdiction.   I do not have jurisdiction --

4          MR. BENSON:  So there's not common hiring

5     halls?

6          MR. CISCO:  No, no.

7          MR. BENSON:  That's all I wanted to know.

8          MR. CISCO:  They're a different Union.

9     They're in Wisconsin.

10          MR. BENSON:  All right.

11          MR. VIGNOCCHI:  That's for all Unions, isn't

12     it?

13          MR. CISCO:  All Unions, yeah.

14          MR. VIGNOCCHI:  Everybody's got to come in,

15     clear in?

16          MR. CISCO:  Right, they've got to clear in.

17     I've only got so much property, okay?

18          MR. VIGNOCCHI:  And you don't deny work?

19          MR. CISCO:  Yes, I do.  If I've got people

20     out of work, John, and -- we allow what is a key man,

21     a top mechanic.

22          MR. VIGNOCCHI:  Or if a specialized guy

23     comes in, you allow that?

24          MR. CISCO:  Specialized, but they have to

1   come into the company --

2       MR. VIGNOCCHI:   And that guy would clear in,

3   but you wouldn't -- okay.

4       MR. CISCO:   If I've got people out of work,

5   I do not allow other people from other locals.

6       MR. AUGUST:   One other thing.   He is or was

7   an apprentice with 139, and they don't have the

8   portability as an apprentice to come over.   That's

9   federal guidelines.

10      MR. BENSON:   Well, regardless, there's no

11  common hiring hall between --

12      MR. CISCO:   That's correct, none at all.

13  Different Union, different bosses, different hiring

14  hall.

15      Back on the record.

16      MS. LORD:   If there are no further

17  questions, Mr. Hanlon?

18      MR. HANLON:   Well, I'd like to commence my

19  address by establishing a procedure on the burden

20  here.   More specifically, I understand the Joint

21  Committee is to follow the rules established and

22  shown in the current Joint Grievance Procedural Rules

23  which I'm holding in my hand right now, which I'm

24  marking as Exhibit A for the court reporter.   Am I

1    correct in that?  The court reporter can't take down

2    a nod, so can someone address that orally, please?

3         MR. VIGNOCCHI:  Yes.  I saw you mark A on

4    the procedures.

5         MR. HANLON:  Okay.  For the record, may I

6    inquire of the sitting members as to which

7    association you belong to?

8         MR. VIGNOCCHI:  Lake County Contractors.

9         MR. BENSON:  Illinois Road Builders.

10        MR. SCULLY:  Underground Contractors.

11        MR. HANLON:  Thank you.  And am I correct

12   that the party bringing the grievance has the burden

13   of establishing its case?

14        MR. VIGNOCCHI:  I don't understand the

15   question.

16        MR. HANLON:  Am I correct in understanding

17   that it's the party, i.e., here the Union has brought

18   the grievance, that it is their burden to prove its

19   case?

20        MR. VIGNOCCHI:  Yes.

21        MR. CISCO:  That's correct.

22        MR. BENSON:  Yes.

23        MR. HANLON:  Are there any specific rules of

24   evidence that apply to this proceeding that aren't

1    enumerated in that exhibit?

2        MR. CISCO:   You know, the procedures speak

3    for themselves.   I wish we would move on.

4        MR. HANLON:   I'm about to move on.   Look, I

5    gave your side an opportunity to talk.

6        MR. CISCO:   This is not a court of law.   If

7    you want to take MARBA to court to go against our

8    procedure, that's your prerogative.

9        MR. HANLON:   I'm just trying to understand,

10   make sure that I understand what that procedure is.

11       MR. CISCO:   We have stated our peace.   We

12   are --

13       MR. HANLON:   Mr. Cisco, would you please

14   allow me to speak?   I allowed you people to speak.

15   Would you please allow me to speak?

16       MR. CISCO:   This is not a court of law.   We

17   are here to hear the grievance presented in front of

18   us.

19       MR. HANLON:   I want to make sure that I

20   understand those rules.

21       MR. CISCO:   You've got a copy.

22       MR. HANLON:   At this time I'm --

23       MR. CISCO:   Have you graduated from first

24   grade?   Can you read, my friend?

1        MR. VIGNOCCHI:  Stop.

2        MR. CISCO:  All right.  All right.  I'm

3   done.

4        MR. HANLON:  I don't know, maybe that's a

5   better question to be posed to you.

6        MR. VIGNOCCHI:  Mr. Hanlon, look.  I'm the

7   chairman --

8        MR. HANLON:  Well, let me move on.

9        MR. VIGNOCCHI:  I'm the chairman here.

10        MR. HANLON:  Fine.

11        MR. VIGNOCCHI:  Typically speaking, the --

12   and this is the first time -- I've been here for

13   about 18 years doing this.  This is the first time

14   I've seen you here.

15        MR. HANLON:  Fair enough.  And that's why I

16   want to --

17        MR. VIGNOCCHI:  Typically speaking, the

18   Union presents its case, and they have done so the

19   way I've heard thousands of cases, and now it's your

20   turn to say whether Ryan Wilson was there, was not

21   there, or why this grievance should be ruled in your

22   favor.

23        MR. HANLON:  Well, here.  At this time I'm

24   asserting a challenge to the jurisdiction of the

1  Committee.  I'm doing that because the grievance was

2  not raised timely.

3          Within the body of the Agreement, the rules

4  for grievances, the Step 2 must take place -- the

5  written grievance must take place within seven

6  working days from the date of the Step 1 grievance.

7  We just heard Mr. August tell us that he had a

8  telephone conversation with me for Step 1 purposes on

9  April 10th and April 11th.  The grievance is dated

10  4-21 of '06.  That means the number of days that

11  elapsed is eight days, and therefore it has exceeded

12  the required seven days.  And that's eight business

13  days, and therefore it exceeds that time frame.

14  Accordingly, this Committee has no authority to hear

15  this grievance, and I am raising a challenge to the

16  authority of the Committee to hear this grievance.

17          Further, contained within the contract, the

18  contract reads that "Neither the Joint Grievance

19  Committee nor an arbitrator shall have any authority

20  to add to, detract from, or in any way alter the

21  provisions of this Agreement."  That appears on

22  page 42, the second full paragraph, in the booklet

23  identified as the Heavy and Highway and Underground

24  Agreement.

1        Notwithstanding that, I also sent a letter

2  to Ms. Hensel requesting that the Union grant

3  membership to the brother-in-laws, past, present, and

4  future, of the Merryman brothers --

5        MR. CISCO:  Excuse me.  This has no bearing

6  on the grievance.

7        MR. HANLON:  It does have a bearing on the

8  grievance.  I allowed you to speak, and now I'm going

9  to finish.

10       MR. CISCO:  Do you have anything in addition

11  to present?  I ain't going to sit here and listen to

12  this bullshit.  This case was heard.  If he's got

13  objections to this, he can bring them to court.

14       For one, I want to dispute what he said.  It

15  does not say it will be -- let me read it because I

16  can read.  "In the event the grievance cannot be

17  resolved within seven working days of the Step 1

18  conference, it shall be reduced to writing and

19  referred for conference," which Chuck did.

20       MR. HANLON:  I disagree.

21       MR. CISCO:  Okay.  That's fine.  That's your

22  prerogative.

23       MR. HANLON:  He did not.

24       MR. CISCO:  We'll argue that point later.

1          MR. BENSON:  Do you have anything else,

2  Mr. Hanlon?

3          MR. HANLON:  Yes, I do.

4          MR. BENSON:  Go ahead.

5          MR. HANLON:  I sent a letter to Attorney

6  Hensel, who is seated here, wherein I requested that

7  she consider a method to resolve this matter by

8  granting membership to Ryan Wilson, a brother-in-law

9  of -- actually, at the time he wasn't a

10  brother-in-law, but I incorporated him via future

11  brother-in-laws.  He's a brother-in-law of Thomas

12  Merryman, one of the owners of the company, and

13  Patrick Merryman, the owner of the company.

14          MR. AUGUST:  Do you have a copy of the

15  letter?

16          MR. HANLON:  Yes, I do.

17          MR. CISCO:  You had said you were going to

18  submit us the letter.  Would you submit it, please?

19  He said he was going to submit this to the board.

20          MR. HANLON:  You'll have to bear with me.

21          MR. AUGUST:  That's all right.  Take your

22  time.

23          MR. HANLON:  If you want the letter, you're

24  just going to have to bear with me.

1         MR. AUGUST:  Take your time.

2         MR. HANLON:  Thank you.

3         MR. BENSON:  So this was during the

4  settlement, is that what you're saying?

5         MR. AUGUST:  No, no, no.  Just let him get

6  the letter.

7         MR. CISCO:  Okay.  That's what he said he

8  was going to do.  Chuck, we got it.  He said he's

9  going to submit it, so let's get it submitted.

10        MR. HANLON:  This is a letter dated May 17th

11  signed by Attorney Hensel directed to me wherein --

12        MR. CISCO:  You don't have to read it.

13        MR. HANLON:  What's that?

14        MR. AUGUST:  No, your letter, your letter

15  first.

16        MR. HANLON:  This is your letter.

17        MR. AUGUST:  No, your letter.  You need to

18  present that, Mr. Hanlon.

19        MR. HANLON:  You know what, Mr. August, I

20  allowed you to speak, okay?  I didn't interrupt you,

21  okay?  I'm referring to a letter that Ms. Hensel sent

22  me which acknowledges my request.  And in pertinent

23  part, I'm not going to read the whole letter --

24        MR. CISCO:  No.  Wait, wait, wait.  No.  We

1    don't want her letter.  I've got that.  You made a

2    statement you were going to give us a copy of the

3    letter --

4         MR. HANLON:  You know what, guys, we're

5    going to be here --

6         MR. CISCO:  Wait, wait.  We don't need this.

7    Let's go on with the grievance.

8         MR. BENSON:  All right.  Hang on.  Do you

9    have anything else pertinent to this grievance for us

10   to hear?

11        MR. HANLON:  Yes.  Mr. Wilson --

12        MR. BENSON:  I don't want to hear about what

13   you're going to do in the future, what deals you want

14   to make.

15        MR. HANLON:  I'm not talking about --

16        MR. BENSON:  Do you have anything else for

17   this grievance?

18        MR. HANLON:  Yes.

19        MR. BENSON:  Okay.  Then proceed.

20        MR. HANLON:  Mr. Wilson wishes to become a

21   member of the Local 150.

22        MR. BENSON:  Okay.

23        MR. HANLON:  And because he desired and

24   requested to become a member of the 150 via my letter

1 and via the response that the 150 gave, which says

2 that they, you know, had no -- well, what exactly

3 does it say? It says, "Local 150 is under no

4 obligation to accept all wives and brother-in-laws

5 deemed worthy by a contractor to membership in the

6 Union." And that's prima facie evidence that the

7 request was made. This is on the letterhead of the

8 legal department of the International Union of

9 Operating Engineers, Local 150.

10     My point here is that the reason that we're

11 here today is because they have arbitrarily denied

12 membership to Mr. Wilson.

13     MR. CISCO: Okay. Thank you. We hear your

14 statement. Now, the question I've got for you, did

15 Mr. Wilson run equipment Monday, April 10th and

16 Tuesday, April 11th on the Wonder Lake project in

17 Wonder Lake?

18     MR. HANLON: I can't answer that question.

19 It's beyond my personal knowledge.

20     MR. BENSON: Do you have any evidence that

21 he didn't?

22     MR. HANLON: No.

23     MR. BENSON: Okay. Was he a member of

24 Local 150 at the time?

1      MR. HANLON:  No.

2      MR. CISCO:  Okay.  Any other questions from

3   the Committee?

4      MR. SCULLY:  No.

5      MR. CISCO:  I'd ask that all interested

6   parties step out, and we'll go into executive

7   session.

8      You're off the record.

9         (The parties left the room, whereupon

10         the Committee went into executive

11         session, after which the parties

12         re-entered the room and the following

13         proceedings were had:)

14      MR. HANLON:  Back on the record.  Could you

15   make note that Attorney Hensel was in advising the

16   Union during the executive session.

17      MS. LORD:  This is the decision in

18   Grievance 06-30.  Based on the testimony heard, the

19   Committee by majority decision determined as follows:

20   One, the Employer shall pay the Local 150 Assistance

21   Fund the sum of $822.88.  Two, the check should be

22   sent to Steven Cisco, Local 150, for distribution.

23   And I'll confirm this in writing.

24      MR. HANLON:  I just wish to raise an

1    objection as to paying to the Assistance Fund.  The

2    contract doesn't call for that.  And, again, the

3    Committee is without the power to change the terms of

4    the contract.

5          MR. CISCO:  So noted.

6          MR. HANLON:  And that dollar amount was?

7          MS. LORD:  $822.88.

8                    *    *    *

9          MR. CISCO:  Bob, is there any objection if

10   she doesn't go through all the reading and just reads

11   the charges on every one or do you want Carol to read

12   everything again?

13         MR. HANLON:  Everything.  I'm not going to

14   waive any right.        . ۰

15                   *    *    *

16   GRIEVANCE NO. 06-31 IS AS FOLLOWS:

17         MS. LORD:  This is Grievance 06-31.  It's a

18   letter dated April 21, 2006 to Merryman Excavation,

19   Incorporated regarding violations of the MARBA Heavy

20   and Highway and Underground Agreement:  Article I,

21   Section 1, Bargaining Unit; Article I, Section 6, No

22   Discrimination; Article I, Section 11, Assignment of

23   Work; Article XII, Hiring.

24         (Reading) Dear Mr. Merryman:  We are advised

1   that your Company is in violation of various articles

2   and sections, including but not limited to those

3   captioned above, of the MARBA Heavy and Highway and

4   Underground Agreement, to which your Company and this

5   Union are parties by virtue of a Memorandum of

6   Agreement signed April 1, 2000.

7   (Reading) We are further advised that the

8   above-stated violations occurred on or about

9   April 11, 2006, on your construction site located in

10  Wonder Lake, Illinois, within Local 150's

11  jurisdictional territory, where your Company was

12  performing work with a nonbargaining unit employee.

13  (Reading) The pre-grievance meeting was

14  scheduled for May 17, 2006.  It is in the best

15  interest of your Company to negotiate a settlement at

16  the pre-grievance hearing.  Many grievances are

17  resolved at this meeting.  If you do not attend the

18  pre-grievance hearing or mail us your settlement

19  check prior to that date and this matter remains

20  unresolved, it will be automatically scheduled for

21  the next meeting of the Joint Grievance Committee.

22  (Reading) This Union shall continue to hold

23  your Company liable for all appropriate remedies,

24  including but not limited to any back wages and

1  fringe benefits lost by all affected members of the

2  bargaining unit who would be working had you honored

3  our Agreement.  Signed by Steven Cisco.

4  MR. CISCO:  Again, there was a

5  pre-grievance.  Mr. Hanlon represented himself as

6  outside counsel for Merryman Excavating, and it was

7  not resolved at the pre-grievance.

8  Chuck, why don't you tell us what happened

9  on this one.

10  MR. AUGUST:  Steve, if I could just go back

11  to the pre-grievance, Mr. Hanlon made an offer.  He

12  wanted a list of people who were on our out-of-work

13  list, and he'd like to write a check rather than to

14  the Assistance Fund of $200 to someone that was on

15  our out-of-work list, and that was rejected; in other

16  words, going to the full board.

17  MR. CISCO:  And what happened on this case?

18  MR. AUGUST:  Again, on the 11th, I was out

19  on the project in Wonder Lake, and I came across a

20  gentleman -- actually, he came up to me on the

21  Bobcat.  And there was a laborer.  Matt, I believe.

22  Carl Matag.  He was running the John Deere 270

23  Skidsteer.  I carded him.  He introduced himself as a

24  laborer with Local 1035.  I explained to him that he

1  shouldn't be on that equipment, and then I proceeded

2  to several other jobs after that, but I called

3  Mr. Hanlon's office and left a message with his

4  secretary, June.  And that's why I filed the

5  grievance because we haven't been able to resolve it.

6       MR. VIGNOCCHI:  Chuck, what was he doing on

7  that Bobcat?

8       MR. AUGUST:  It's a big project.  He came

9  down the road and came directly up to me.  I didn't

10  see him doing anything with it other than coming up

11  directly to me.

12       MR. VIGNOCCHI:  So you didn't observe what

13  he was doing?

14       MR. AUGUST:  No, other than being on it and

15  operating it, coming from the far side of the -- the

16  project was actually split by a tree line.  He was

17  coming from the side that was on the other side of

18  the tree line, and came out and around and came

19  directly up to me.

20       MR. VIGNOCCHI:  How do you know he wasn't

21  doing laborers' work?  You don't.

22       MR. AUGUST:  I actually cannot say that.  I

23  did not observe what he was doing on the Bobcat other

24  than when he came directly up to me on it.

1   MR. BENSON:  But he was Union?

2   MR. AUGUST:  He was in 1035, correct.

3   MR. VIGNOCCHI:  Where is 1035?

4   MR. AUGUST:  Marengo.

5   MR. VIGNOCCHI:  Okay.

6   MR. AUGUST:  Gordy's local, Gordy Anderson.

7   MR. CISCO:  Back to my statement I made on

8   the pre-grievance.  I don't want to get things

9   confused here.  Mr. Hanlon represented himself as

10  outside counsel in this case, not as an employee of

11  Merryman.  And he, same as the one before, presented

12  the card, one time card, represented all the

13  grievances that day, but he was outside counsel.

14  MR. BENSON:  Okay.  So noted.

15  MR. CISCO:  Okay.  Anything else, Chuck?

16  MR. AUGUST:  No, that's all.

17  MR. VIGNOCCHI:  Mr. Hanlon?

18  MR. HANLON:  Yeah.  To the best of my

19  knowledge, Mr. Matag was moving his tools that day.

20  And from a discussion I had with him, that's what he

21  said, that all he was doing was moving his tools, and

22  so I don't think that infringes upon the work of

23  Local 150 or within its trade.

24  Notwithstanding that, again I raise my

1    objection to the lack of timeliness and the lack of

2    jurisdiction of the Committee to hear this matter

3    because, again, it is not timely.  And, again, for

4    the same reasons that I stated earlier, there was no

5    attempt to resolve this matter.  And notwithstanding

6    that, the rules don't allow for changes to the time

7    frames set forth within the contract.  The Committee

8    doesn't have any power to change those timeliness

9    rules.  And since this was not timely raised, the

10   Committee has no jurisdiction to hear this.

11           Having said that, I don't believe that the

12   evidence adduced by Mr. August reaches the burden of

13   establishing that there's a violation of the

14   contract, and therefore, I don't think we should have

15   to pay a dime.

16           MR. BENSON:  Do you know what he meant by

17   moving his tools?  What did he mean by that?

18           MR. HANLON:  Rakes, shovels, things of that

19   nature.  That's all he told me.

20           MR. BENSON:  Was there anything in the

21   bucket?

22           MR. AUGUST:  Absolutely not.  Absolutely

23   not.  In fact, at the pre-grievance it was brought up

24   as him moving the tools, and that's exactly what was

1  discussed, and he was not moving any tools.

2  　　　　MR. HANLON:  We did not have a discussion

3  about that, Chuck.

4  　　　　MR. BENSON:  He might have just been moving

5  a machine, though?  You don't know?

6  　　　　MR. AUGUST:  I could tell you what the

7  operator said, but I'm not going to get into that.

8  I'm just telling you what I saw.

9  　　　　MR. BENSON:  All right. That's all I want

10  to know.

11  　　　　MR. SCULLY:  You did make an offer to settle

12  this for $200?

13  　　　　MR. HANLON:  Yes, I made an offer to settle

14  it for $200.

15  　　　　MR. SCULLY:  If the laborer was correctly

16  running that machine, why did you offer to settle it?

17  　　　　MR. HANLON:  This is a venial amount.

18  They're asking for $374, and my time is more valuable

19  than what's in dispute here.  And therefore I made it

20  as a concession and made it as a statement of

21  settlement, not necessarily an indication of

22  liability.

23  　　　　MR. CISCO:  I want to make a statement to

24  the board.  The Step 1 procedure of the grievances is

1    not seven days, as being brought up here saying

2    they're untimely.  If you go to page 40 of your

3    contract books, it's 45 days.

4              MR. HANLON:  No, that's to raise the Step 1.

5              MR. CISCO:  Excuse me.  We've got 45 days to

6    raise the grievance.  If we cannot resolve the

7    grievance in Step 1 between the representative of the

8    Union and the representative of the Company, then it

9    is submitted in writing within seven days of that

10   meeting.

11             MR. VIGNOCCHI:  45 days.  So April 11th --

12             MR. HANLON:  Let me address that, if I may.

13             MR. VIGNOCCHI:  Sure.

14             MR. HANLON:  Once the Step 1 was initiated

15   by Mr. August, that's the Step 1 date.  That's the

16   date which he referred to as being in compliance with

17   the program here for Step 1 purposes.

18             So the Step 2 date tolls from the date of

19   the Step 1, which is 4-11 of '06.  And at seven

20   working days, as defined within the first full

21   paragraph on page 41, wherein it reads, "In the event

22   the grievance cannot be resolved within seven working

23   days of the Step One conference," -- the Step 1

24   conference is what Mr. August has articulated took

1    place on the 11th of April -- "it shall be reduced to

2    writing and referred for conference and resolution by

3    designated officials of the Union and the Contractor

4    at a pre-grievance hearing to be held at the office

5    of Local 150." We did that. It was late.

6             MR. BENSON: Okay. Anybody else got any

7    more questions?

8             MR. CISCO: No.

9             MS. LORD: We'd ask the interested parties

10   to leave the room while the Committee goes into

11   executive session.

12            MR. CISCO: You're off the record again.

13                      (The parties left the room, whereupon

14                       the Committee went into executive

15                       session, after which the parties

16                       re-entered the room and the following

17                       proceedings were had:)

18            MS. LORD: This is the decision in 06-31.

19   Based on the testimony heard, the Committee was

20   unable to reach a majority decision that resulted in

21   a deadlock. The Union may pursue this matter through

22   the arbitration provision in the contract. And I'll

23   confirm that in writing.

24            MR. VIGNOCCHI: So for you, Mr. Hanlon,

1  that's called a win.

2         MR. BENSON:  A draw.

3         MR. VIGNOCCHI:  It's a draw.  It's as good

4  as we get.

5         MR. HANLON:  It's as good as it gets.  I

6  understand.

7                      *    *    *

8         MR. CISCO:  From this point forward on all

9  grievances under Step 2 of the procedures, I'm making

10  a motion that we drop down to two votes from each

11  side.

12         MR. VIGNOCCHI:  I second that.

13         MR. CISCO:  Any objections?

14         MR. HANLON:  I'd like to raise an objection.

15         MR. CISCO:  This is between the Committee.

16  Any objections?

17         MR. BENSON:  No, no.

18         MR. CISCO:  All in favor?  Opposed?

19         (The motion was carried without dissent.)

20         MR. CISCO:  Okay.

21         MR. BENSON:  Bye, John.  Have a good time.

22         MR. VIGNOCCHI:  Thank you very much.

23         MR. CISCO:  Who will be the chair for --

24         MS. LORD:  Joe Benson.

1          MR. CISCO:  Pardon me?

2          MS. LORD:  Joe Benson.

3          MR. CISCO:  Make note that --

4          MS. LORD:  He is co-chair.

5          MR. CISCO:  You're co-chair?  Okay.

6          MS. LORD:  Yeah.  He's already our

7    co-chairman.

8          MR. CISCO:  Okay.  He was chair, wasn't he?

9          MS. LORD:  They're both co-chair.  I have to

10   have two people.

11               *    *    *

12   GRIEVANCE NO. 06-32 IS AS FOLLOWS:

13         MS. LORD:  This is Grievance 06-32, letter

14   dated April 24th to Meryman Excavation regarding

15   violations of the MARBA Heavy and Highway and

16   Underground Agreement:  Article I, Section 1,

17   Bargaining Unit; Article I, Section 6, No

18   Discrimination; Article I, Section 11, Assignment of

19   Work; Article XII, Hiring.

20         (Reading) Dear Mr. Merryman:  We are advised

21   that your Company is in violation of various articles

22   and sections, including but not limited to those

23   captioned above, of the MARBA Heavy and Highway and

24   Underground Agreement, to which your Company and this

1    Union are parties by virtue of a Memorandum of

2    Agreement signed April 1, 2000.

3        (Reading) We are further advised that the

4    above-stated violations occurred on or about

5    April 18, 2006, on your construction site located on

6    West Wonder Lake Road and Thompson Road in Wonder

7    Lake, Illinois, within Local 150's jurisdictional

8    territory, where your Company was performing work

9    with a nonbargaining unit employee.  The amount

10   sought is $451.28.

11       (Reading) The pre-grievance meeting was

12   scheduled for May 17, 2006.  It is in the best

13   interest of your Company to negotiate a settlement at

14   the pre-grievance hearing.  Many grievances are

15   resolved at this meeting.  If you do not attend the

16   pre-grievance hearing or mail us your settlement

17   check prior to that date and this matter remains

18   unresolved, it will be automatically scheduled for

19   the next meeting of the Joint Grievance Committee.

20       (Reading) This Union shall continue to hold

21   your Company liable for all appropriate remedies,

22   including but not limited to any back wages and

23   fringe benefits lost by all affected members of the

24   bargaining unit who would be working had you honored

1    our Agreement.  Signed by Steven Cisco.

2            MR. CISCO:  There was a pre-grievance.  They

3    could not come up with a resolution to this.

4    Mr. Hanlon was present and represented himself as

5    outside counsel and not an employee of Merryman

6    Excavating.

7            Chuck, tell us what happened.

8            MR. AUGUST:  I was out on the project on the

9    18th of April and caught Vincent White, a member of

10   Local 1035, the laborers local, run an EC210 B.L.C.

11   Volvo backhoe.  I called Mr. Hanlon's office on the

12   19th and left a message with June, his secretary.

13   The phone number is (847) 577-1434.  But on the 18th

14   I spoke to the job site foreman, George, and let him

15   know that I'd be filing a grievance.  George

16   apologized for having him on the project, said that

17   the operator had just left a couple hours prior to me

18   getting there.

19           MR. CISCO:  Anything else, Chuck?

20           MR. AUGUST:  At the pre-grievance,

21   Mr. Hanlon said he would pay someone that was on the

22   out-of-work list.  He wanted a copy of our

23   out-of-work list, but he refused to pay the grievance

24   to the Assistance Fund.

1    MR. CISCO:  Okay.  Any questions for Chuck?

2    MR. BENSON:  Yeah.  So when Merryman told

3    you that the operator had just left, the operator for

4    this machine had just left?

5    MR. AUGUST:  That's what they told me,

6    correct.  George, the foreman, came over.  The

7    operator left a couple hours prior to this.

8    MR. BENSON:  Did he say why he let the

9    operator go and then now he's running a laborer?

10   MR. AUGUST:  What he explained to me, it was

11   one of the Merrymans that was operating it just prior

12   to Vincent getting on.

13   MR. SCULLY:  And you saw the laborer doing

14   what?

15   MR. AUGUST:  Running the backhoe.

16   MR. SCULLY:  Doing what?

17   MR. AUGUST:  Working.

18   MR. SCULLY:  While he's running the backhoe?

19   MR. AUGUST:  Yeah, running the --

20   MR. SCULLY:  All right.

21   MR. CISCO:  Doing excavation of some sort?

22   MR. AUGUST:  Yes, for the water main or

23   sewer main.  I think it was water main.

24   MR. CISCO:  The bucket was in the dirt?

1          MR. AUGUST:  Yes.  Oh, yes.

2          MR. CISCO:  Or clay.

3          MS. LORD:  Any further questions for the

4     Union at this time?  Mr. Hanlon?

5          MR. HANLON:  Thank you.  This one, I'm not

6     going to raise an objection to timeliness, so I think

7     you can all be glad that this will be a little

8     shorter.  However, if you'd just bear with me a

9     second, here there was no meaningful attempt to

10    settle this matter between the Union and Merryman

11    Excavation.

12          Mr. August stated that he left a voicemail

13    message.  I wrote Mr. August a letter on April 25th,

14    wherein in pertinent part I wrote, "This letter

15    serves to renew Mr. Merryman's and my prior request

16    that you place your comments in writing and fax them

17    to me as it relates to any Union-related matter

18    involving Merryman Excavation, Inc. or any Merryman

19    family member."  Mr. August did not do that.  He

20    leaves voicemail messages, and he knows that there's

21    a concern on the part of all persons that we

22    accurately document our respective interfacings.

23          To that end, by attempting to leave

24    voicemail messages, he has attempted to circumvent

1   any method by which he could reasonably anticipate a

2   settlement of this particular grievance.  And as

3   such, he hasn't followed the rules with regard to

4   grievances and arbitrations set forth within the

5   Agreement because there's been no meaningful attempt

6   in order to settle this.  And based on that factor, I

7   object to the jurisdiction of this Committee to hear

8   this particular complaint.

9           MR. CISCO:  I've got to ask you a question.

10  Was there a laborer running that backhoe at that time

11  as stated in the grievance?

12          MR. HANLON:  To the best of my knowledge --

13  well, actually, I have no knowledge that there was or

14  was not.

15          MR. CISCO:  Thank you.  Have you got any

16  other questions?

17          MR. BENSON:  No.

18          MS. LORD:  If there's no further questions,

19  we'd ask all interested parties to leave the room.

20                  (The parties left the room, whereupon

21                   the Committee went into executive

22                   session, after which the parties

23                   re-entered the room and the following

24                   proceedings were had:)

1        MS. LORD:   This is the decision in

2   Grievance 06-32.   Based on the testimony heard, the

3   Committee by majority decision determined as follows:

4   One, the Employer shall pay the Local 150 Assistance

5   Fund the sum of $451.28.   Two, the check should be

6   sent to Steven Cisco, Local 150, for distribution.

7   And I'll confirm this in writing.

8        MR. HANLON:   Okay.   I'd like to renew my

9   objection to making the payment to the Assistance

10  Fund.   The contract calls for the actual employee who

11  was out of work, and the Committee doesn't have any

12  jurisdiction to add or subtract to the Agreement and

13  therefore can't order Merryman to pay to an

14  Assistance Fund because that's not what the contract

15  calls for.

16       MR. CISCO:   So noted.

17              *     *     *

18  GRIEVANCE NO. 06-33 IS AS FOLLOWS:

19       MS. LORD:   This is Grievance 06-33, letter

20  dated May 17, 2006 to Merryman Excavation,

21  Incorporated regarding violations of the MARBA Heavy

22  and Highway and Underground Agreement:   Article XII,

23  Hiring.

24       (Reading) Dear Mr. Merryman:   We are advised

1    that your Company is in violation of various articles

2    and sections, including but not limited to that

3    captioned above, of the MARBA Heavy and Highway and

4    Underground Agreement, to which your Company and this

5    Union are parties by virtue of a Memorandum of

6    Agreement signed April 1, 2000.

7         (Reading) We are further advised that the

8    above-stated violation occurred on or about May 10,

9    2006, on your construction site located on Golf Road,

10   one block east of Milwaukee, within Local 150's

11   jurisdictional territory, where your Company was

12   performing work with a nonbargaining unit employee.

13   Amount sought, $451.28.

14        (Reading) The pre-grievance meeting was

15   scheduled for June 15, 2006.  It is in the best

16   interest of your Company to negotiate a settlement at

17   the pre-grievance hearing.  Many grievances are

18   resolved at this meeting.  If you do not attend the

19   pre-grievance meeting or mail us your settlement

20   check prior to that date and this matter remains

21   unresolved, it will be automatically scheduled for

22   the next meeting of the Joint Grievance Committee.

23        (Reading) This Union shall continue to hold

24   your Company liable for all appropriate remedies,

1    including but not limited to any back wages and

2    fringe benefits lost by all affected members of the

3    bargaining unit who would be working had you honored

4    our Agreement.  Signed by Steven Cisco.

5          MR. CISCO:  Okay.  At the pre-grievance,

6    Mr. Hanlon did not represent himself as outside

7    counsel or inside counsel for Merryman because no one

8    from the Company showed up at the pre-grievance.

9          Timmy, what happened?

10          MR. GORMAN:  Well, making routine stops in

11    my area, I stopped by a new Wal-Mart going up in this

12    area on Golf Road, a couple blocks east of Milwaukee,

13    or one block.  I talked to the guys like I always do,

14    went back to see Merryman in the back, stopped and

15    talked to the loader guy, which was a 150 guy on the

16    loader.  I went over and talked to the guy on the

17    backhoe.  He pulled out his card, an Andrew

18    Vanderstappen, if I'm pronouncing his name right, a

19    139 guy.  I asked him if he cleared in or had a

20    permit through our hiring hall.  He said no, he

21    didn't.  And I said, well, you're not supposed to be

22    here.  You need to go up in Wisconsin.  I explained

23    to him the rules, that Merryman needs to call the

24    hall.  We've got guys on the out-of-work list.  If we

1    ain't got nobody, we could probably clear you in that

2    way.  You have to just get one of our permits.  So I

3    told him to go back to Wisconsin and not be coming in

4    here and not clearing in, doing the right thing,

5    because he can get in trouble according to our

6    bylaws.

7         So I filed a grievance for the one day for

8    the backhoe, eight hours.  Eight and a half hours,

9    actually.  I gave the guy my business card, by the

10   way, and told him to have Tom give me a call, and I

11   later called Mr. Hanlon's office and left a message

12   with him and never got no call back.

13        MS. LORD:  Any questions at this time for

14   the Union?  Mr. Hanlon?

15        MR. HANLON:  Okay.  The reason Merryman

16   wasn't present on the 15th was because I received

17   notice the day before or thereabouts.  But first I'd

18   like to point out that there was no attempt here for

19   a Step 1 conference, and therefore skipping Step 1

20   for the purpose of going to Step 2, this grievance

21   has been waived.

22        And the claim that a message was left for

23   me, I had received no call on that date in my phone

24   records, and the Union has not presented any evidence

1    that they made a telephone call other than the

2    testimony of the business agent.  There's nothing to

3    confirm that.  Notwithstanding that, that's

4    insufficient because there's been no reasonable

5    attempt to hear this, and therefore this Committee

6    lacks any jurisdiction to hear this matter.

7            Notwithstanding that, we went through the

8    rules earlier that required that Local 150 had the

9    burden to establish its case on the record, you know,

10   and it's devoid of an actual attempt to resolve this

11   matter, and therefore it has failed to meet that

12   burden.  And the Committee doesn't have the power to

13   adjudicate this matter because they can't add or

14   subtract to the Agreement pursuant to that provision

15   on page 42 which I've read a few times here today.

16           In addition to that, Mr. Vanderstappen has

17   asked to become a member.  He's been denied.

18   Mr. August says that there's a pre-clearing

19   procedure.  I would like to know how many people are

20   actually cleared by that procedure because any time

21   anyone that has asked to do that, that I'm aware of,

22   they've been denied.  And so can you speak to that or

23   can the Committee ask Mr. August to speak to that?

24           MR. DUNLAP:  Well, it's Tim Gorman's

1    grievance, right?

2           MR. HANLON:  Oh, I'm sorry.  Mr. Gorman.

3           MR. GORMAN:  Well, the Company would place a

4    work order in our hiring hall, and we have 48 hours

5    to fill that work order.  If it's not filled within

6    48 hours, the Company can bring a guy in and we would

7    put that guy on permit.  Or in this case, a member of

8    another local, we would probably just clear him in.

9           MR. HANLON:  So in the absence of this

10   particular Employer, other Employers, you would just

11   clear them in, is that what you're saying?

12          MR. GORMAN:  Do what now?

13          MR. HANLON:  You would just clear them in?

14          MR. GORMAN:  Just what I just told you.

15          MR. SCULLY:  I have a question.

16          MR. HANLON:  Sure.  Go ahead.

17          MR. SCULLY:  Do you agree that when an

18   operator from Local 139 comes down here, they have to

19   clear themselves through 150?

20          MR. HANLON:  I believe that that's what

21   their internal rules may prescribe.

22          MR. SCULLY:  Then anything after that is

23   irrelevant, isn't it, because he didn't clear himself

24   with 150?

1                 MR. HANLON:   No.

2                 MR. SCULLY:   There's no reason to go past

3      that and waste time on it.

4                 MR. HANLON:   No.  What is relevant is the

5      issues with regard to whether or not they waived the

6      grievance.  They failed to adhere to the provisions

7      within the grievance procedure.  And because they

8      failed to do that, the grievance is waived, and the

9      Committee lacks the power to do this.

10                You know, and this is being premised on the

11     fact that you have a wrong here that's being

12     committed by the 150 by restricting access to

13     membership into the 150, thereby creating an

14     exclusive domain and a monopoly on operators.  And

15     because they refused to agree to admit members, which

16     is their right, they are in essence creating a

17     monopoly in the marketplace that leaves Merryman in a

18     position where, you know, he has no alternatives.

19     And notwithstanding that, because Mr. Vanderstappen

20     has asked to become a member and he's been denied

21     membership, it stands to reason that he's done what

22     he can and that the Local 150 is attempting to

23     benefit by its own wrongdoing.

24                MR. SCULLY:   Did he ask to become a 150

1   member on or before this date?

2          MR. HANLON:  Before that date.

3          MR. BENSON:  Are you saying that Merryman

4   called the Local 150 dispatch and they told you they

5   didn't have anybody?

6          MR. HANLON:  No, I'm not saying that.

7          MR. BENSON:  Oh, all right.  I have no more

8   questions.

9          MS. LORD:  Do any of the Committee members

10  have any further questions?  If not, could I ask the

11  interested parties to leave the room.

12          (Discussion off the record.)

13          MR. HANLON:  I'm objecting to Mr. August

14  being present for the purpose of the discussion of

15  this because of a potential bias on his part.

16                  (The parties left the room, whereupon

17                   the Committee went into executive

18                   session, after which the parties

19                   re-entered the room and the following

20                   proceedings were had:)

21          MS. LORD:  This is the decision in

22  Grievance 06-33.  Based on the testimony heard, the

23  Committee by majority decision determined as follows:

24  One, the Employer shall pay the Local 150 Assistance

1     Fund the sum of $451.28.  Two, the check should be

2     sent to Steven Cisco, Local 150, for distribution.

3     I'll confirm it in writing.

4          MR. HANLON:  I wish to raise my objection

5     again and ask that the Committee reconsider the

6     payment to the Assistance Fund as being outside of

7     the terms of the contract.

8          MR. CISCO:  So noted.

9          MR. HANLON:  You're not going to give

10    consideration to my request?

11         MR. AUGUST:  So noted.

12         MR. CISCO:  So noted.

13         MR. HANLON:  Is that denied, then?

14         MR. CISCO:  It says what it is.  The

15    decision is what it says.

16         MR. AUGUST:  So noted.

17              *    *    *

18    GRIEVANCE NO. 06-34 IS AS FOLLOWS:

19         MS. LORD:  This is Grievance 06-34, letter

20    dated May 17, 2006 to Merryman Excavation,

21    Incorporated regarding violation of the MARBA Heavy

22    and Highway and Underground Agreement:  Article VIII,

23    Section 2, Machinery Operation.

24         (Reading) Dear Mr. Merryman:  We are advised

1   that your Company is in violation of various articles

2   and sections, including but not limited to that

3   captioned above, of the MARBA Heavy and Highway and

4   Underground Agreement, to which your Company and this

5   Union are parties by virtue of a Memorandum of

6   Agreement signed April 1, 2000.

7          (Reading) We are further advised that the

8   above-stated violation occurred on or about May 1,

9   2006, and is ongoing on your construction site

10  located at the Hampshire Waste Treatment Plant,

11  within Local 150's jurisdictional territory, where

12  your Company was operating a Komatsu 600 excavator

13  without an oiler.  The amount sought is $2,501.70,

14  with a note that it's ongoing.

15         (Reading) The pre-grievance meeting was

16  scheduled for June 15, 2006.  It is in the best

17  interest of your Company to negotiate a settlement at

18  the pre-grievance hearing.  Many grievances are

19  resolved at this meeting.  If you do not attend the

20  pre-grievance hearing and this matter remains

21  unresolved, it will be automatically scheduled for

22  the next meeting of the Joint Grievance Committee.

23         (Reading) This Union shall continue to hold

24  your Company liable for all appropriate remedies,

1    including but not limited to any back wages and

2    fringe benefits lost by all affected members of the

3    bargaining unit who would be working had you honored

4    our Agreement.  Signed by Steven Cisco.

5            MR. CISCO:  There was a no-show at the

6    pre-grievance meeting.  This is Mike.

7            MR. KRESGE:  That's me.

8            MR. CISCO:  Mike, what happened?

9            MR. KRESGE:  Basically, I was out checking

10   the job site, a wastewater treatment plant in

11   Hampshire.  They were not actually working on the

12   treatment plant site.  They were running a line from

13   the treatment plant out to the future developments.

14   It's a main line sewer job.  It's deep cut.  They

15   were using the 600 because they were digging down 20,

16   30-some-odd feet.  They've got a Komatsu 600, which

17   is in excess of 115,000 pounds, which requires an

18   oiler.

19           I did Step 1 of the grievance with Joe

20   Merryman on site.  He looked at me and laughed and

21   said, "I'm not going to pay a guy to stand around

22   here and do nothing all day."  And I said, "Okay,

23   fine."  I said, "I'm going to file a grievance."

24           I filed the grievance.  My grievance goes

1    from May 1st through May 5th, May 8th through

2    May 12th, May 15th through May 19th, and then

3    June 1st and 2nd.  All those dates there was no oiler

4    on site.  I've got some pictures here.  The total

5    comes out to $8,569.74.  That includes wages and --

6           MR. CISCO:  How much is that, Mike, total?

7           MR. KRESGE:  The total is $8,569.74.

8           MR. CISCO:  How many pennies?

9           MR. KRESGE:  74 of them.

10          MR. CISCO:  Can I see a picture of the

11   machine, Mike?

12          MR. BENSON:  What dates have you got now?

13          MR. KRESGE:  I've got May 1st through

14   May 5th, May 8th through May 12th, May 15th --

15          MR. HANLON:  I'm sorry.

16          MR. AUGUST:  You're going too fast.  Slow

17   down, Mike.

18          MR. KRESGE:  Basically, it's May through

19   June 2nd, excluding the Sundays.  So I've got the 1st

20   through the 5th, the 8th through the 12th, the 15th

21   through the 19th, and then you've got June 1st and

22   2nd.

23          MR. DUNLAP:  And June 2nd they were done?

24          MR. KRESGE:  Yeah.  They're using the

1    Komatsu 400 now.

2         MR. CISCO:  Mike, how many --

3         MR. KRESGE:  I charged them ten hours a day,

4    and I think that was a little bit light.

5         MR. CISCO:  Okay.  You've got pictures,

6    Mike, you said?

7         MR. KRESGE:  Yeah, sure.

8         MR. CISCO:  Submit them and we'll put them

9    in the file.

10        MR. HANLON:  May I inspect the pictures?

11        MR. AUGUST:  They'll be passed around.

12        MR. KRESGE:  The only operators on that site

13   were Mr. Merryman and another gentleman running a

14   loader, that's it.

15        MR. BENSON:  Well, you had an operator on

16   the excavator.

17        MR. KRESGE:  Yeah.  There was an operator on

18   the loader.

19        MR. BENSON:  And that needs the oiler, the

20   600?  I mean, that's the big one, right?

21        MR. CISCO:  Right.  It's over 115,000

22   pounds.

23        MR. BENSON:  Were you out there every day?

24        MR. KRESGE:  Yes, I was.  I went out there

1    every day.  I also have a gentleman that lives down

2    the street, a member of ours, that comes by every day

3    and checks it for me too.

4            MR. HANLON:  Who is that?

5            MR. KRESGE:  I don't need to let you know

6    that.

7            MR. BENSON:  All I want to know is were you

8    out there.

9            MR. KRESGE:  Yes, yes.

10           MR. BENSON:  You witnessed the machine

11   working without --

12           MR. KRESGE:  Yes.

13           MR. BENSON:  But you do not know that it

14   worked ten hours?

15           MR. KRESGE:  I've been told that they work

16   till 7:30, 8 o'clock every night.

17           MR. BENSON:  Okay.  But I'm asking you what

18   you know.

19           MR. CISCO:  You had an operator on there,

20   right?

21           MR. KRESGE:  Right.

22           MR. CISCO:  We can look at his time card.

23           MR. BENSON:  So he would have to pull time

24   records.

1              MR. CISCO:  Right.

2              MR. KRESGE:  Correct.

3              MR. CISCO:  You want to see the pictures?

4    Want to see the Komatsu?

5              MR. BENSON:  Yeah.

6              MR. AUGUST:  $8,569.74?

7              MR. KRESGE:  Yes.  I believe Joe should be

8    in there.  I took a picture of him when we did the

9    Step 1.

10             MR. GORMAN:  Joe Merryman?

11             MR. KRESGE:  Yes.

12             MR. GORMAN:  And he's the one that told you

13   he's not putting up --

14             MR. KRESGE:  He's not going to waste money

15   putting a guy on to stand around.

16             MR. BENSON:  So what's the total days you've

17   got, Mike, the total days you were out there?

18             MR. KRESGE:  1st, 2nd, 3rd, 4th --

19             MR. BENSON:  Wait.  You got a number?  Do

20   you have a number of days, though?

21             MR. AUGUST:  Do it in your head, Mike.

22             MR. GORMAN:  32 days?

23             MR. BENSON:  No, no.  17?

24             MR. KRESGE:  20.

1          MR. BENSON:  Oh, okay.  So you've got 20

2     with Saturdays.  All right.

3          MR. KRESGE:  Yes.

4          MR. BENSON:  So 20 days with three

5     Saturdays?

6          MR. KRESGE:  Correct.

7          MR. BENSON:  Okay.  And then after that

8     time, they moved that machine out and put the 400 in?

9          MR. KRESGE:  Correct.  They were further

10    down the line and the cuts are not as deep.

11         MR. BENSON:  Okay.

12         MR. CISCO:  Any other questions for Mike?

13         MS. LORD:  There are no further questions.

14    Mr. Hanlon?

15         MR. HANLON:  Well, where do I start?  Just

16    bear with me for a second.  As with the other ones, I

17    object to a payment to the Assistance Fund.  I would

18    like to cite that the provision within the contract

19    requires that -- just one moment.

20         MR. CISCO:  Can we help you out?  What are

21    you looking for in the contract?

22         MR. HANLON:  Excuse me.

23         MR. CISCO:  Machinery Operation?

24         MR. HANLON:  I'll come back to that.

1    The business agent indicated that he talked

2    with Joe Merryman on site there on May 1st.

3    Mr. Merryman or Joseph Merryman is not authorized to

4    deal with grievances. I placed the Union on notice

5    that I was the sole person who was authorized by

6    Merryman Excavation in my letter to Mr. August on the

7    25th of April and that if there is a grievance issue,

8    that they need to raise it with me. All the other

9    business agents seem to have recognized that insofar

10   as they have asserted that they've made claims to

11   have called my office to facilitate that Step 1

12   process. And therefore, based on that, the grievance

13   is improper.

14        Secondly, the grievance date here is the

15   17th. That's 12 working days of elapsed time, it

16   requires seven, and therefore is not in compliance.

17   And there was improper notice. I didn't get a notice

18   of any Step 2 conference until it was too late for me

19   to adjust my schedule.

20        The testimony has been that there's some

21   other person who lets the business agent know.

22   Unfortunately, there's no way for me to ascertain the

23   truth or veracity of those statements without knowing

24   who that person is. And because I don't know who

1   that person is, I can't attest to that.

2          Mr. Merryman, Joseph Merryman, is an

3   authorized operator.  He carries a 150 card.  The

4   machine itself is a self-oiling, self-lubricating,

5   self-greasing machine.  And within the body of the

6   contract, it says you don't have to create a job.

7   And here we're creating a job for a machine which is

8   self-oiling, self-greasing, and doesn't need anyone

9   else.

10         Notwithstanding that, the pictures, the

11  photographic evidence, don't demonstrate a thing.

12  All they demonstrate is that Mr. Merryman was

13  operating a machine, and therefore they failed to

14  meet their burden of proof.  And because they failed

15  to meet their burden of proof, they cannot succeed

16  here.

17         MR. CISCO:  I've got one question for you.

18  Well, it's two questions.  Was there one or two

19  people, operating engineers, on that backhoe?

20         MR. HANLON:  There was another operating

21  engineer here by the name of Dave Schmidt.

22         MR. CISCO:  He was doing what?  What was his

23  function?

24         MR. HANLON:  It's my understanding he was

1   working at the site, and his function was to take

2   care of all sorts of ancillary stuff.

3           MR. CISCO:  On that backhoe, you had an

4   operator apparently.  You can see him operating the

5   equipment in the pictures.  Was there an oiler

6   assigned to that machine?

7           MR. HANLON:  I believe that Mr. Schmidt was.

8           MR. KRESGE:  Dave was on the loader.  That

9   machine requires an oiler, which is a light-duty guy

10  off our list.

11          MR. CISCO:  Or an apprentice.

12          MR. GORMAN:  Or an apprentice.

13          MR. KRESGE:  Or an apprentice.

14          MR. CISCO:  Somebody running another piece

15  of equipment cannot be assigned as an oiler.  So back

16  to Merryman, was there one or two people assigned to

17  this piece of equipment?

18          MR. HANLON:  I've already answered your

19  question.

20          MR. CISCO:  No, you didn't.

21          MR. HANLON:  Yes, I did.

22          MR. CISCO:  No, you didn't.

23          MR. HANLON:  Yes, I did.

24          MR. CISCO:  No, you didn't, my friend.

1          MR. BENSON:  Any other questions?

2          MR. CISCO:  No.

3          MR. BENSON:  Okay.  I will not vote on the

4    ten hours unless -- I know it's eight hours per the

5    contract that I can vote on, if you want to adjust

6    this.  Otherwise, you're going to have to pull

7    records on whoever was driving.  If you want to

8    modify this to eight hours, I'll vote on that for the

9    20 days, unless you can tell me you sat there ten

10   hours, Mike.

11         MR. KRESGE:  No.  I have other things to do.

12         MR. BENSON:  Okay.

13         MR. CISCO:  That'll be fine, Joe.

14         MR. BENSON:  All right.

15         MR. CISCO:  We'll modify it so that the

16   start-up of the machine is eight hours.

17         MR. KRESGE:  Eight and a half.

18         MR. CISCO:  No, no.  There was an oiler

19   there.  It's eight hours a day.

20         MR. BENSON:  And this is only for the

21   oilers?

22         MR. CISCO:  How many days are we talking,

23   then, total?

24         MR. GORMAN:  Same amount of days.

1        MR. CISCO:  How many days was that again?

2        MR. HANLON:  Can I just take a look at the

3   calendar?

4        MR. BENSON:  20 days, three of which are

5   Saturdays.

6        MR. CISCO:  So we've got 17 straight-hour

7   days and 3 OT.  You got a calculator?

8        MR. DUNLAP:  What's the rate of pay you've

9   got down there?  An oiler is $35.75.

10        MR. GORMAN:  It's all the same.

11        MR. DUNLAP:  No, it isn't.

12        MR. GORMAN:  They made a mistake here.

13        MR. CISCO:  This is May 1st, so wait a

14   second, Rick.  There's a mistake in the contract

15   book.  There's a misprint.  The top line is the

16   correct line.

17        MR. HANLON:  Which page are you looking at?

18        MR. CISCO:  I'll be with you in a second to

19   tell you what page.  Oilers, page 57 of the contract.

20   I have a corrected one.  Okay.  It says $32.55 an

21   hour.

22        MR. GORMAN:  No, $34.

23        MR. CISCO:  Where are you?

24        MR. GORMAN:  Class V, Steve.

1          MR. DUNLAP:  This was May.

2          MR. HANLON:  It's still $32.55.

3          MR. DUNLAP:  Right.  It's $32.55.  It's May.

4          MR. CISCO:  This was in May, Timmy, not now.

5          MR. GORMAN:  Oh, May.  Okay.

6          MR. DUNLAP:  The raise took place in June.

7          MR. HANLON:  The raise took place in June,

8     so it's $30.60 if you want to get to the correct --

9          MR. CISCO:  That's 172 hours' pay.

10          MR. DUNLAP:  Right.  We're in 2006.

11          MR. CISCO:  172 hours' pay times $32.55.

12     Wages are $5,598.60.  Fringes will be --

13          MR. GORMAN:  $14.23.

14          MR. CISCO:  Wait, wait.  How much?

15          MR. GORMAN:  $14.23 before the raise.

16          MR. HANLON:  What fringe number are you

17     calculating?

18          MR. GORMAN:  The fringes.

19          MR. HANLON:  What's the per-hour rate?

20          MR. GORMAN:  That was before 6-1-06.  $6.45,

21     $5.15, $1.80, $.65, and $.18.  Page 44.

22          MR. CISCO:  172 hours, 172 again, times

23     $14.23.

24          MR. KRESGE:  Don't forget the raise in June.

1          MR. DUNLAP:  He's saying he's doing it in

2   May because you started in May.

3          MR. KRESGE:  Yeah, but you've got June 1st

4   and June 2nd with the raise.

5          MR. DUNLAP:  They're just doing one.

6          MR. CISCO:  You know what, I ain't going to

7   figure that out.  I'm going to give him the benefit

8   of the doubt.  I'll take it all under the old

9   contract.  Two days went into the new contract rate.

10   I'll take it all on the old contract rate.

11          MR. GORMAN:  You had three days at time and

12   a half.

13          MR. CISCO:  It comes out to 72 hours total.

14   20 times 8 is 160, and then you've got 12 hours, 172.

15          MR. GORMAN:  No.  You've got --

16          MR. AUGUST:  No, he's right.

17          MR. CISCO:  You've got three Saturdays.

18          MR. KRESGE:  Gorman, you're talking to a

19   numbers man over there.

20          MR. DUNLAP:  He's fine.

21          MR. CISCO:  Carol, we're readjusting our

22   grievance to eight hours a day times the 20 days,

23   three days being Saturdays, which comes out to 72

24   hours' pay.  And we're calculating this all under the

1    old rate, not to change the rate at June 1st.  It's

2    Christmas.  Wages due are $5,598.60, and that's

3    calculated at 72 times $32.55, and we are seeking 72

4    hours of benefits at $14.23 an hour, which comes out

5    to $2,447.56, for a total of $8,046.16.

6              MR. KRESGE:  16?

7              MR. CISCO:  Wait.

8              MR. BENSON:  Did you say 72 hours or 172?

9              MR. CISCO:  72, 72.

10             MR. BENSON:  How can that be right?

11             MR. CISCO:  20 times 8 is how much?

12             MR. BENSON:  160.

13             MR. CISCO:  172.  I apologize.  Yeah,

14   $8,046.16 total, payable to the Local 150 Assistance

15   Fund.  Any other questions?

16             MR. BENSON:  I have no more questions.

17             MS. LORD:  Are there any more questions or

18   comments on this grievance?

19             MR. HANLON:  Yeah.  I'd like to reiterate

20   that there was no meaningful attempt to settle the

21   grievance.  There was no notice.

22             MS. LORD:  Pardon me?

23             MR. HANLON:  There was no notice.  They

24   informed the wrong person with the knowledge that it

1    was the wrong person.  All the amounts could have

2    been avoided had they followed the proper procedure.

3           MR. BENSON:  So noted.

4           MS. LORD:  We'd ask the interested parties

5    to leave the room at this point for the Committee to

6    go into executive session.

7                    (The parties left the room, whereupon

8                     the Committee went into executive

9                     session, after which the parties

10                    re-entered the room and the following

11                    proceedings were had:)

12           MS. LORD:  This is Grievance 06-34.  Based

13    on the testimony heard, the Committee by majority

14    decision determined as follows:  One, the Employer

15    shall pay the Local 150 Assistance Fund the sum of

16    $8,046.16.  Two, the check should be sent to Steven

17    Cisco, Local 150, for distribution.  I'll confirm

18    this in writing also.

19           MR. CISCO:  Thank you, Carol.

20                    *    *    *

21           MR. CISCO:  I move that we take a

22    five-minute break.

23           (Recess taken.)

24                    *    *    *

1    GRIEVANCE NO. 06-35 IS AS FOLLOWS:

2          MS. LORD:  This is Grievance 06-35, a letter

3    dated May 17, 2006 to Merryman Excavation,

4    Incorporated regarding violations of the MARBA Heavy

5    and Highway and Underground Agreement:  Article I,

6    Section 11, Assignment of Work; Article XV,

7    Section 1, Wage Rates and Fringe Benefits.

8          (Reading) Dear Mr. Merryman:  We are advised

9    that your Company is in violation of various articles

10   and sections, including but not limited to those

11   captioned above, of the MARBA Heavy and Highway and

12   Underground Agreement, to which your Company and this

13   Union are parties by virtue of a Memorandum of

14   Agreement signed April 1, 2000.

15         (Reading) We are further advised that the

16   above-stated violations occurred on or about May 1,

17   2006, and are ongoing on your construction site

18   located at the Hampshire Waste Treatment Plant,

19   within Local 150's jurisdictional territory, where

20   your Company failed to assign work to employees in

21   the bargaining unit covered by our Agreement.  The

22   amount sought is $5,955.92, with a note that it's

23   ongoing.

24         (Reading) The pre-grievance meeting was

1    scheduled for June 15, 2006.  It is in the best

2    interest of your Company to negotiate a settlement at

3    the pre-grievance hearing.  Many grievances are

4    resolved at this meeting.  If you do not attend the

5    pre-grievance hearing and this matter remains

6    unresolved, it will be automatically scheduled for

7    the next meeting of the Joint Grievance Committee.

8            (Reading) This Union shall continue to hold

9    your Company liable for all appropriate remedies,

10   including but not limited to any back wages and

11   fringe benefits lost by all affected members of the

12   bargaining unit who would be working had you honored

13   our Agreement.  Signed by Steven Cisco.

14           MR. CISCO:  There was a no-show at the

15   pre-grievance.  Mike, what --

16           MR. KRESGE:  Same job site as the previous

17   grievance, located at the Hampshire Wastewater

18   Treatment Plant, not at the plant precisely, but on

19   the main line running out of the plant into the

20   upcoming subdivisions.

21           On a daily basis there was generators out

22   there.  They had two 89KW generators, two 56KW

23   generators, and one 80KW.  Now, they staggered these

24   as to their use of however they used them.  I wrote

1    the grievance for one generator.  There was many well

2    points that these generators were powering.  One

3    generator over 50KW requires an operator.

4         What I did is these are just for the night,

5    night only, nights, weekends.  And I've got from

6    May 6th through August 2nd.  I've got the dates

7    written down.  They ran 24 hours a day.  You guys

8    just knocked me down from 12 hours to 8 hours on the

9    last grievance.  I'm only asking for 12 hours a day

10   on this grievance here, 12 hours on Saturdays, 24

11   hours on Sundays.  I've got pictures here.

12        I did Step 1 with Joe Merryman, again, on

13   site, the same time I did the Step 1 with the oiler,

14   and he again refused to put a guy on.

15        MR. CISCO:  We should have four guys out

16   here, no?

17        MR. KRESGE:  Yes.  Yes, we should.

18        MR. CISCO:  You're going to be asking for 12

19   hours a day?

20        MR. KRESGE:  For one guy, when I should ask

21   for four.

22        MR. CISCO:  I understand.  But why are you

23   only asking for 12 hours a day, Mike?

24        MR. KRESGE:  Well, I could adjust that to

1    more.  I mean, we just --

2            MR. AUGUST:  Mike, why are you asking for

3    12, shouldn't it be 24?

4            MR. KRESGE:  Well, they had a guy during the

5    day sitting in his pickup truck maintaining these

6    pumps over, you know, away from the job site.

7            MR. CISCO:  So they had a truckie.  A

8    truckie was visiting the pumps, making sure --

9            MR. KRESGE:  Yes, yes.  So, I mean, I will

10   have a beef --

11           MR. CISCO:  You were being lenient.

12           MR. KRESGE:  I was being very lenient, very,

13   very lenient.

14           MR. CISCO:  So, what are you seeking, Mike?

15           MR. KRESGE:  $137,510.76.

16           MR. CISCO:  $137,510.76.

17           MR. KRESGE:  There's a lot of overtime in

18   there.

19           MR. CISCO:  How is this broken down, wages,

20   fringes, Mike?  Do you have the breakdown?

21           MR. KRESGE:  The weekdays were 12 hours a

22   day, 8 at straight time, 4 at overtime.  And then it

23   was 12 hours of fringes.  Saturdays were

24   time-and-a-half all day.

1          MR. CISCO:  But did you break it down

2    just wages and -- well, it doesn't make a difference.

3          MR. KRESGE:  It's broke down in my

4    grievance.

5          MR. CISCO:  It doesn't make a difference.

6    Total wages and fringes, you're seeking $137,510, and

7    the dates are what, Mike?

8          MR. KRESGE:  May 6th through August 2nd.

9          MR. CISCO:  May 6th, and this is through

10   August 2nd.

11         MR. KRESGE:  Which is today.

12         MR. CISCO:  Which is today.  Are these pumps

13   still running, Mike?

14         MR. KRESGE:  Yes, they are.  I was out there

15   last night.  I've got pictures from last night.  I

16   can present those right here.

17         MR. CISCO:  No, no, no, no.  You've got to

18   file a new grievance.  It ended today, Mike.

19         MR. KRESGE:  Okay.

20         MR. CISCO:  If you've got ongoing, write a

21   new grievance from today forward.

22         MR. KRESGE:  Well, these pictures are of

23   last night, 8-1.

24         MR. CISCO:  Oh, of 8-1.  Last night is fine.

1  That's fine.

2         MR. DUNLAP:  If it's 8-1, nothing's changed.

3         MR. CISCO:  What's today, 8-2?

4         MS. LORD:  Yes.

5         MR. KRESGE:  I'll file a new grievance

6  today, and I'll be more precise on how many guys I

7  should have out there.

8         MR. DUNLAP:  So it's just for the nights,

9  then?

10         MR. CISCO:  He's just charging for the night

11  guy out there.

12         MR. DUNLAP:  12 hours.

13         MR. CISCO:  Anything else, Mike?

14         MR. KRESGE:  That's it.  I've got pictures

15  of the rest of the site here if you want to see them.

16         MR. CISCO:  All right.  Pass the pictures

17  around so everybody can see the pumps.  No questions.

18         MR. DUNLAP:  And that's just for the

19  generator, not the pumps.

20         MR. KRESGE:  Right.

21         MS. LORD:  Are there any questions at this

22  point for the Union?

23         MR. KRESGE:  And there's 15 to 20 pumps

24  going.

1          MR. BENSON:  I've got the same question.

2   You were out there every day, Mike?

3          MR. KRESGE:  Yes, sir.

4          MR. BENSON:  And what did they have, they

5   had a guy during the day?

6          MR. KRESGE:  They had a guy during the day,

7   and what he would do, they set up these well points,

8   and they've got to haul pipe around with the forks

9   and, you know, set up their well points and drop the

10  wells in the hole.  He'd do that, you know, fire the

11  generators up, and then sit in his truck all day.  If

12  the machine needed fueling or servicing, he'd take

13  care of that.  They did not have a guy at night.

14         MR. BENSON:  Did they say why they had a guy

15  in the day and not at night?

16         MR. KRESGE:  No.  I guess because they

17  figured we wouldn't be doing our job at night, you

18  know.  Business agents go home at 1 o'clock.

19         MR. CISCO:  Who?

20         MR. BENSON:  So he didn't tell you.

21         MR. SCULLY:  Approximately how many well

22  points?

23         MR. KRESGE:  It varied, between 15 to 20.  I

24  mean, this is a big job.  The discharge on this job

1    has got to be a thousand feet.

2         MS. LORD:  Are there any further questions

3    at this point for the Union?

4         MR. CISCO:  One massive job.

5         MS. LORD:  Mr. Hanlon?

6         MR. HANLON:  Oh, boy, do I have a lot to say

7    on this one.

8         First, procedurally, the grievance isn't

9    timely.  The Step 1 date was 5-1.  The grievance date

10   for Step 2 was 5-17.  Having 12 days elapsed, 7 was

11   required in the contract, it's not in compliance.

12        Secondly, Mr. Kresge here has just

13   acknowledged that we had a guy there.  He says he was

14   running the pumps.  We say he was running the

15   generators.  Notwithstanding that, I have an

16   affidavit from Mr. Joe Merryman that says that Dick

17   Arsonal, a Local 150 member, was assigned to the

18   pumps and generators full-time when the crew was

19   working.

20        In addition to that, I have a computer

21   printout here that shows that Dave Schmidt was paid

22   the overage, which was required underneath the

23   contract, for the pumps at the rate of 50 cents per

24   hour.  And I'd like to read the pertinent provision

1   here.   (Reading) It says the member shall be assigned

2   to the pumps and compensated at the rate of 50 cents

3   per hour for the entire shift over and above the

4   member's negotiated rate of pay.

5            Included and contained within the statement

6   of the business agent is that there were two

7   generators and two power submersible electric pumps.

8   According to Mr. Joe Merryman's statement, those

9   pumps are less than 4 inches in diameter.   Therefore,

10  we've complied with all of the terms of the contract.

11           (Reading) Another provision here says, with

12  regard to submersible pumps, that only during the

13  entire daytime shift, Monday through Friday and on

14  such other days as the regular daytime crew is

15  conducting full-scale job operations.

16           Now, you know, he's talking about things

17  taking place at night, and he's asking the Committee

18  to, in essence, re-engineer the contract for the

19  purposes of extracting another $137,000.   This is

20  egregious, especially since he's admitted that our

21  guy is there and present on the site.

22           MR. CISCO:   For one, you said you got an

23  affidavit.   Could we have a copy, please?

24           MR. HANLON:   Sure.   And we'll note that the

1    notary isn't completed there.  I didn't have an

2    opportunity to have that signature notarized, but I

3    did see Mr. Merryman sign it.

4            MR. CISCO:  Secondly, you keep referring to

5    pumps.  If you'll notice, this grievance says pumps

6    and generators.

7            MR. HANLON:  Yes, and I'm talking about both

8    pumps and generators.

9            MR. CISCO:  Well, there's a difference

10   between pumps and generators.  So who was on the

11   generators?  Who was assigned to the generators?

12           MR. HANLON:  Dick Arsonal and David Schmidt.

13           MR. CISCO:  Okay.  You had two guys assigned

14   to generators, is that correct?

15           MR. HANLON:  That's correct.

16           MR. CISCO:  How about the pumps?

17           MR. HANLON:  David Schmidt was also assigned

18   to the pumps and paid the premium wage for those two

19   pumps.

20           MR. CISCO:  Okay.

21           MR. KRESGE:  That's a typo in the grievance,

22   by the way.

23           MR. HANLON:  That's the grievance that was

24   submitted to this Committee.  That's what I came here

1    to talk about.

2              MR. CISCO:  All right.  It is what it is.

3              MR. HANLON:  It's too late to change it.

4              MR. CISCO:  We're not disputing that.  Go

5    ahead.

6              MR. HANLON:  Well, the point is that we had

7    a guy on the site, you know, and you're asking us to

8    pay for that guy again.

9              MR. CISCO:  Does this guy work 24 hours a

10   day?

11             MR. KRESGE:  No.

12             MR. HANLON:  He was available 24 hours a

13   day.

14             MR. CISCO:  No, no.  Was he on the site --

15             MR. HANLON:  But he was on the site -- your

16   contract doesn't say 24 hours a day.

17             MR. CISCO:  Yes, it does.  Okay.

18             MR. SCULLY:  Were the generators and the

19   pumps running at night?

20             MR. KRESGE:  Yes, sir.

21             MR. SCULLY:  You were out there?

22             MR. KRESGE:  Yes, sir.

23             MR. HANLON:  I would also raise an objection

24   to the jurisdiction of this Committee to hear this

1    particular grievance.   Again, you know, no notice.

2         We had a worker on the site.   With regard to

3    the provisions with regard to pumps, even the most

4    maximum amount that you can have, the contract is

5    very clear that the Employer isn't required to keep

6    extra people on the job site when the regular daytime

7    crew isn't conducting full-scale job operations.

8    Now, it's commensurate with that provision that

9    anything that's incidental to the operation of those

10   pumps runs with it.   So you can't say on one hand,

11   oh, you know, you've got to have a full-time guy

12   there, but you don't have to have a full-time guy

13   there.

14        MR. CISCO:   Where are you reading that from?

15   It's in the contract, but whereabouts?

16        MR. HANLON:   Page 39.

17        MR. CISCO:   How about the generators, does

18   that say anything about --

19        MR. HANLON:   Well, he cited Article XV here,

20   and Article XV goes to wages and fringe benefits.

21   And if you look at the --

22        MR. CISCO:   Yes, because pumps are covered

23   in Article XV, and generators are also covered in

24   Article XV.

1          MR. HANLON:  And if you go to Article I,

2    Section 2, that which you're talking about --

3          MR. CISCO:  Article what?

4          MR. HANLON:  Article I, Section -- it's in

5    your grievance.

6          MR. CISCO:  Well, I'm going by what you're

7    saying.  You're saying it.  I'm asking you.  I don't

8    know where you're at.  You're bouncing like a ball

9    here, so tell me where you're at.

10         MR. HANLON:  Why don't you just hold on and

11   I'll go back to it.

12         MR. DUNLAP:  What page are you at?

13         MR. CISCO:  Article I, Section 2, New and

14   Unlisted Equipment?

15         MR. HANLON:  No.  This is brought under

16   Article I, Section 11.

17         MR. CISCO:  Thank you.

18         MR. HANLON:  This is what your business

19   agent has brought forward.

20         MR. CISCO:  Okay.  What's wrong with that?

21   That covers the whole book.

22         MR. HANLON:  Well, if you go on and continue

23   to read where it says a combination of one piece

24   of -- Small Category Equipment Assignment, you know,

1    you talk about the pumps.

2        MR. CISCO:  Yes.

3        MR. HANLON:  And if you read there, it shows

4    that the pump guy is supposed to get paid a 50-cent

5    differential.  We've got a guy on the site, and we're

6    paying him, and he's one of your guys, for the

7    generators, so what's the problem?

8        MR. CISCO:  Because a generator that size

9    does not fall under small equipment.  It requires a

10   man by itself.

11       MR. HANLON:  Okay.  But we have a man on the

12   site when the regular crew is working, and that piece

13   of equipment is incidental to the operation of the

14   pumps.

15       MR. CISCO:  You are correct if it's small

16   equipment.  On a generator, running 24 hours a day,

17   it requires a man 24 hours a day and weekends.

18       MR. HANLON:  Where does it say that?  It's

19   not within the grievance which was submitted before

20   this Committee which I am called here to answer.

21   It's not in there.

22       MR. CISCO:  (Reading) I received a complaint

23   about Merryman Excavating on a job site at the

24   Hampshire Waste Treatment Plant.  The Company was

1  running three 89KW generators and two power

2  submersible electric pumps.

3  　　　　MR. HANLON:  But the complaint relative to

4  the contract reads to Article I, Section 11.  And if

5  you look at the actual grievance and statement of the

6  business agent --

7  　　　　MR. CISCO:  And Article XV, Section 1, which

8  refers to generators.

9  　　　　MR. HANLON:  Article XV, Section 1, Fringe

10  Benefits.  And then what page are you citing here?

11  　　　　MR. CISCO:  It has generators listed in

12  Article XV.

13  　　　　MR. KRESGE:  Page 56.

14  　　　　MR. CISCO:  Okay.  Any other questions?

15  　　　　MR. HANLON:  My point is that we put a guy

16  on the job, and we paid the other guy the premium,

17  and you're asking us for stuff 24/7, and I don't see

18  where it says in the contract you get 24/7.

19  　　　　MR. CISCO:  Would you agree with me that the

20  generators ran 24 hours a day?

21  　　　　MR. HANLON:  No.

22  　　　　MR. CISCO:  Oh, they didn't?  You shut the

23  pumps off at night?

24  　　　　MR. HANLON:  Well, as a matter of fact, I'm

1   really glad that you asked that --

2       MR. CISCO:   Thank you.

3       MR. HANLON:   -- because, see, the pumps were

4   actually vandalized.

5       Oh, I'm so glad that you thought that was

6   funny because you made a statement to Mr. Merryman

7   about that, didn't you?

8       MR. KRESGE:   I'm perfect, huh?

9       MR. HANLON:   Yeah, you're perfect.   And

10  those pumps were vandalized by the placing of

11  shredded plastic into the well pumps.   That's

12  something your particular business agent made a

13  comment to one of our guys that, gee, we should have

14  someone here at night.  'You better, you know, wonder

15  what's going on.

16      MR. CISCO:   And he's right.   That's why you

17  should have --

18      MR. KRESGE:   That's why you have a guy on,

19  in case the machine breaks down or it runs out of oil

20  or fuel.

21      MR. CISCO:   Mike, I'll --

22      MR. HANLON:   Well, that's pumps.

23      MR. CISCO:   And the generators that were

24  powering these pumps.   Well points do not shut off at

1    night.

2         MR. SCULLY:  The original question, were

3    they running at night?

4         MR. HANLON:  I don't believe so.  They say

5    that they were, you know.

6         MR. CISCO:  Do you know what a well point

7    system is?

8         MR. HANLON:  Do I know what a well -- I'm

9    not an engineer.

10         MR. CISCO:  Okay.  Well, you're a

11    representative of the Company.

12         MR. HANLON:  Sure.

13         MR. CISCO:  Obviously you're an employee of

14    the Company, as you had stated, so I assume you have

15    knowledge of construction.

16         MR. HANLON:  No, I don't have much knowledge

17    of construction.  I'm not that smart.

18         MR. CISCO:  Okay.  Well points cannot be

19    shut off in the evening.  It defeats the whole

20    purpose of a well point system.

21         MR. HANLON:  Well, good.  And because you

22    recognize that and you recognize that the contract

23    relative to those wells says that you don't have to

24    have engineers on the site to monitor those wells,

1    you're talking out of both sides.

2         MR. CISCO:  No, I'm not.

3         MR. HANLON:  Yeah.

4         MR. CISCO:  I'm asking about the generators.

5    Do you have down power?

6         MR. HANLON:  My point here is that if you

7    can't have one without the other, and included within

8    the contract it says you don't have to keep people

9    there 24/7, you're asking for something that's

10   unreasonable.

11        MR. CISCO:  No.  That's referring to -- did

12   you have down power there or did you have generators?

13   Do you know what down power is?

14        MR. HANLON:  Yeah.  I'm sure you're talking

15   about off the pole.

16        MR. CISCO:  Yes.  Did you have down power

17   there or did you have generators?

18        MR. HANLON:  Well, I'm pretty sure that

19   we've talked about having generators here in the

20   sense that we've had a man --

21        MR. CISCO:  Thank you.  That's all I asked.

22        MR. HANLON:  -- who we paid full-time to

23   work on that job site.

24        MR. CISCO:  You're done.  I asked you a

1   question.  You answered me.  You had generators on

2   the site.  Thank you very much.  That's all I have.

3            MS. LORD:  Do you have any questions?

4            MR. SCULLY:  What size were the pumps?

5            MR. HANLON:  They were less than 4 inches.

6            MR. KRESGE:  3 inches.

7            MR. HANLON:  3-inch?

8            MR. BENSON:  The pumps were under the small

9   tools.

10           MR. CISCO:  What was the discharge?

11           MR. BENSON:  But the generators --

12           MR. CISCO:  Wait, wait, wait, Joe.  What was

13  the discharge?

14           MR. KRESGE:  You saw in the picture.  It was

15  a thousand feet at least.

16           MR. AUGUST:  What was the discharge, Mike?

17           MR. HANLON:  That's speculation.  He used

18  the terms "got to be, at least, maybe."

19           MR. CISCO:  Okay.  We'll ask you a question.

20  What was the discharge?

21           MR. HANLON:  It is my understanding it was

22  less than 4 inches.

23           MR. CISCO:  No.  How many feet?

24           MR. HANLON:  I'm not going to answer that.

1   It's your burden, you didn't prove it, and this is

2   ridiculous.

3           MR. CISCO:  I think we did.

4           MR. HANLON:  No, I don't think so.

5           MR. BENSON:  How about the generators?

6           MR. KRESGE:  That's well over --

7           MR. DUNLAP:  Yeah.  The generators are

8   separate pieces of equipment.  They're running 24

9   hours.

10          MR. HANLON:  May I see any of the

11  photographs that are being submitted?

12          MR. CISCO:  Absolutely.

13          MR. AUGUST:  Didn't you get to see them?

14          MR. HANLON:  No.

15          MR. AUGUST:  I'm sorry.

16          MR. CISCO:  We've got to get a copy of this

17  affidavit too for everybody, to pass out to

18  everybody.

19          MR. AUGUST:  I'll get it, Steve.

20          MR. BENSON:  Mr. Hanlon, we're being asked

21  to vote on a $137,000 issue.  Would you like to take

22  a few minutes to try and talk to the Local to work

23  this thing out?

24          MR. HANLON:  Sure, I'd love to.

| | |
|---|---|
| 1 | MR. BENSON:  Why don't you do that.  Are you |
| 2 | guys willing to talk about this for a few minutes? |
| 3 | MR. CISCO:  No, because that's light change. |
| 4 | MR. KRESGE:  No. |
| 5 | MR. CISCO:  $137,000 is light money because |
| 6 | he should have had actually three guys out there. |
| 7 | MR. KRESGE:  And I'll adjust that today. |
| 8 | MR. CISCO:  And the next grievance will show |
| 9 | all three guys.  And if I have to, I'll bring in |
| 10 | cameras or whatever.  This is very light.  He owes us |
| 11 | about a quarter of a million. |
| 12 | And we rest.  We're done.  I ask that we |
| 13 | move to executive session. |
| 14 | MR. DUNLAP:  Are we off the record? |
| 15 | MR. KRESGE:  Where do you talk about |
| 16 | generators in here? |
| 17 | MR. HANLON:  Just a moment. |
| 18 | MR. DUNLAP:  We're off the record, right? |
| 19 | MR. HANLON:  No, we are not off the record |
| 20 | yet.  I haven't finished my statement. |
| 21 | MR. DUNLAP:  I thought Steve just -- |
| 22 | MR. BENSON:  Well, at least wait till he |
| 23 | gets back. |
| 24 | MR. HANLON:  Sure. |

1      MR. DUNLAP:  It's page 56.

2      (Discussion off the record.)

3      MR. CISCO:  Let's go in executive session.

4          (The parties left the room, whereupon

5          the Committee went into executive

6          session, after which the parties

7          re-entered the room and the following

8          proceedings were had:)

9      MS. LORD:  This is the decision in

10  Grievance 06-35.  Based on the testimony heard, the

11  Committee by majority decision determined as follows:

12  One, the Employer shall pay the Local 150 Assistance

13  Fund the sum of $77,426.96.  Two, the check should be

14  sent to Steven Cisco, Local 150, for distribution.

15  And I'll confirm this in writing.

16      MR. CISCO:  And we apologize for the

17  original number.  There was a miscalculation.  This

18  was for one man, so that's why you got what you got.

19                  *    *    *

20  GRIEVANCE NO. 06-36 IS AS FOLLOWS:

21      MS. LORD:  Grievance 06-36, a letter dated

22  May 18, 2006 to Merryman Excavation, Incorporated

23  regarding violations of the MARBA Heavy and Highway

24  and Underground Agreement:  Article I, Section 1,

1    Bargaining Unit; Section 3, Recognition; Section 6,

2    No Discrimination; Section 9, Prevailing Wage Scale;

3    and Section 11, Assignment of Work; Article XII,

4    Hiring; and Article XV, Wage Rates and Fringe

5    Benefits.

6         (Reading) Dear Mr. Merryman:  We are advised

7    that your Company is in violation of various articles

8    and sections, including but not limited to those

9    captioned above, of the MARBA Heavy and Highway and

10   Underground Agreement, to which your Company and this

11   Union are parties by virtue of a Memorandum of

12   Agreement signed April 1, 2000.

13        (Reading) We are further advised that the

14   above-stated violations occurred on or about

15   April 28 and 29, 2006, and May 1 through 4, 2006, and

16   are ongoing on your construction site located on Lake.

17   Street and Kilkerney Court in Woodstock, Illinois,

18   within Local 150's jurisdictional territory, where

19   your Company was performing work with a nonbargaining

20   unit employee.  Amount sought is $3,282.73, with a

21   note that it is ongoing.

22        (Reading) The pre-grievance meeting was

23   scheduled for June 15, 2006.  It is in the best

24   interest of your Company to negotiate a settlement at

1    the pre-grievance hearing.  Many grievances are

2    resolved at this meeting.  If you do not attend the

3    pre-grievance hearing and this matter remains

4    unresolved, it will be automatically scheduled for

5    the next meeting of the Joint Grievance Committee.

6              (Reading) This Union shall continue to hold

7    your Company liable for all appropriate remedies,

8    including but not limited to any back wages and

9    fringe benefits lost by all affected members of the

10   bargaining unit who would be working had you honored

11   our Agreement.  Signed by Steven Cisco.

12             MR. CISCO:  A no-show at the pre-grievance.

13   We're back to you, Chuck.

14             MR. AUGUST:  This is in regards to Jeff, I

15   believe, is it not, so we're all on the same form?

16   Jeff Cable?

17             MR. CISCO:  Yes, Jeff Cable.

18             MR. AUGUST:  May 4th, I was out on the job

19   site.  It was the Wal-Mart job site in Woodstock on

20   Lake Street and Kilkerney Court.

21             (Reading) Jeff Cable, a 139 Wisconsin

22   operator, was working for Merryman, running a

23   W.A. 180 loader.  It's a wheel tire loader.  I spoke

24   to Mr. Cable about the proper procedures to clear in

1  when you are from another local.  I also spoke to

2  Mr. Cable about the hours he had worked on this job

3  site.  He wrote them down for me.  I explained that I

4  would be filing a grievance for the time he was

5  working down here not cleared in and asked him to

6  call the next time to clear in.  I also asked how

7  much he was getting paid per hour.  He stated $28.94.

8  Mr. Cable inquired about the transferring process

9  into Local 150.

10      I left a phone call for Mr. Hanlon on

11  5-11-06, and I haven't received a phone call back.

12  The phone number I called was (847) 577-1434.

13      MR. SCULLY:  Is this the grievance or is it

14  ongoing?

15      MR. AUGUST:  I just put down the dates that

16  he gave me, and all I did was here's what I've got.

17  I haven't caught him down here working since that

18  time.

19      MR. SCULLY:  Okay.

20      MR. BENSON:  Where did you get that phone

21  number to call?

22      MR. AUGUST:  From Mr. Hanlon.

23      MR. BENSON:  What is that, this number?

24      MR. HANLON:  One of his office numbers.

1          MR. BENSON:  What's the number?

2          MR. AUGUST:  (847) 577-1434.  I'll give you

3     a copy of his card if you'd like.

4          MS. LORD:  Any questions for the Union at

5     this point?  If not, Mr. Hanlon?

6          MR. HANLON:  Well, for the record, I'd like

7     to simply state that this grievance is, again, not

8     timely.  The violation date and the date on which

9     Mr. August has indicated that he called my office is

10    ten business days prior to his Step 2 date.  I had

11    previously sent Mr. August a letter dated 4-25, which

12    he's acknowledged having received, which requires

13    that he put his comments to me in writing.  And in

14    addition thereto, he has not done that, so there was

15    no meaningful attempt to settle this.

16          Without waiving any rights relative to the

17    balance of the claim, as I mentioned earlier, the

18    Joint Grievance Committee is without power to

19    adjudicate this matter because it wasn't timely

20    brought.

21          I don't know what the source of these

22    overtime hours is.

23          MR. CISCO:  Did you have a Jeff Cable

24    working for you at that time?

1      MR. HANLON:  I don't have a record with

2   that.  I'm sure Mr. August is not lying with regard

3   to Mr. Cable being present.  I lack a document to

4   demonstrate that he was not working for Merryman, but

5   I thought he was working up in Wisconsin.  Oh, wait.

6   Here's my printout.

7      MR. BENSON:  Was Wisconsin slow or what?

8      MR. CISCO:  Uhn-uhn.

9      MR. BENSON:  It's time you have a talk with

10  them.

11     MR. CISCO:  They've got a big water job out

12  there, a huge job.

13     MR. HANLON:  He hasn't worked with us for

14  some time.  Well, for the hours that he actually did

15  work, we have scale wages here reported paid on our

16  system totaling $1,917, not $3,282.

17     MR. CISCO:  Right, no question.  He actually

18  got fringes, and you were paying him -- according to

19  Jeff, he was being paid $28.94 versus the contract of

20  $37.20.  He's got fringes involved too.

21     MR. HANLON:  I know that he was getting paid

22  the contract wage.

23     MR. CISCO:  Pardon me?

24     MR. HANLON:  It's a discrepancy on the

1    hours.  He got paid the contract wage.

2          MR. CISCO:  And how much did you pay him?

3          MR. HANLON:  $1,900.

4          MR. CISCO:  Well, if you just do

5    straight-time hours, it would be $1,488, and fringes

6    are $818.23.

7          MR. HANLON:  That included his fringes.

8          MR. CISCO:  Pardon me?

9          MR. HANLON:  That included his fringes.

10         MR. CISCO:  That's what I'm trying to say.

11   40 straight-time hours --

12         MR. HANLON:  His net pay was $1,216.

13         MR. CISCO:  What I'm trying to get to is

14   this $2,300 for those days in question.

15         MR. HANLON:  I think what I'm trying to say

16   here is that I think the hours are overstated.

17         MR. BENSON:  Okay.  So this stopped after

18   the 4th?

19         MR. HANLON:  It immediately stopped.

20         MR. CISCO:  Yeah, it stopped on the 4th.

21         MR. BENSON:  So that's the only day you were

22   really there?

23         MR. AUGUST:  No.

24         MR. BENSON:  The rest of the stuff came from

1    him?

2              MR. AUGUST:   Came from him and Jim, who is

3    the backhoe operator on the job site.

4              MR. CISCO:   And they're admitting --

5              MR. HANLON:   Jim who?

6              MR. CISCO:   How many hours did you say?   How

7    much did you pay him in total wages?

8              MR. HANLON:   Total wages, fringes,

9    everything, was $1,900.

10             MR. CISCO:   $1,900.   But you don't know how

11   much an hour?

12             MR. HANLON:   It was the scale wage because

13   that's how the computer system calculates it.

14             MR. CISCO:   But you do work in Wisconsin,

15   don't you?

16             MR. HANLON:   Yeah, we do work in Wisconsin,

17   but it goes by job site, and I'm sure that he was

18   paid the scale wage.

19             If I may, can we just settle this one for

20   $2,000?

21             MR. CISCO:   Excuse me one second.   Come

22   here.

23             MR. HANLON:   Let the record note that

24   Ms. Hensel and Mr. Cisco have left the room.

1       (Whereupon Mr. Cisco and Ms. Hensel left

2        the room.)

3       (Whereupon Ms. Hensel re-entered the room.)

4       MR. BENSON:  Did he hear the offer?

5       MS. HENSEL:  He did.

6       (Whereupon Mr. Cisco re-entered the room.)

7       MR. CISCO:  Okay.  I will agree to settle

8   this for $2,000.  Are you going to write me a check

9   today?

10      MR. HANLON:  I can't write you a check

11  today, but I can get someone --

12      MR. CISCO:  Okay.  I will get faxed over a

13  release form.  They're faxing over a release form to

14  me, and pending you signing it, we settle it for

15  $2,000.

16      MR. HANLON:  And I have to look at the

17  language of release.

18      MR. CISCO:  I'm sure you do.  That's why I

19  said it'll be pending you signing it, otherwise it'll

20  be brought back before the board.  Okay?

21      MR. HANLON:  All right.

22      MR. BENSON:  Okay.

23              *     *     *

24

1    GRIEVANCE NO. 06-37 IS AS FOLLOWS:

2         MS. LORD:   This is Grievance 06-37, a letter

3    dated May 18, 2006 to Merryman Excavation,

4    Incorporated regarding violations of the MARBA Heavy

5    and Highway and Underground Agreement:   Article I,

6    Section 1, Bargaining Unit; Section 3, Recognition;

7    Section 4, Subcontractor; Section 6, No

8    Discrimination; Section 7, Scope of Work; and

9    Section 11, Assignment of Work.

10        (Reading) Dear Mr. Merryman:   We are advised

11   that your Company is in violation of various articles

12   and sections, including but not limited to those

13   captioned above, of the MARBA Heavy and Highway and

14   Underground Agreement, to which your Company and this

15   Union are parties by virtue of a Memorandum of

16   Agreement signed April 1, 2000.

17        (Reading) We are further advised that the

18   above-stated violations occurred on or about May 5,

19   2006, on your construction site located on Lake

20   Street and Kilkerney Court in Woodstock, Illinois,

21   within Local 150's jurisdictional territory, where

22   your Company was performing work with nonbargaining

23   unit employees.   The amount sought was $785.68.

24        (Reading) The pre-grievance meeting was

1    scheduled for June 15, 2006.  It is in the best

2    interest of your Company to negotiate a settlement at

3    the pre-grievance hearing.  Many grievances are

4    resolved at this meeting.  If you do not attend the

5    pre-grievance hearing or mail us your settlement

6    check prior to that date and this matter remains

7    unresolved, it will be automatically scheduled for

8    the next meeting of the Joint Grievance Committee.

9         (Reading) This Union shall continue to hold

10   your Company liable for all appropriate remedies,

11   including but not limited to any back wages and

12   fringe benefits lost by all affected members of the

13   bargaining unit who would be working had you honored

14   our Agreement.  Signed by Steven Cisco.

15        MR. CISCO:  No-show, pre-grievance.  This

16   belongs to Chuck.

17        MR. AUGUST:  Out on the Wal-Mart job site in

18   Woodstock --

19        MR. HANLON:  Can I interject here for just a

20   quick second?  We've spent a lot of time here over

21   $700.  How about, for the purposes of settlement,

22   without any acknowledgment of wrong, I just offer to

23   pay you $500 and we move on to the next one?

24        MR. AUGUST:  Done.

1          MR. CISCO:  Done, pending signing my

2     release.

3                    *     *     *

4          MS. LORD:  Are we hearing 38 and 39

5     together?  Is this the same issue?

6          MR. HANLON:  No, they should be two separate

7     issues.  Well, wait, wait, wait.  I want to defer

8     mine until the end.  My issue is tangential.  It's

9     not the same issue, okay?  It may deal with some

10    similar facts, but they're not the same.

11         MS. LORD:  Okay.

12         MR. CISCO:  Okay.

13                   *     *     *

14    GRIEVANCE NO. 06-38 IS AS FOLLOWS:

15         MS. LORD:  This is Grievance 06-38, a letter

16    dated May 30, 2006 to Merryman Excavation,

17    Incorporated regarding violations of the MARBA Heavy

18    and Highway and Underground Agreement:  Article I,

19    Section 1, Bargaining Unit; Section 3, Recognition;

20    Section 6, No Discrimination; Section 7, Scope of

21    Work; Section 9, Prevailing Wage Scale; and

22    Section 11, Assignment of Work; Article IX,

23    Section 1, Discharge; and Section 3, Regular Assigned

24    Engineers; Article XII, Hiring.

1    (Reading) Dear Mr. Merryman:  We are advised

2  that your Company is in violation of various articles

3  and sections, including but not limited to those

4  captioned above, of the MARBA Heavy and Highway and

5  Underground Agreement, to which your Company and this

6  Union are parties by virtue of a Memorandum of

7  Agreement signed April 1, 2000.

8    (Reading) We are further advised that the

9  above-stated violations occurred on or about

10  April 21, 2006, and are ongoing on your various

11  construction sites within Local 150's jurisdictional

12  territory.  The amount sought is $451.27, with a note

13  that it is ongoing.

14    (Reading) The pre-grievance meeting was

15  scheduled for June 15, 2006.  It is in the best

16  interest of your Company to negotiate a settlement at

17  the pre-grievance hearing.  Many grievances are

18  resolved at this meeting.  If you do not attend the

19  pre-grievance hearing and this matter remains

20  unresolved, it will be automatically scheduled for

21  the next meeting of the Joint Grievance Committee.

22    (Reading) This Union shall continue to hold

23  your Company liable for all appropriate remedies,

24  including but not limited to any back wages and

1    fringe benefits lost by this and all affected members

2    of the bargaining unit who would be working had you

3    honored our Agreement.   Signed by Steven Cisco.

4            MR. CISCO:   No-show at the pre-grievance.

5    Chuck?

6            MR. AUGUST:   If I could, I'll pass this out.

7    Take a moment, if you would, and read that.

8            MR. HANLON:   Mr. August, would you

9    articulate what document you're exactly distributing?

10           MR. AUGUST:   I'll give you a copy of it

11   also.

12           MR. HANLON:   Okay, but the record won't know

13   what that is.

14           Would you just enter that in, please.

15           (Re:   A letter dated May 5, 2006 to

16           Mr. William Dugan from Mr. Robert Hanlon.)

17           MR. CISCO:   It's a letter from you dated

18   May 5, 2006 and signed by you.

19           Okay.  Chuck, go on.

20           MR. AUGUST:   Do you want me to read it into

21   the record?   I'll wait for everybody to get done

22   reading it.

23           MR. HANLON:   I object to the entry of this

24   document into the record at this time.   The reason

1    for that, this document was prepared for the purpose

2    of settlement.  And it reads at the bottom of the

3    first page, "I believe the issues that exist can be

4    settled without resort to the courts and perhaps be

5    reconciled to the mutual satisfaction of Merryman."

6    Therefore, this document was made for the purpose of

7    settling a dispute, not as evidence of a dispute.

8              MR. CISCO:  So stated.  We'll discuss it.

9              MR. BENSON:  All right.  So what's going on

10   with this one?

11             MR. HANLON:  It's also irrelevant to the

12   issues relative to the grievance.

13             MR. AUGUST:  If I could read this into the

14   record.  Is it necessary?

15             MR. HANLON:  I object.

16             MR. BENSON:  Well, I think we all read it,

17   so tell me what this grievance is about.

18             MR. AUGUST:  Mr. Rabine, who is present

19   here, was dispatched out to run a piece of equipment.

20             MR. CISCO:  What was he sent out to run?

21             MR. AUGUST:  One second.  Let me get

22   everything.

23             MR. GORMAN:  What was it?

24             MR. RABINE:  It was a Komatsu mini

1    excavator.

2                MR. GORMAN:  Okay.

3                MR. AUGUST:  Mr. Rabine was dispatched out

4    April 20th to run a mini excavator out on the Wonder

5    Lake project.  He performed those duties.  I have

6    pictures of the job that he did out there in Wonder

7    Lake.  I'd like to submit those, if possible.

8                MR. CISCO:  When was the date, Chuck?

9                MR. AUGUST:  April 20th.

10               MR. CISCO:  April 20th.  Okay.

11               MR. BENSON:  That's subsequent to a work

12   order?

13               MR. AUGUST:  Correct.  I've got a copy of

14   the work order also for you.

15               He was sent out there and performed the

16   duties.  At the end of the day, he was told that he

17   would be going somewhere else.  The foreman that he

18   spoke to --

19               MR. BENSON:  So he worked all day?

20               MR. AUGUST:  He worked all day.

21               MR. RABINE:  A nine-hour day.

22               MR. AUGUST:  A nine-hour day.

23               MR. CISCO:  On 4-20.  Okay.  Go ahead.

24               MR. BENSON:  What happened at the end of the

1     day?

2           MR. AUGUST: He was told that they'd be

3     calling him to tell him where to go for the next day.

4     That would have been a Saturday?

5           MR. RABINE: I believe it was a Friday for

6     Saturday. They had no work for Friday. They did

7     inform me on Friday there wouldn't be any work. I

8     believe it was Friday. We can check the day. And

9     then Saturday they wanted me to work. They were

10    interested in having me work Saturday.

11         MR. CISCO: Would you please identify

12    yourself for the court reporter.

13         MR. RABINE: John Paul Rabine, Local 150.

14         MR. BENSON: All right. So 4-20 was a

15    Thursday?

16         MR. RABINE: I'd have to check the day. I'm

17    almost sure it was a Thursday.

18         MR. CISCO: Okay. Hang on. Let's check.

19    Let's get the dates right.

20         MR. BENSON: 4-20 was a Thursday. So at the

21    end of the day you're told I don't have any work for

22    you Friday, but they said --

23         MR. RABINE: But work Saturday.

24         MR. BENSON: When did they tell you that,

1    that night, Thursday night?

2          MR. RABINE:  It was, I believe, Thursday

3    night.

4          MR. CISCO:  And were you still on the job or

5    did they call you up and tell you that?

6          MR. RABINE:  They called me up, and I talked

7    to the foreman on the phone.

8          MR. CISCO:  The foreman said no work for you

9    tomorrow?

10          MR. RABINE:  Exactly.

11          MR. CISCO:  Come in Saturday?

12          MR. RABINE:  Right.

13          MR. BENSON:  Where were you going Saturday?

14          MR. RABINE:  Down to Deerfield.  They had a

15    Deerfield job, running a combination backhoe and

16    tractor.

17          MR. BENSON:  Which was a different job than

18    you were on Thursday?

19          MR. RABINE:  Yes, sir.

20          MR. BENSON:  Okay.

21          MR. RABINE:  And then they had further told

22    me I would be working the following week on Monday

23    because they said Saturday was off.  They called me

24    on I believe it was Friday night and said Saturday

1  was off, so it was a continuing -- they said okay,

2  now you'll work Monday, ongoing work.

3        MR. BENSON:  So on Friday night they called

4  you off for Saturday?

5        MR. RABINE:  Yes, sir.

6        MR. BENSON:  Did they actually assign you

7  someplace Monday?

8        MR. RABINE:  They didn't, no, because there

9  was some underlying issue.

10       MR. BENSON:  Okay.  So then what?

11       MR. RABINE:  Basically, they kept me on

12  hold.  I called the following week every day, twice a

13  day, and was looking to work Monday, Tuesday, I

14  believe it was up until Wednesday of the following

15  week, and then the letter was sent to the Union hall.

16  They never contacted me, never called me back.

17       MR. BENSON:  What did they tell you when you

18  called in?

19       MR. RABINE:  They said he wasn't available.

20  They said no one was available.  They basically like

21  kind of gave me the runaround.  I felt like I was

22  given the runaround, like they didn't want me to work

23  or they didn't have any work, but they kept telling

24  me that I was going to work.

1    MR. BENSON:  So you never went back to work

2 for them after that Thursday?

3    MR. RABINE:  Never went back to work after

4 that Thursday, correct.

5    MR. BENSON:  Okay.

6    MR. RABINE:  And I worked for them the

7 previous year in 2005 also.  Should I bring that up?

8    MR. AUGUST:  That's all right.

9    MR. BENSON:  So what are you looking for,

10 Chuck?

11    MR. AUGUST:  I feel that he was let go and

12 discriminated against and lost the opportunity to

13 work for the Company, and I believe he should be made

14 whole for every day that he has been off of work.

15    MR. CISCO:  Through what date, Chuck?

16    MR. AUGUST:  Through today's date.

17    MR. SCULLY:  What happened on Wednesday?

18 Wednesday you called once or twice, and what were you

19 told?

20    MR. RABINE:  They never contacted me back

21 from Monday.  They told me to check in on Monday

22 because they'd probably send me out basically was the

23 gist of what the foreman told me.  They never called

24 me back.  And I called a second time on Monday, I

1    called Tuesday in the morning, I called Tuesday in

2    the afternoon, and also Wednesday.  And by that time

3    we received a letter.  Their answer to me was a

4    letter to the Union saying that I had performed

5    unfavorably for their Company.

6              MR. SCULLY:  What was your last contact with

7    the Union, was it Friday?  Prior to the letter.

8              MR. AUGUST:  With the Company, you mean?

9              MR. SCULLY:  Yeah.

10             MR. RABINE:  With the Company, it would be

11   that Friday.

12             MR. SCULLY:  And that was a telephone call

13   telling you not to come in Saturday?

14             MR. RABINE:  Not to come in Saturday, but to

15   come in Monday or to call him Monday, that I would be

16   working Monday, to call to get my orders for the job

17   that I'd be working on Monday, so that's what I did.

18             MR. SCULLY:  And this is the letter?  Is

19   this the letter you're talking about?

20             MR. RABINE:  I believe that that's the

21   letter they sent.  In other words, that was their

22   answer was a letter to the Union.

23             MR. SCULLY:  And this letter is dated

24   May 5th?

1          MR. RABINE:  I believe so.

2          MR. BENSON:  No.  April 25th is the letter

3     here.

4          MR. HANLON:  April 21st is the letter to the

5     Union.

6          MR. BENSON:  You've got one the 21st too?

7          MR. HANLON:  Well, it's attached as an

8     exhibit to their grievance.

9          MR. RABINE:  I didn't receive word until

10    Mr. August had informed me that they had terminated

11    my employment.

12         MR. BENSON:  This one?

13         MR. HANLON:  Yeah.

14         MR. BENSON:  Okay.

15         MR. CISCO:  Chuck, why are you showing

16    pictures here?  Are you going to get to this?

17         MR. AUGUST:  Yes.

18         MR. BENSON:  So you're saying they sent a

19    letter Friday saying you're terminated, and you said

20    nobody ever told you you were terminated?

21         MR. RABINE:  Exactly.

22         MR. BENSON:  Is that what this is all about?

23         MR. AUGUST:  Just the opposite.  Led him to

24    believe that he was going to be working at a

1    different site down in Deerfield, strung him along,

2    strung him along another day, another day.

3           MR. BENSON:  So when did you go back on the

4    out-of-work list?

5           MR. RABINE:  I believe it was that week,

6    either that Wednesday or Thursday, if I'm not

7    mistaken.

8           MR. HANLON:  If I may inquire, I have

9    requested a copy of the out-of-work list.  I have not

10   been provided a copy of the out-of-work list, and the

11   Union is clearly in a position where they could

12   provide a copy of the out-of-work list as required in

13   the elusive Addendum -- No. 1, is it?  It's not in

14   the little book, but in a separate document.

15          MR. AUGUST:  4-27, he went back on the

16   out-of-work list.  4-20, he was dispatched out to

17   Merryman.  4-27, he put his name back in.

18          MR. BENSON:  Was the weather bad or

19   anything?

20          MR. AUGUST:  No, sir.

21          MR. BENSON:  Why did you wait so long to go

22   back on the out-of-work list?

23          MR. RABINE:  I was informed there was a

24   couple foremen that wanted me to work, a couple

1    foremen wanted me to work, and I wanted to work for

2    Merryman because I thought Merryman would be a great

3    company to work for.  I had worked for them in the

4    previous year, 2005, and there was a foreman at that

5    time that wanted me to work on his jobs.

6         MR. BENSON:  So you're saying the first time

7    you knew that in Merryman's mind you were terminated

8    was when 150 got this letter and told you about it,

9    is that what you're saying?

10        MR. RABINE:  Yeah.  And I don't recall the

11   exact date, but when that letter came, Mr. August

12   called me and said, John, they basically terminated

13   you.  And I had expected to work.  I think all that

14   week I -- in my mind, I was going to go back to work

15   for them at some point.  I didn't think that they

16   were going to give me the runaround because when I

17   worked for them before, they had the same thing

18   happen.  Basically, the same thing had happened to me

19   the previous year, and I actually kept working up

20   until a point.

21        MR. CISCO:  What's the date on that letter,

22   Joe?

23        MR. BENSON:  Which one?

24        MR. CISCO:  The one to the Union.

1    MR. BENSON:  To terminate?  April 21st, the

2    next day.  I mean, I don't know when you got it, but

3    it's dated the 21st.

4        Have you got any other questions?

5        MR. HANLON:  You'll notice that there's

6    ordinarily a date line at the top.  And on the

7    grievance, that date line, the paper has been moved

8    up, so you can't read that on the copy, but I know

9    for a fact that that was dispatched on the 21st.

10       MR. BENSON:  Okay.  Anything else?

11       MR. AUGUST:  Let me correct what he just

12   said because the order was placed on the 19th, and he

13   was dispatched out on the 20th.

14       MR. BENSON:  I got that.

15       MR. AUGUST:  Okay.  Not the 21st.

16       MR. CISCO:  No, no, no, the letter from

17   them.

18       MR. BENSON:  He's saying the letter.

19       MR. AUGUST:  Oh, I'm sorry.  I apologize.

20       MR. BENSON:  The date of his letter was the

21   next day, terminating him.

22       MR. CISCO:  And what's the reason for

23   termination?

24       MR. BENSON:  He wasn't qualified to run a

1  machine, unsafe.

2          MR. HANLON:  Actually, there's more.

3          MR. BENSON:  Well, yeah.  I mean, you've got

4  everything listed in your letter, but that's the crux

5  of it, I guess.

6          MS. LORD:  Are there any further questions?

7          MR. CISCO:  Chuck, you got anything?

8          MR. AUGUST:  No, just what I submitted so

9  far.

10          MR. CISCO:  So what are you seeking here,

11  Chuck?

12          MR. AUGUST:  I believe that he was

13  unjustifiably discharged, and I believe for the time

14  that he was off to be made whole, from the 20th to

15  the 27th, excluding Sunday.  He worked the 20th, so

16  it would be the 21st to the 27th.

17          MR. CISCO:  How about weekends?

18          MR. AUGUST:  Excluding Sunday.

19          MR. CISCO:  Okay.  So you're looking for --

20  Joe, turn the page.

21          MR. BENSON:  Here's when he worked.  Here's

22  when he went back to --

23          MR. CISCO:  Okay.  Well, I want to see.  So

24  you're seeking five days, Chuck?

1          MR. AUGUST:  Correct.

2          MR. CISCO:  Except Saturday and Sunday,

3    right?  Well, no.

4          MR. AUGUST:  No.  Saturday is included

5    because it's a day that he should have worked.

6          MR. CISCO:  That's five days.  So you're

7    seeking five days' pay.  Anything else on it?

8          You're up.

9          MR. HANLON:  Outside of saying this is

10   absolutely ridiculous, I'm going to commence with

11   Mr. Rabine had worked for Merryman Excavation before.

12   On 10-3 of '05, he was released because he filled a

13   7-foot live sanitary manhole to the rim with dirt.

14          A letter was sent via Certified Mail to the

15   Union and was received, according to the U.S. Postal

16   tracking system, if you want to pass this on down to

17   the Committee, addressed to Mr. Martin, that said,

18   "In summary of our conversation on September 20th,

19   you informed me that the Local 150 intends to supply

20   Merryman Excavation, Inc. (hereinafter Merryman) with

21   those persons whom Merryman has previously dismissed

22   from Merryman's employment.  Merryman has only

23   dismissed those persons who have demonstrated an

24   inability to competently perform tasks assigned to

1    them or their conduct at Merryman presented a threat

2    to the health and safety to other Merryman employees.

3    Merryman takes the health and safety of its employees

4    and the Local 150 members very seriously and does not

5    intend to expose either our employees or others to

6    the dangers that may manifest themselves when

7    unqualified or irresponsible workers undertake

8    dangerous work assignments.  I believe that in the

9    MARBA Agreement, Merryman has been granted a

10    management rights provision by the Local 150.  Under

11    that provision, Merryman will not accept for

12    employment those members who were terminated."  And

13    that letter is 10-4.

14        The prior day, the Operator Release Letter

15    faxed to the Local 150 hall, with the fax line

16    conspicuously absent from the grievance, indicates

17    that the operator, John Rabine, "This letter is to

18    request that the operator listed above be removed

19    from the list to return to our Company," as is

20    allowed under the Addendum 1 to the contract.  It

21    says then after that, "This operator filled a 7-foot

22    live sanitary manhole to the rim with dirt.  We had

23    to send a vacuum truck to remove the dirt he filled

24    it up with.  Thank you for your time, Thomas

1    Merryman." That was back in October. Because he was

2    on the Do Not Dispatch list and he was dispatched,

3    that's grounds independent of his activity on the

4    date that he arrived for work at Merryman Excavation.

5         According to the foreman, he violated

6    Merryman Excavation's safety policy, demonstrated a

7    lack of familiarity with the equipment he commenced

8    using, demonstrated a lack of familiarity with sewer

9    and water work, and failed to present a Local 150

10   card identifying himself as a Local 150 member.

11        Now, we've heard grievances today about not

12   having guys with the right card and not having the

13·  right player, and here the particular employee failed

14   to even have his card. You know, previously, since

15   he was terminated for unsafe conduct, that presents a

16   legal liability risk for which Merryman cannot

17   accept.

18        I sent a letter asking Ms. Hensel to provide

19   us a list of those people on the dispatch list. She

20   refuses to provide us a list of those people on the

21   dispatch list. Mr. August has indicated that there

22   is a dispatch list, which he referenced, and that

23   this gentleman returned to the hiring hall some five

24   days later. Our documents demonstrate that

1    Mr. Rabine was let go on that 21st date and that

2    there was cause for it.

3          Furthermore, Mr. August has failed to

4    demonstrate any actual discrimination against the

5    member.  He came to work and he was let go, which is

6    allowed under the Management Rights section of the

7    contract.  He was let go for very serious issues.  He

8    was also let go because the contract allows Merryman

9    to request that certain workers not return to

10   Merryman Excavation, and he was one of those such

11   employees.

12         MR. BENSON:  I'll agree.  Did anybody tell

13   the guy at the end of the day that he was terminated?

14         MR. HANLON:  Absolutely.  I spoke with Chris

15   Noe and the job foreman.  The job foreman told me in

16   no uncertain terms.  I went through the statement

17   which Mr. Rabine had submitted to the Committee on a

18   line by line item basis with the job foreman, and he

19   expressed to me a complete disbelief in the veracity

20   of the statements contained therein.

21         MR. BENSON:  Okay.  So yes, someone told him

22   at the end of Thursday you're terminated?

23         MR. HANLON:  Yes.

24         MR. BENSON:  Is that true?

1          MR. HANLON:  Yes.

2          MR. BENSON:  Okay.  And who would that be?

3          MR. HANLON:  The job foreman and a fellow by

4  the name of Chris Noe.  And if you want, I'll be

5  happy to get them on the phone if you want.

6          MR. BENSON:  Why did you put him to work

7  Thursday when he got dispatched?

8          MR. HANLON:  What's that?

9          MR. BENSON:  Why did you even let him go to

10  work Thursday when he was dispatched?

11          MR. HANLON:  Oh, because they didn't tell us

12  who was coming.  He just appeared on the site, and he

13  was already there, and we had to pay him for the

14  whole day anyhow because the contract requires that

15  we pay anybody who shows up for the show-up time and

16  for the full day's pay once they get into the

17  machine.  He got into the machine, he turned it on,

18  he's got to get paid.  He cashed his paycheck.  You

19  know, the paycheck was issued --

20          MR. BENSON:  Well, you're the guy that

21  decides that he's unsafe, so you let an unsafe guy,

22  in your opinion, an unsafe guy work on the job?

23          MR. HANLON:  We didn't determine he was

24  unsafe until after he got in the machine.

1    MR. BENSON:  You wrote a letter on the 5th

2  that said that.

3    MR. HANLON:  Yes, but we didn't know that he

4  was the actual operator who got into the machine.

5    MR. BENSON:  You just said that when you

6  found out he was, you let him finish the day.

7    MR. HANLON:  That was at the end of the day.

8    MR. BENSON:  He worked eight hours before

9  you knew who was in the machine?

10    MR. HANLON:  Yes.

11    MR. BENSON:  Okay.

12    MR. HANLON:  Hey, they've got a ton of

13  employees here.

14    MR. BENSON:  How did he know what to do all

15  day?

16    MR. HANLON:  The job foreman must have told

17  him.

18    MR. DUNLAP:  Did the foreman know who he

19  was?

20    MR. HANLON:  No.  And the problem here is

21  that, you know, if you accept what he says as the

22  truth, the problem is that he was already -- you

23  know, we sent notice to the Union not to send him

24  back.  So there's no discriminatory intent here to

1   discriminate against him for any reason other than

2   the legitimate interest that Merryman Excavation has

3   to control its work and limit its liability.  When he

4   filled that 7-foot sanitary sewer to the rim, there

5   could have been a person inside there.

6        MR. BENSON:  You know what, I got all that.

7   That's not what this is about.

8        MR. HANLON:  Yeah.

9        MR. BENSON:  So why would you guys have told

10  him for the next week hang in there, we've got work

11  for you?

12       MR. HANLON:  We didn't.

13       MR. BENSON:  That's denied too?

14       MR. HANLON:  That's denied.

15       MR. BENSON:  So he's making all this up?

16       MR. HANLON:  Well, he says that he didn't

17  know he got fired, but he cashed a paycheck.

18       MR. BENSON:  Okay.  Did you give him his

19  check at the end of the day or mail it to him?

20       MR. HANLON:  I think the following day he

21  picked it up.

22       MR. BENSON:  He came and picked it up?  If

23  you could show me that, that would sure lend a lot of

24  credence to you saying that he got canned.

1         MR. HANLON: Here's his paycheck dated

2   4-21-06.

3         MR. BENSON: When did he pick it up?

4         MR. HANLON: Well, let's look at the

5   endorsement. 4-22, 5-4.

6         MR. BENSON: I mean, if you wrote it the

7   next day, then I believe you probably fired him. If

8   you didn't write it until the next payroll period,

9   then I've got to believe the guy never thought he was

10   fired.

11         MR. HANLON: The check was written the

12   following day. It says it right here, if you want to

13   see the check. Would you pass this on down to the

14   members of the Committee?

15         MR. BENSON: How did he get it?

16         MR. HANLON: It's my understanding he picked

17   it up. You can ask him.

18         MR. BENSON: Can you see when it got cashed?

19         MR. HANLON: I looked on the back, and I

20   can't read the coding.

21         MR. BENSON: You can't tell when it got

22   cashed?

23         MR. HANLON: Wait, wait, wait. Maybe it's

24   on the bank statement.

122

1         MR. AUGUST: Joe, you can just ask him.

2         MR. BENSON: Well, if he's lying about

3 getting terminated, he's going to lie about when he

4 cashed the check. What's that going to tell me?

5         MR. AUGUST: He's no liar. He's no liar.

6         MR. RABINE: I'll tell you the truth.

7         MR. CISCO: Yeah. We've heard from both

8 sides. We have the member here. Why don't we hear

9 his side now, Joe.

10         MR. RABINE: The problem they have is

11 they're working with a bunch of guys --

12         MR. AUGUST: No, no, no. Just when did you

13 get your check that got mailed to you?

14         MR. BENSON: Tell me when you got the check.

15         MR. RABINE: It got mailed to me the next

16 week.

17         MR. BENSON: It got mailed to you the next

18 week? So when did you get it? You didn't get it at

19 your house till Thursday or Friday?

20         MR. RABINE: I think it was a Monday,

21 actually. I think they had it Federal Expressed.

22 Yeah, it was Federal Expressed. They FedEx'd it out

23 to me, and I thought it was unusual, but I didn't

24 think that they were going to fire me, honest to God.

123

1    I did not believe I was fired because I wasn't told I

2    was fired.

3            MR. BENSON:  Okay.  Which Monday?  You

4    worked the 20th.

5            MR. RABINE:  Yes.

6            MR. BENSON:  The 24th or the 1st?

7            MR. RABINE:  And the 24th was a Monday?

8            MR. BENSON:  Which Monday did you get it?

9            MR. RABINE:  I got it the following week.  I

10   believe it was Monday.

11           MR. BENSON:  The 24th --

12           MR. RABINE:  I'm almost positive I got it on

13   Monday.

14           MR. BENSON:  -- or a week later, the 1st?

15           MR. RABINE:  It was just a few days later, .

16   just the next week.

17           MR. BENSON:  So you got your check the 24th?

18           MR. RABINE:  I believe so.  I believe it was

19   the 24th.  It was a FedEx guy that came and brought

20   it out to me.

21           MR. BENSON:  So that's when you knew you

22   were getting paid off, right?

23           MR. RABINE:  No, I didn't because they had

24   done that before.  I had been through the same thing

124

1  with this Company in the last year and the previous

2  year, where they had sent a check to me, and then I

3  had been sent checks from other companies and never

4  been fired.  I thought it was unusual, but I thought

5  they just wanted to get the check to me, honestly.

6          The foreman did not fire me.  And the guy

7  that I worked for on the job said you're working

8  Saturday, you're not working the next day, you're

9  working Saturday.  The guy that called me on either

10 that night or Friday said you're going to be working

11 Saturday.  Well, John, we're not working Saturday now

12 because we don't need you now for that job, we're

13 going to work you next Monday.  Do you understand?

14         MR. BENSON:  Who was your foreman out there,

15 do you know his name?

16         MR. RABINE:  I have his name.  It was

17 George, and his last name -- that was the first time

18 I met him.  George -- I don't have his last name.

19 George Scott.  George Scott.

20         MR. BENSON:  Do you know who George Scott

21 is, Bob?

22         MR. HANLON:  Yeah.  I spoke with him.  I'm

23 Rob, by the way.

24         MR. BENSON:  Okay.

1        MR. RABINE:  And I showed George my card.

2        MR. BENSON:  Does he have the authority to

3   fire people?

4        MR. HANLON:  No.  That would have been

5   delegated by the Company.

6        MR. BENSON:  Okay.  So the guy worked all

7   day long before George, the foreman, came out to even

8   see who was in the seat.  Then who would have come

9   out to fire the guy before he left for the day?

10        MR. HANLON:  George Scott along with Chris

11   Noe.  But I believe that Mr. Noe called Mr. Scott and

12   authorized him to release him.

13        MR. BENSON:  You just said he doesn't have

14   the authority to fire him.

15        MR. HANLON:  He doesn't.  He was authorized

16   by Mr. Noe later in the day.

17        MR. BENSON:  I'm confused here.

18        MR. HANLON:  From a practical standpoint,

19   how this works is that they call for the dispatch.

20   The Union sends the guy out.  We don't know who they

21   send out until he's already jumped in the machine.

22   We find out later in the day who the guy is.  And

23   that came from the fact that there were complaints.

24   I was receiving complaints from people on the job

1    site who felt threatened with their safety and that

2    they didn't feel safe in the hole.

3         MR. BENSON:  Well, maybe you should change

4    your procedures because I know every guy that's in

5    the seat of my stuff, okay?

6         MR. HANLON:  Well, that might be the case.

7         MR. BENSON:  You can bet I do.  And maybe

8    you guys should figure it out.

9         MR. HANLON:  Well, that might be the case,

10   but the point is that he was let go, and the Union

11   was provided notice within the time frame required in

12   the contract.  And because the Union was provided

13   notice in the time frame -- he said earlier today

14   that on the date that Chuck got the letter, you know,

15   Chuck called and told him about it.  This letter is

16   dated the 21st of April, you know, and it was sent

17   from Merryman Excavation's offices via fax as well as

18   regular mail.

19        MR. BENSON:  If you could show me that check

20   was cashed the 21st, I will vote with you.

21        MR. RABINE:  Can I say something else?

22        MR. CISCO:  Yeah, sure.  You're entitled.

23        MR. RABINE:  There was a foreman that I did

24   talk to on the phone.  That's a different foreman, a

1    manager, Greg.  When I talked to Greg, he's the guy

2    that gave me my instructions, you're going to work

3    Saturday, okay, John?  He calls me, I believe it was

4    on Friday, midway through the day, and says, John,

5    we're not working Saturday, we just don't need the

6    combination for that job, so you'll work Monday.  You

7    understand?

8          MR. BENSON:  Got it.

9          MR. RABINE:  And they said I did a good job.

10   They said, you know, you seem like you're a little

11   bit inexperienced, but this was after he left the

12   job.  My foreman, Scott, had left the job and was

13   gone for like two hours, so I'm on this job by myself

14   working with the laborer, so obviously he felt safe

15   enough to leave me there with the laborer for the

16   whole day too.  And, see, I had no animosity towards

17   this Company.  I thought that they were going to

18   almost like give me another chance is what I thought.

19         MR. BENSON:  All right.

20         MR. HANLON:  Animosity has nothing to do

21   with it.  The charge is discrimination.  The charge

22   is that we discriminated against him for some reason.

23   They have failed to adduce any reason why we would

24   have discriminated against this particular employee.

1          MR. BENSON:  All I want to know is that --

2          MR. HANLON:  He got let go.  He was

3  terminated on the 21st.

4          MR. BENSON:  Then show me the check that he

5  cashed.

6          MR. HANLON:  I gave you the copy of the

7  check.  You know, the check is dated the 21st.  He's

8  already admitted that he cashed the check on the

9  24th.  And so if he cashed the check on the 24th,

10  which is the Monday afterwards --

11         MR. AUGUST:  No, he never admitted that.

12         MR. BENSON:  That could be as long as two

13  days, then, that he's entitled to.

14         MR. RABINE:  I'm not sure when I cashed the

15  check, but it was during that week.  I know that.

16  I'm being totally honest.

17         MR. HANLON:  The contract does not afford

18  back pay here, you know.  The cold hard reality of it

19  is that this Committee will be substituting its

20  judgment for the terms of the contract, which is

21  contrary to the rights and the power that this

22  Committee has, and I object to this Committee

23  exercising any jurisdiction over that matter, as well

24  as the fact that --

1    MR. BENSON:  So noted.  It does require you

2  to notify the guy.

3    MR. HANLON:  Well, you know, we've got the

4  notice to the Union, and he was given notice.

5    The point is that when you look at the

6  grievance, and it's their burden, they have

7  eliminated the time stamp on the top of their fax or

8  on the top of the fax on that page, and that would

9  answer it, but it's conspicuously cut off here.

10    MR. BENSON:  But even notice to the Union is

11  not notice to the man.

12    MR. HANLON:  I understand that.  But he's

13  already commented that when Chuck got the letter from

14  us, Chuck called him and told him about it.  So he

15  had notice.  He was given a check.  There's no issue

16  here.  He's not entitled to any money.  I've given

17  you a copy of the endorsement and the face of the

18  check.

19    MR. BENSON:  All right.  I have no more

20  questions.

21    MR. HANLON:  One more thing.  You asked us

22  about changing our policies.  We did.  We require

23  that a copy of the card be photocopied and sent to

24  our office.

130

1    MR. BENSON:  What card is that now?

2    MR. HANLON:  The Union card for the member.

3    MR. BENSON:  Okay.

4    MR. HANLON:  And so one of the things that

5  we have here, which we have listed here, is that he

6  didn't have his 150 card on him.  You know, look at

7  it from the position of the 150.  There's a guy that

8  gets dispatched to them, you know.  We cut him a

9  check.  So how did he get the check cut?  We had to

10  have gotten his Social Security number, and from

11  whom?  From him.  And that had to have taken place on

12  the 21st, so he had to have known that he was being

13  terminated.

14    MR. BENSON:  When my guys come to work, I

15  get their licenses and Social Security cards when

16  they start work.  How do I know you didn't get it

17  then?

18    MR. HANLON:  Well, because he didn't have it

19  on him when we asked him for it.

20    MR. RABINE:  No one told me I was fired.

21    MR. AUGUST:  He did.  He had a receipt with

22  him.

23    MR. RABINE:  And to this day no one told me

24  I was fired.

1      MR. BENSON:  It's he said, she said.  All

2  right.

3      MR. HANLON:  Well, the burden is on them.

4  And if it's a he said, she said thing, then we should

5  prevail.

6      MR. BENSON:  The burden is also on you to

7  pay the man within 24 hours, and you haven't shown me

8  that you did that.

9      MR. HANLON:  I did.  I gave you a check

10  dated one day after he worked.

11      MR. BENSON:  You gave me a check that you

12  work for him too, so I'll put that right up there

13  with that.

14      MS. LORD:  Are there any further questions

15  of the parties?

16      MR. BENSON:  No.

17      MS. LORD:  If not, if I could ask the

18  interested parties to leave the room at this point.

19              (The parties left the room, whereupon

20              the Committee went into executive

21              session, after which the parties

22              re-entered the room and the following

23              proceedings were had:)

24      MS. LORD:  This is the decision in

1   Grievance 06-38.   Based on the testimony heard, the

2   Committee by majority decision determined as follows:

3   One, the Employer shall pay John Rabine the sum of

4   $660.62 in payment of wages.   Two, the Employer shall

5   pay to the Midwest Operating Engineers Fund the sum

6   of $241.91 in payment of fringe benefits for John

7   Rabine.   Three, the check should be sent to Steven

8   Cisco, Local 150, for distribution.   And I will

9   confirm this in writing.

10          MR. RABINE:   Thank you.

11                    *    *    *

12          MS. LORD:   I think at this point we're going

13  to take a break for lunch.

14          (The hearing was adjourned at 1:10 p.m.

15           to 1:40 p.m., August 2, 2006.)

16                    *    *    *

17

18

19

20

21

22

23

24

```
 1              JOINT GRIEVANCE COMMITTEE

 2   INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150

 3                        AND

 4       MID-AMERICA REGIONAL BARGAINING ASSOCIATION

 5

 6              WEDNESDAY, AUGUST 2, 2006

 7                 AFTERNOON SESSION

 8

 9   FOR MARBA:      Joe Benson, Tim Scully.

10

11

12   FOR THE UNION:  Steve Cisco, Melinda Hensel,
                     Chuck August, Tim Gorman,
13                   Mike Kresge, Rick Dunlap.

14

15              COMMITTEE SECRETARY

16                   Carol Lord

17

18

19   ALSO PRESENT:      MERRYMAN EXCAVATION, INC.
                        Mr. Robert Hanlon
20

21                     Mr. John Rabine, Local 150

22                     Mr. Ray Herron, Local 150

23

24                  *    *    *
```

1     MR. HANLON:  We're back.

2     MR. CISCO:  So you want to continue your

3 three?  For what reason is that?

4     MR. HANLON:  Yeah, I would prefer to, all of

5 mine.

6     MS. LORD:  I think it's four.

7     MR. CISCO:  Four.  You've got four.  You're

8 asking for a continuance, is that correct?

9     MR. HANLON:  Yes.

10     MR. CISCO:  Okay.  We don't object.

11     MR. SCULLY:  What numbers are the four?

12     MS. LORD:  The numbers would be 39, 41, 42,

13 and 43.

14     MR. SCULLY:  Okay.

15     MR. BENSON:  So what are we doing?

16     MR. CISCO:  He's asked for a continuance of

17 his four grievances.

18     MR. BENSON:  What numbers?

19     MS. LORD:  It would be 39 and the last

20 three.

21     MR. CISCO:  41, 42, and 43.

22     MR. BENSON:  Okay.

23     MR. CISCO:  And for the record, I want these

24 continued till the next grievance board, and that way

1   you've got a month, you've got about a month, month

2   and a half to decide what you want to do.

3          MR. HANLON:  Okay, fine.  I think that

4   leaves us just with this one that you guys have with

5   regard to Mr. Herron.

6          MR. GORMAN:  06-40.

7          (Discussion off the record.)

8                    *    *    *

9   GRIEVANCE NO. 06-40 IS AS FOLLOWS:

10         MS. LORD:  This is Grievance 06-40, letter

11  dated May 30, 2006 to Merryman Excavation regarding

12  violations of the MARBA Heavy and Highway and

13  Underground Agreement:  Article I, Section 1,

14  Bargaining Unit; Section 3, Recognition; Section 6,

15  No Discrimination; Section 7, Scope of Work;

16  Section 9, Prevailing Wage Scale; and Section 11,

17  Assignment of Work; Article IX, Section 1, Discharge;

18  and Section 3, Regular Assigned Engineers;

19  Article XII, Hiring.

20         (Reading) Dear Mr. Merryman:  We are advised

21  that your Company is in violation of various articles

22  and sections, including but not limited to those

23  captioned above, of the MARBA Heavy and Highway and

24  Underground Agreement, to which your Company and this

| | |
|---|---|
| 1 | Union are parties by virtue of a Memorandum of |
| 2 | Agreement signed April 1, 2000. |
| 3 | (Reading) We are further advised that the |
| 4 | above-stated violations occurred on or about |
| 5 | April 20, 2006, and are ongoing on your various |
| 6 | construction sites within Local 150's jurisdictional |
| 7 | territory. The amount sought is $451.27 per day, and |
| 8 | it's noted as ongoing. |
| 9 | (Reading) The pre-grievance meeting was |
| 10 | scheduled for June 15, 2006. It is in the best |
| 11 | interest of your Company to negotiate a settlement at |
| 12 | the pre-grievance hearing. Many grievances are |
| 13 | resolved at this meeting. If you do not attend the |
| 14 | pre-grievance hearing and this matter remains |
| 15 | unresolved, it will be automatically scheduled for |
| 16 | the next meeting of the Joint Grievance Committee. |
| 17 | (Reading) This Union shall continue to hold |
| 18 | your Company liable for all appropriate remedies, |
| 19 | including but not limited to any back wages and |
| 20 | fringe benefits lost by this and all affected members |
| 21 | of the bargaining unit who would be working had you |
| 22 | honored our Agreement. Signed by Steven Cisco. |
| 23 | MR. CISCO: No-show at the pre-grievance. |
| 24 | This is Chuck's. Why don't you tell us what |

1    happened.

2         MR. AUGUST:  Mr. Herron is here to give a

3    statement also.  Mr. Herron was sent out to a job out

4    in Bull Valley.  The exact address --

5         MR. CISCO:  Nice area.

6         MR. AUGUST:  Oh, this is a nice area, very

7    nice.

8         MR. BENSON:  Does Mr. Rabine have anything

9    to do with this one?

10        MR. AUGUST:  No.

11        MR. BENSON:  Could we ask you to step out,

12   please?

13        MR. RABINE:  Sure.

14        MR. BENSON:  Thanks.  Could you close that

15   door too?  Thank you.

16        MR. AUGUST:  The address is 2033 Greenville.

17   It's in The Ponds of Bull Valley.  It's an

18   established subdivision.

19        He was called out to repair a leaking

20   buffalo box.  The water main service was leaking

21   prior to any excavation done by Ray Herron.  The main

22   was across the street.  They tried to repair the

23   line, a live service, with a CO2 freeze plug.  The

24   whole time the line was live and leaking.  While

1    digging the excavation and exposing it, the laborer

2    exposed the buffalo box with a shovel, and it was

3    still standing, and there's pictures showing that,

4    and the water main was leaking.

5    Approximately 10:00 or 10:30, the attorney,

6    Robert Hanlon, showed up on the job site and talked

7    to the foreman, then the laborer, and then spoke to

8    Ray.  We then received, after Mr. Ray Herron worked

9    out there, a letter dated May 5, 2006 from

10   Attorney Hanlon.  And it's in your packet, but if I

11   could just read a few of the excerpts.

12   (Reading) While present on a Merryman job

13   site, Mr. Herron willfully and deliberately damaged a

14   "buffalo box" and a water line flooding an excavation

15   with water and stopping work on the site.

16   (Reading) In the alternative to Mr. Herron's

17   intentional act, while present on a Merryman job

18   site, Mr. Herron, in gross negligence and with the

19   complete and utter disregard for the safety of

20   others, assumed the controls of a machine he lacked

21   the knowledge and experience to operate.  In doing

22   so, Mr. Herron presented a threat to the health and

23   safety of other Merryman employees and damaged a

24   "buffalo box" and a water line flooding the hole with

1   water and stopping work on the site.

2          (Reading) I inquired -- meaning

3   Mr. Hanlon -- of Mr. Herron as to his experience in

4   operation of equipment he assumed the controls of at

5   the site.  Mr. Herron stated that he "had been an

6   operator for over 25 years and knew how to operate

7   the machine."  Mr. Herron also stated that he had not

8   run that type of machine, which he assumed the

9   controls of, for over five years.  He further stated

10  he had between 18 and 25 employers over the last year

11  alone.

12         (Reading) In either event, Mr. Herron's

13  admissions demonstrate the violation of the Agreement

14  by the Local 150, by sending to Merryman Excavation,

15  Inc. those operators who lack the knowledge and

16  experience to operate equipment safely or that the

17  act was itself an intentional act by the Local 150 to

18  damage property.

19         Understand that this buffalo box was in the

20  ground, covered up, sod is there, trees are growing,

21  the subdivision's placed.  He came out there because

22  it was leaking prior to him ever getting out there.

23  There was no damage done by Mr. Herron whatsoever.

24  Here's the pictures so that you know what we're

1    looking at.

2              MR. CISCO:  Okay.

3              MR. BENSON:  What's the grievance about?

4              MR. AUGUST:  He's being accused of something

5    he didn't do, Joe, and he's not being allowed --

6              MR. BENSON:  But what is this money for?

7    Tell me what the money is for.

8              MR. AUGUST:  He should be working rather

9    than being treated like he did something that he

10   didn't do.  He's accused of something that he did not

11   do whatsoever.

12             MR. BENSON:  Okay.  So he got terminated?

13             MR. AUGUST:  Yes.  Oh, yes.

14             MR. BENSON:  So this is a termination case.

15             MR. AUGUST:  And discrimination.

16             MR. BENSON:  Well, which is it, both?

17             MR. AUGUST:  It's all.

18             MR. BENSON:  So unjust termination.

19             MR. AUGUST:  You've got the complete packet

20   right there.

21             MR. SCULLY:  What was the date that the hall

22   received the call?

23             MR. AUGUST:  Merryman?  4-18 at 2:28 in the

24   afternoon.  The call was from Trevor.  Phone number,

1   (815) 337-1700.

2           MR. SCULLY:  So he was out on the 18th or

3   the 19th?

4           MR. AUGUST:  The 19th he would have went

5   out, 7 o'clock.

6           MR. SCULLY:  And this work took place on the

7   20th?

8           MR. AUGUST:  The 19th, I believe, 19th.

9           MR. CISCO:  Chuck, you got anything else?

10          MR. AUGUST:  I have a lot, but it all is

11  included in the packet.

12          MR. SCULLY:  What machine was he requested

13  to operate?

14          MR. HANLON:  I have a picture of it.

15          MR. AUGUST:  Right here, the combo 426, Cat.

16  426 combo.

17          MR. CISCO:  Combo, wasn't it?

18          MR. AUGUST:  Yes, sir.  If I could continue,

19  though.

20          MR. CISCO:  Oh, I thought you were --

21          MR. AUGUST:  No, no, no.  I just wanted

22  to let the pictures go by so Tim could see them and

23  then I can go on because without seeing it --

24          MR. CISCO:  Go ahead.

1    MR. SCULLY:  And what was the last day Ray

2 worked?

3    MR. AUGUST:  That was the last day, first

4 and last day.

5    MR. SCULLY:  One day?

6    MR. AUGUST:  Yes, sir.

7    MR. SCULLY:  What are we looking at here?  I

8 see three houses.

9    MR. CISCO:  A couple of them are for sale.

10 You want to buy one?

11    MR. AUGUST:  It's an established subdivision

12 is what it is.

13    MR. SCULLY:  Is that the service that's

14 leaking?

15    MR. HERRON:  No.  It's across the street.

16    MR. AUGUST:  It's right across the street.

17 It's directly across the street.  You're standing

18 here with your back to the service.  Just so that you

19 know, this is new.

20    MR. CISCO:  It's a residential area.

21    MR. AUGUST:  It's a residential area.  It's

22 been leaking for quite some time.  Nothing that

23 Mr. Herron did caused the leak.  Everything he did

24 helped to cure the problem, and to be accused of it

1    is wrong.

2         MR. CISCO:  Okay.  Chuck, continue.

3         MR. AUGUST:  (Reading) Notwithstanding all

4    of the aforementioned items, it appears that

5    Mr. Herron has serious anger issues as evidenced by

6    his extensive involvement in the criminal justice

7    system.

8         (Reading) Within the verified petitions for

9    orders of protection, it has been alleged that

10   Mr. Herron has admitted to suicidal ambitions and

11   statements that he "damages property to get even."

12   Additionally, it was alleged that Mr. Herron even

13   told his girlfriend to sleep with one eye open

14   because she may not wake up in the morning.

15   Furthermore, in another verified petition by Patricia

16   Diehl was a statement that Mr. Herron "had been

17   drinking all day, a usual occurrence," underlined.

18   Emphasis added.  One statement contained in Lisa

19   Bergren's petition reads, "Ray starts drinking at

20   9:00 a.m. and does not stop until he goes to bed at

21   night."  His girlfriend, Ms. Diehl, indicates in her

22   petitions that Mr. Herron has punched her in the

23   face, pushed her, broke things in her house,

24   threatened her life and safety, and made threats to

1   his own mother, ex-wife, and others.

2           And there's some more verbiage down at the

3   bottom.   (Reading) Available public information

4   indicates that Mr. Herron has previously been charged

5   with numerous crimes ranging from DUI, domestic

6   battery, phone harassment, making a false police

7   report, Class A battery, resisting a peace officer,

8   starting a fire on another's land, and has multiple

9   orders of protection entered against him.   Inquiry

10  made to ascertain whether or not he had the requisite

11  knowledge and experience to operate the equipment.

12          (Reading) Available public information

13  indicates that Mr. Herron has previously been charged

14  with numerous crimes ranging from DUI, domestic

15  battery, phone harassment, making a false police

16  report, Class A battery, resisting a peace officer,

17  starting a fire on another's land, and has multiple

18  orders of protection against him.

19          (Reading) Also, please see the attached

20  statement from Merryman President Patrick Merryman

21  for further details, including the damages owed in

22  the current estimate of $667.95.

23          (Reading) In an attempt to further resolve

24  this dispute in accordance with Step 1 of the

1  Grievance and Arbitration clause of the Agreement,

2  Article XII, Section 1, I am requesting that you fax

3  a written reply to this grievance.

4        (Reading) Merryman Excavation, Inc. shall

5  continue to hold the Local 150 liable for all

6  appropriate remedies, including but not limited to

7  reimbursement of wages and benefits paid.

8        (Reading) Further, this letter serves to

9  inform you and your member, Ray Herron, that should

10  Ray Herron return to or appear at any Merryman

11  Excavation, Inc. office or any Merryman Excavation,

12  Inc. construction site, he shall be considered a

13  trespasser and treated accordingly.  Very truly

14  yours, Robert Hanlon, Esquire.

15        The first photograph that is shown in

16  Exhibit A of that shows the B-box still standing with

17  a pump in the background and the backhoe parked

18  parallel to the hole.  Do you see that?

19             MR. BENSON:  Uh-huh.

20             MR. SCULLY:  Where is the picture?

21             MR. AUGUST:  You're looking at it.

22             MR. SCULLY:  Where is the original?

23             MR. AUGUST:  Where is the original, Robert?

24             MR. CISCO:  Me too, Joe, me too.

1          MR. AUGUST:  Can I go on a little bit

2    further?

3          MR. CISCO:  Yeah.  You've got the floor.

4          MR. AUGUST:  I don't mean to bore you with

5    the details, but I'm tired of people getting conned

6    here.

7          They brought out a pump initially that

8    didn't work.  It couldn't take the capacity of the

9    volume of water it was leaking originally from the

10   buffalo box.  They went to a rental place, and I

11   forget --

12         MR. HERRON:  Ralph's Rental.

13         MR. AUGUST:  Ralph's Rental.  Excuse me.

14         MR. HERRON:  In Woodstock.

15         MR. AUGUST:  In Woodstock.  They went to get

16   another one, and the people that rented it, they

17   couldn't get it working or it would not work.  They

18   had to bring a mechanic out to it, and that caused

19   the water that was now free to flow, without having

20   any dirt against it, to fill up the ditch.

21         From that point in time, someone else came

22   from the shop.  Was it the mechanic?

23         MR. HERRON:  I asked who the guy was, and he

24   seemed pretty knowledgeable about, you know, how to

1  use this freeze pack, and he said first you've got to

2  pump the water out and then you've got to close the

3  pipe so it can --

4        MR. AUGUST:  So it's stationary, right, so

5  it can freeze.

6        MR. HERRON:  Right.

7        MR. AUGUST:  They were trying something new

8  that the laborers that were on the job site didn't

9  know how to do, and you can't get free-flowing water

10  to freeze with the $CO_2$, and they couldn't get the

11  hole pumped down with the pumps that they had.  They

12  had to bring another pump from the shop, didn't they?

13        MR. HERRON:  Yeah.  They actually had three

14  pumps total.

15        MR. AUGUST:  They brought a third pump out

16  there.  And finally in the afternoon, the laborer --

17  what was his name?  It escapes me right now.

18        MR. HERRON:  I don't recall.

19        MR. AUGUST:  I apologize.  The laborer that

20  was on the job site got on the Nextel and spoke to

21  either his father or a relative of his and asked what

22  he should do, and the fellow said just bend the pipe

23  over and change the service live, and that's what

24  they wound up doing in the afternoon.  Correct?

1      MR. HERRON:  Correct.

2      MR. AUGUST:  About what time?

3      MR. HERRON:  It was probably about -- at

4  that time probably about 3:00.

5      MR. AUGUST:  3 o'clock?

6      MR. HERRON:  About 3:00 or 3:30, something

7  like that.

8      MR. AUGUST:  By the time they got done --

9  after you got done backfilling, what time was it?

10     MR. HERRON:  It was about 5:00.  It was

11  5:00.

12     MR. AUGUST:  About 5 o'clock.  That's all I

13  have at this time.

14     MR. BENSON:  So then what, did they come to

15  you at the end of the day and tell you you're fired?

16     MR. HERRON:  No, no.  They came out with a

17  paycheck.  And the foreman there told me -- he was

18  kind of in a rush to get out of there because he was

19  getting married over the weekend.  He says, I tell

20  you what.  He says, you know, here's your check for

21  now, he said, but we'll probably wind up calling you.

22  Just give me a day or two, I'll give you a call,

23  we'll give you something to do.  I never received a

24  phone call.  So I couldn't wait around, you know.

1  I'm a single father.  So I just went back to the hall

2  and went out to work for somebody else.

3          MR. BENSON:  But they gave you your check

4  that day?

5          MR. HERRON:  Yeah.

6          MR. BENSON:  For all your hours?

7          MR. HERRON:  Yes, sir.

8          MR. BENSON:  So there's no question you were

9  paid for what you did?

10          MR. HERRON:  Exactly.

11          MR. BENSON:  Did you go back to the hall the

12  next day?

13          MR. HERRON:  I believe so.

14          MR. CISCO:  And when did you go back out?

15          MR. HERRON:  Probably I think within a day

16  or two days.  I don't recall.  It wasn't very long.

17          MR. CISCO:  Chuck, what are you seeking

18  here?

19          MR. AUGUST:  I believe that because of the

20  discrimination, the opportunity for Mr. Herron to be

21  working for Merryman was the violation here, and he

22  should have been working every day that the Company

23  was working, at the very minimum.  And I'm looking at

24  his work card.

1        MR. CISCO:  Did that machine operate the

2   next day, anybody know?

3        MR. AUGUST:  Yes.

4        MR. HANLON:  What do you base that on?

5        MR. AUGUST:  I went out there.  And I went

6   down the street a little bit further to the west

7   where it was at.

8        MR. BENSON:  Okay.

9        MR. GORMAN:  Steve wanted to know what you

10  were seeking.

11        MR. AUGUST:  I know, but that's per day.

12  That's per day.  $451.27 per day for every day.

13        MR. BENSON:  How many days was it, Chuck?

14        MR. CISCO:  We don't know.

15        MR. AUGUST:  Steve, I didn't total it up,

16  and I apologize.

17        MR. CISCO:  Well, you got his work card

18  there?

19        MR. AUGUST:  That's what I'm trying to get

20  to right now.  He put his name back on at the hall on

21  4-20 and was dispatched to Neptune.  Were you still

22  working for a sewer crew for Neptune on the 24th?

23        MR. HERRON:  Right, and still am.

24        MR. BENSON:  Have you got any questions?

1          MR. SCULLY:  No.

2          MS. LORD:  Is there nothing further at this

3    point from the Union?

4          MR. AUGUST:  Not at this time.

5          MS. LORD:  Rob?

6          MR. HANLON:  First of all, I object to the

7    grievance based on its lack of timeliness.

8    Therefore, there's no jurisdiction.

9          (Reading) I would like to read into the

10   record an affidavit signed and executed by Daniel

11   Frawley, which reads I, Daniel Frawley, being first

12   duly sworn, under penalties as provided by law

13   pursuant to Section 1-109 of the Illinois Code of

14   Civil Procedure and the laws of the United States of

15   America, certify that I have reviewed the statements

16   contained in this affidavit; that I have personal

17   knowledge of the facts stated herein; that if called

18   as a witness in this proceeding, I could competently

19   testify to the facts stated in this affidavit; and

20   that the statements contained in this affidavit are

21   true and correct, except as to any matters stated to

22   be on information and belief, and as to those matters

23   I certify that I verily believe them to be true.

24          (Reading) I reside in McHenry County, State

1    of Illinois.  I am employed by Merryman Excavation,

2    Inc. as a punchlist foreman.  On April 19th, I placed

3    a phone call to Christopher Noe to convey concerns

4    about an operator because I did not feel safe in the

5    hole with the operator assigned to the machine at my

6    location.  All events described herein in this

7    affidavit took place on 4-19, 2006.

8              (Reading) Christopher Noe told me that if I

9    was really concerned about my safety that I should

10   call the Company attorney, Robert T. Hanlon, and he

11   gave me Rob's phone number.  After Ray Herron started

12   the machine and just prior to digging, Ray Herron

13   announced, "Stay back.  It's been a while.  Let me

14   get used to the controls."  I called Rob and told him

15   I felt unsafe in the hole because the operator

16   appeared as though he didn't know how to operate the

17   machine, refused to follow instructions, and ignored

18   hand signals.  While present at the site, Ray Herron

19   did not wear his vest or hard hat.

20             (Reading) During a phone conversation,

21   Mr. Hanlon asked if the job could be completed

22   without me being in the hole at the same time that

23   Mr. Herron was operating the machine.  I told him

24   that it would be hard, but I might be able to manage,

1    or words to that effect.  At the time of my first

2    call to Mr. Hanlon, the hole was damp from a minor

3    leak, but not flooded.  After I got off the phone

4    with Mr. Hanlon, the operator, Ray Herron, refused to

5    follow my instructions and hand signals.  I then

6    observed Ray Herron pull out the buffalo box with the

7    backhoe, as well as disconnect the copper water

8    service from the curb stop which connects to the

9    water main.  Soon thereafter, the trench flooded with

10   water.

11          (Reading) I called Robert Hanlon to inform

12   him that the operator, Ray Herron, pulled out the

13   buffalo box and damaged a water line and flooded the

14   trench with water.  Robert Hanlon said he was nearby

15   and would stop over.  Robert Hanlon pulled up to the

16   job site.  When he exited, he was wearing a dark suit

17   and tie and called out my name.  He introduced

18   himself and handed me his business card and told me

19   he was the same lawyer and business representative

20   for Merryman Excavation, Inc. that I had called and

21   spoke with earlier that day.  Ray Herron was close

22   by, within 5 to 10 feet, at the time.  Mr. Hanlon

23   asked me to tell him again what happened to make sure

24   that he understood.  I again told Mr. Hanlon that the

1    operator was not following instructions, didn't

2    follow hand signals, demonstrated a lack of

3    familiarity with the operation of the equipment, and

4    that I didn't want to get in the hole because I felt

5    unsafe.

6         (Reading) I also told Mr. Hanlon that we

7    were freezing the water line to make a minor repair

8    when the operator pulled out the box flooding the

9    trench with water.  I told Mr. Hanlon that because

10   the operator pulled out the buffalo box, the job

11   would now take all day and it should have only taken

12   a few hours.

13        (Reading) Mr. Hanlon approached Mr. Herron

14   and handed him his business card and in a loud voice

15   stated, "I am Robert Hanlon, and I represent Merryman

16   Excavation, Inc.  I am its business representative."

17   Mr. Hanlon also asked Mr. Herron, "Do you want an

18   attorney or anyone else present?"  At that time I did

19   not hear Mr. Herron request any Union steward or

20   attorney to be present.  At no time, before, during,

21   or after Mr. Hanlon's arrival and departure, did I

22   tell Mr. Herron that Mr. Hanlon was a Union attorney

23   or an attorney for the Local 150.  At no time did I

24   ever tell Mr. Herron that he had done a good job or

1    even an adequate job.  Mostly, I just wanted to stay

2    away from Mr. Herron.  Signed Daniel Frawley, dated

3    the 5th day of June, 2006.

4         MS. LORD:  May I have a copy of that for my

5    record too?

6         MR. HANLON:  Sure.  I'd like to get that

7    copy back.

8         MR. AUGUST:  You'll get it back.

9         MR. HANLON:  I have here with me a copy of a

10   check, actually two checks, made payable to Ray

11   Herron on 4-19, 2006.  The first one is for $286.53

12   signed by Mr. Herron and cashed at McHenry Savings

13   Bank in McHenry on April 19th, the same date of the

14   check, with the teller stamp being present on the

15   back of the check.  A separate check in the amount of

16   $50.42 was made payable to Mr. Herron because

17   apparently there was a miscalculation in the original

18   check.  Mr. Herron also cashed that check on

19   April 19, 2005 at the same bank, with the teller

20   stamp being present on the back of the check.

21        The contract here shows that Merryman

22   Excavation has its management rights.  Accordingly,

23   it has the right to dismiss an employee, especially

24   when that employee has engaged in conduct which other

1   employees feel threatened by.   It was denoted in the

2   release letter to the 150 that Mr. Herron did not

3   follow hand signals and ignored Merryman's safety

4   policy.   An OSHA requirement requires a hard hat and

5   vest.   You'll notice that this particular machine is

6   on the roadway.   And at the time that I appeared at

7   the site, Mr. Herron was not wearing a hard hat or a

8   vest, both of which are violations of both the OSHA

9   standards and the Merryman safety· policy.

10          Accordingly, there has been no

11  discrimination against Mr. Herron.   The issues here

12  are simply that Mr. Herron doesn't like the fact that

13  he's been dismissed.   He was dismissed for legitimate

14  purposes.

15          And the issues with regard to who pulled

16  that buffalo box out, he made a comment here that the·

17  picture shows the buffalo box is in place.   No.   What

18  we see is the top of the B-box pipe, not necessarily

19  the copper connections at the bottom which connect to

20  the -- what is the service?   What do you call that?

21          MR. AUGUST:   The main?

22          MR. HANLON:   No.   There's something in

23  between it.   He drew me a picture.   Let's see if I

24  have my picture from Mr. Frawley.

1       MR. BENSON:  When you were out there, did

2  you tell him he was terminated?

3       MR. HANLON:  No, I didn't tell him he was

4  terminated.

5       MR. BENSON:  Somebody did, though?

6       MR. HANLON:  Yes, that's true.

7       MR. BENSON:  No, I'm asking you.

8       MR. HANLON:  Yes.  It's my understanding

9  that Mr. Frawley conveyed that, plus he received his

10  check and cashed his check the same day.  I don't

11  have the picture that Mr. Frawley drew.

12       MR. BENSON:  Do you have the checks that he

13  cashed?

14       MR. HANLON:  Yeah.  I've passed that on down

15  to you.

16       Also, I think it's important to note for

17  jurisdictional purposes that the Local 150 filed an

18  unfair labor practice charge relative to this, and

19  the National Labor Relations Board determined that it

20  had no merit.  I do not know whether or not they have

21  appealed it, but Attorney Pallelis, the outside

22  counsel for Merryman on that matter, tells me that

23  that's what he was informed by the folks there at the

24  NLRB.

1      Notwithstanding that, you'll note that in
2   the contract, under the Management Rights section,
3   Merryman has the right to hire and terminate people.
4   That's exactly what he did.  It's within his rights.
5   He chose to do it.  The fact of the matter is is that
6   Mr. Herron knows that he was discharged.  It hasn't
7   been raised that he didn't know that he was
8   discharged.  Therefore, there's no merit to this
9   particular charge, and it should just be dismissed.
10      And if I didn't raise an objection to the
11   timeliness earlier, I raise that again.  The
12   occurrence was 4-20, and the grievance letter is
13   dated 5-30, and the alleged Step 1 conference --
14      MR. BENSON:  You raised it.
15      MR. HANLON:  Okay.  Thank you.
16      MR. BENSON:  I have no more questions.
17      MR. HANLON:  He has no damages.  He was put
18   back to work with another crew, so there's no injury.
19      MR. CISCO:  Wait, wait, wait.  He was put
20   together with a crew?  What crew?
21      MR. HANLON:  With a different employer.
22   He's been redispatched.
23      MR. CISCO:  Three days later, though.
24      MR. HANLON:  He said he was dispatched right

1    after that.

2               MR. BENSON:  Okay.

3               MR. CISCO:  I've got to see if Ray's got

4    anything to say.  He's the grievant.

5               MR. BENSON:  Okay.

6               MR. HERRON:  Yeah.  I'm confused.  Who is

7    Daniel Frawley?

8               MR. HANLON:  He was the job foreman on the

9    site that day.

10              MR. HERRON:  Excuse me.  That's not his

11   name.  His name is Gary McHugh.

12              MR. HANLON:  No.  Daniel Frawley, he swore

13   under oath that he was present.

14              MR. HERRON:  I don't care.  I don't know who

15   this man is.  There was a third person out there, but

16   I never spoke to him.

17              MR. AUGUST:  And the gentleman's name was

18   who that you said?

19              MR. HERRON:  The foreman.  The foreman's

20   name was Gary McHugh.

21              MR. AUGUST:  Perfect.  All right.

22              MR. HERRON:  I don't know the laborer's

23   name.

24              MR. AUGUST:  That's fine.

1    MR. CISCO:  And that was the only people out

2    there that day?

3        MR. HERRON:  No.  There was a third person

4    there, but I never spoke to him.  He was not a

5    Merryman employee.

6        MR. CISCO:  Okay.

7        MR. HANLON:  But that wasn't included in

8    your letter now, was it?

9        MR. HERRON:  When I first arrived on the

10   job, it was approximately 7 o'clock.  I was told that

11   there was a leaking buffalo box.  So the three of us,

12   the foreman, the laborer, and myself, stood there,

13   and you could hear the water running.  You'd have to

14   be deaf not to hear it.  It was gushing.  It was

15   gushing.  As I excavated around the buffalo box, it

16   was immediately filling up full of water because

17   that's how severe the leak was.  It was not a minor

18   leak, it was major.  The sod was just like soaking

19   wet.  You could hear it.  The soil that was being

20   excavated was like wet cement.

21       MR. HANLON:  Mr. Frawley described it as a

22   mere trickle, a minor leak.

23       MR. HERRON:  Well, Mr. --

24       MR. AUGUST:  You just keep talking.

1    MR. CISCO:  Go ahead.

2    MR. HANLON:  Sorry.  I apologize.

3    MR. HERRON:  Anyway, the whole theory was to

4    excavate the hole, get it down to where the leak was.

5    But because the water was leaking at such a rapid

6    rate, the hole filled up.  And the foreman had a pump

7    on the back of his truck, took it off, tried to pump

8    out the water, but it was too much for the pump to

9    handle.  It was an older pump or it was too small.  I

10   don't know.  So then he went someplace.  I don't know

11   where he went.  I think he ran to the shop or

12   something and got another pump.  That, it was the

13   same thing.  It just couldn't do it.  By that time,

14   the water kept on rising and rising.  And what little

15   bit of water the pump was able to pump out kind of

16   kept it somewhat even.

17       Finally, they went to Ralph's Rental there

18   in Woodstock and rented like a 6-inch pump.  It was

19   like a huge pump.  They brought it to the site.  They

20   didn't know how to start it.  They asked me if I knew

21   how to start it, and I didn't know how to start it.

22   It's not my job.  I don't know.  So they had to call

23   a mechanic out.  The mechanic couldn't start it

24   because there was something wrong with the ignition

1    or whatever.  Eventually they got it going and it

2    sucked the water out probably in a matter of, I don't

3    know, two minutes.  It was not a very big hole.  Once

4    they got it down, they took a sledgehammer and

5    smashed the pipe to try to keep the water from

6    leaking a lot.  That's when it became somewhat of a

7    trickle, but it was still running pretty good.  They

8    tried to freeze pack it probably for a couple hours.

9    That had no effect on it, had none.

10           Some guy came out, I don't know who he was,

11    and I asked McHugh, I says who is that guy, and he

12    says, oh, he's like a troubleshooter for Merryman, he

13    used to work here years ago or something like that,

14    but I never spoke to this gentleman.  I don't even

15    know his name.  Anyway, he was saying to McHugh and

16    the laborer you've got to smash it totally closed,

17    it's got to be totally closed, not even a drip, not

18    even a drip.

19           MR. CISCO:  So the hole was in the pipe, not

20    the buffalo box itself?

21           MR. HERRON:  Correct.  It was in the

22    fitting.

23           MR. CISCO:  So the way he stopped it, he

24    just crimped the hole is what he did to stop the --

1        MR. HERRON:  Precisely, precisely, in order

2  to use this freeze pack.  Well, for some reason the

3  freeze pack didn't work.  McHugh had never done it

4  before, the laborer had never done it before, and I

5  certainly had never done it before.  So that's when

6  the laborer -- because this was getting like later in

7  the afternoon.  As this thing was continuing to leak,

8  that's when he called his father, I believe it was,

9  and his father recommended to him, he says -- he said

10  it in a joking way, and the laborer said to me, well,

11  this is what we're going to do.  My dad told me to

12  put on my rain coat, get in the hole and cut it,

13  which he did, but he capped it off right away.  And

14  it already had a fitting about -- you know, a pipe

15  about that long, so he could screw the thing together

16  and it was a done deal, backfilled it, and by that

17  time it was 5 o'clock and I went home.  That was it.

18  But prior to that --

19        MR. CISCO:  And no one talked to you.  When

20  did they give you a check?

21        MR. HERRON:  That day at 5 o'clock.

22        MR. CISCO:  They handed you a check?

23        MR. HERRON:  Yeah.

24        MR. CISCO:  And what did they say to you?

1          MR. HERRON:  They didn't say anything.

2  McHugh said, well, I'm going to be married over the

3  weekend, and when I come back I'll be calling you,

4  probably wind up giving you -- I'll send you out to

5  another job.

6          MR. CISCO:  And you've heard that before?

7          MR. HERRON:  Yeah.  I just assumed that he

8  would call, but then I figured, well, what the heck,

9  you know.  I've got a seven-year-old daughter to take

10  care of, so I went back to the hall.  I need to work,

11  you know.

12          One thing I didn't mention, I missed it, is

13  that when they went to Ralph's in order to rent this

14  third pump, both the laborer and the foreman left,

15  and they left me on the site alone with this gaping

16  hole next to the sidewalk.  Now, it's an established

17  neighborhood.  There's like little kids running up

18  and down the sidewalk on their bicycles, and I just

19  wanted to stand out there and make sure nobody fell

20  in there.

21          But after this was all done, why was I left

22  there alone?  And not only that, one other point that

23  I'm curious about, if I did damage that buffalo box

24  like they said I did, how come I wasn't terminated

1    immediately?  Why was I allowed to work until

2    5 o'clock at night?  I mean, that raises a question

3    for me.

4              MR. AUGUST:  Could I ask a couple questions,

5    please?

6              MR. HERRON:  Sure.

7              MR. AUGUST:  Do you remember speaking to

8    Mr. Hanlon out there?  Is that the gentleman that

9    came out there?

10             MR. HERRON:  Yeah.

11             MR. AUGUST:  Was he wearing a vest and a

12   hard hat when he was out there?

13             MR. HERRON:  No, he was not, no.  He was

14   wearing the same suit that he's got hanging there.

15             MR. AUGUST:  Now, I looked through your

16   dispatch cards.  You've run a combination hoe several

17   times, correct?

18             MR. HERRON:  Many times.  I used to own one.

19             MR. AUGUST:  You're familiar with it?  You

20   used to own one?

21             MR. HERRON:  Yeah, I used to own one.

22             MR. AUGUST:  Okay.

23             MR. SCULLY:  Okay.  Anybody else have

24   anything to say?

```
 1              MR. HANLON:  Yeah.

 2              MR. AUGUST:  Wait.  Just one more question,

 3     please.

 4              MR. HERRON:  Yeah.

 5              MR. AUGUST:  When Mr. Hanlon came up to you

 6     and introduced himself to you --

 7              MR. HERRON:  I was curious as to who he was,

 8     and I was just minding my own business.  I was

 9     probably standing 15, 20 feet away from him.  He was

10     talking to the job foreman, and I was kind of

11     curious.  I thought he was from the City, an

12     inspector, because of the way it was leaking in the

13     parkway, you know, that kind of a thing.  And after

14     he talked to McHugh and, the laborer, McHugh told me

15     that that guy wants to talk to you for a little bit.

16     So I walked past the hole over to where he was, and

17     he introduced himself to me as an attorney or a

18     representative for the Local 150.  Then he asked me a

19     few questions.  And it looks like to me like he has

20     inflated the numbers there.  I mean, that's

21     preposterous.

22              MR. CISCO:  He said he belonged to 150?

23              MR. AUGUST:  Correct.

24              MR. HERRON:  He said he did, he was an
```

1    attorney for the 150.

2            MR. CISCO:  Did I hire you?

3            MR. HANLON:  Well, I'll address that in a

4    moment.  I'll let him speak, and I'll demonstrate to

5    you the lack of veracity in that statement.

6            MR. HERRON:  I even confirmed that with the

7    foreman.  I said, who is that guy?  He said he's from

8    like the 150.  He says, yeah, he's like a Local 150

9    attorney.  I says, geez, why is he out here?  He

10   didn't card me or anything.  I was thinking to

11   myself, and I even said it to Mr. McHugh, you know,

12   what was the reasoning for him to even be here?

13           MR. AUGUST:  And what did he say to you?

14           MR. HERRON:  He said, well, he's out here

15   because Merryman's got a problem with the 150 and

16   because they got caught a lot of times with laborers

17   running the equipment and that kind of thing.  I just

18   said oh.  I just assumed he was telling me the truth.

19   I had no clue.  After that, I just went and did my

20   job.  I waited for more direction.

21           MR. CISCO:  Mr. Business Agent or Attorney?

22           MR. HANLON:  Well, first of all, the

23   supporting document from Mr. Frawley, the actual

24   foreman on the job site, which can be verified via

1   the payroll records, says that I made no such

2   statement.  Further, in Mr. Herron's own words, in

3   his statement attached to his grievance, it says that

4   "After the interview, Mr. Hanlon talked to my foreman

5   and the laborer.  I asked my foreman who Mr. Hanlon

6   was.  The foreman stated that he was a 150 attorney,

7   and the foreman had no idea why Mr. Hanlon was even

8   there."

9          Now, you'll notice that in the affidavit

10  from Mr. Frawley it says, one, that he called me not

11  once, but several times that day.  Two, it says in

12  there that I identified myself as an attorney

13  representing Mr. Merryman.  Those are not my words,

14  those are Mr. Frawley's words.  In addition to that,

15  I categorically deny that I ever held myself out to

16  be a representative of the Local 150.

17  Notwithstanding that, if I had, which I did not,

18  there would be no reason for Mr. Herron to have made

19  an inquiry as to who I was, as articulated in his own

20  handwriting.

21          MR. CISCO:  Does anybody else have anything?

22          MR. HANLON:  Oh, I'm not done.

23          MR. CISCO:  Oh, right.

24          MR. HANLON:  I just have to find the other

1   statement.  You'll notice that from Mr. Frawley's

2   description in his affidavit -- what does it say

3   here?  Okay.  I already spoke to that.

4            And as to those allegations with regard to

5   the impression that I was with the 150, the NLRB has

6   already found that that has absolutely no bearing.

7            MR. CISCO:  Fair enough.  I believe the

8   government.

9            MS. LORD:  Any further comments at this

10  point?  Questions?  Could I ask the interested

11  parties to leave the room.

12           MR. HANLON:  Can I ask that Mr. August also

13  leave the room?

14           MR. AUGUST:  I'm coming.

15           MR. CISCO:  He's leaving.  I'm just asking

16  him for the work card.

17                   (The parties left the room, whereupon

18                    the Committee went into executive

19                    session, after which the parties

20                    re-entered the room and the following

21                    proceedings were had:)

22           MS. LORD:  This is the decision in

23  Grievance 06-40.  Based on the testimony heard, the

24  Committee was unable to reach a majority decision

1    that resulted in a deadlock.  The Union may pursue

2    this matter through the arbitration provision in the

3    contract.  And I'll confirm that in writing.

4                        *    *    *

5              MR. CISCO:  Well, thank you, everybody, for

6    coming out.  It's been an enjoyable day here.

7              MR. HANLON:  Could you note for the record

8    that during each executive session Attorney Hensel

9    was present and representing the Local 150 and there

10   was no attorney representing the interest of the

11   contractor's side.

12             MR. CISCO:  She's an employee of Local 150.

13             (The hearing was terminated at 2:40 p.m.)

14                     *   *   *    *

15

16

17

18

19

20

21

22

23

24

1     STATE OF ILLINOIS )
                          )
2     COUNTY OF C O O K )

3

4         I, PATRICIA DOBEK, CSR, do hereby certify

5     that I reported in shorthand the proceedings had at

6     the hearing aforesaid, and that the foregoing is a

7     true, complete, and accurate transcript of the

8     proceedings at said hearing as appears from my

9     stenographic notes so taken and transcribed under my

10     personal direction on this 9th day of August, 2006.

11

12

13     **OFFICIAL SEAL**
      **PATRICIA DOBEK**
    **NOTARY PUBLIC - STATE OF ILLINOIS**
     **MY COMMISSION EXPIRES:03/23/10**

14                          Certified Shorthand Reporter

15

16     CSR No. 084-003249

17

18

19

20

21

22

23

24

# EXHIBIT E

## Exhibit E

### 4. HEARING PROTOCOL

**Opening**

The Joint Grievance Committee shall open its session on call of the Co-Chairmen to hear and dispose of grievances before it.

**Order of Presentation**

At sessions of the Joint Grievance Committee, except discharge cases, the grieving party shall present its case first, and the responding party second. In discharge cases, the Employer shall go first. Adequate allowance shall be made for rebuttal.

**Oral Participation**

Oral participation in Committee session shall be limited to the Committee members, the grievant, and regular officials or employees of the parties to the grievance.

**Interrogation**

Interrogation of parties to a grievance being heard by the Joint Grievance Committee shall be limited to members of the Committee.

**Executive Sessions**

After hearing a grievance, the Joint Grievance Committee shall exclude parties thereto and retire into Executive Session to dispose of the grievance.

**Decisions**

Grievances shall be decided by secret ballot vote of the Committee members. In the event an equal number of Union and Employer Committee members are not present, the respective panels representing the Employers and the Union may cast votes in an amount equal to the number of members present on behalf of the panel having the fewer numbers present.

Upon reaching a decision on such grievance, it shall be announced to the parties. The Committee's Secretary shall confirm such decision by letter to the parties.

### 5. AMENDMENTS

The Joint Grievance Committee may amend, alter, delete, or add to these rules of Committee Procedure upon their own agreement to do so.





International Union of Operating

Engineers, Local 150

*and*

Mid-America Regional
Bargaining Association

## Exhibit E Continued

### 1. FILING, SCHEDULING OF GRIEVANCES

**Filing Procedure**

To be heard at a session of the Joint Grievance Committee, a grievance must be filed with its secretary not less than ten (10) days prior to the start of a scheduled session. At the same time, the party bringing the grievance before the Committee shall also file with the Committee a notice which has been mailed to the opposing party informing such opposing party that the grievance will be heard at the Committee's next session if not sooner resolved.

**Interim Sessions**

The Joint Grievance Committee may hold interim sessions to hear and dispose of a grievance upon agreement of the Committee's Co-Chairmen that such grievance warrants a special hearing date. The above ten (10) day notice rule shall also apply to interim sessions of the Committee unless waived by mutual consent of the parties.

**Discharges**

A grievance involving a discharge of an employee may be heard in less than ten (10) days by mutual consent of the parties.

**Pre-hearing Investigation, Resolution**

Grievances are not properly before the Joint Grievance Committee unless the parties have actually been engaged in an attempt to resolve the grievance. Wage claims before the Committee must have been presented to the Employer in sufficient detail to permit investigation of them by the Employer before the hearing date.

**Withdrawal or Postponement**

After a grievance is filed for hearing by the Joint Grievance Committee, it may be withdrawn by agreement of the parties. Postponement of a scheduled hearing of a grievance after filing requires the consent of the Co-Chairmen. Requests for postponement will be considered up to 48 hours before the actual hearing.

**Absence at Hearing**

After due notice, in case of the failure of either party to appear at the hearing of a grievance properly filed for hearing by the Joint Committee, the party in attendance shall offer evidence in support of its position and the Committee shall dispose of the case on the basis of such evidence.

### 2. COMMITTEE PARTICIPANTS

**Quota**

The presence of three Committee members representing the Union and three Committee members representing the Employers shall constitute a quorum for transacting the business of the Joint Grievance Committee. By agreement of both parties, under extenuating circumstances, a lesser number of equal representatives may be used.

**Chairmanship**

The chairmanship of the sessions of the Joint Grievance Committee shall alternate between the Chairman of the Committee's Employer panel and the Chairman of the Committee's Union panel.

**Conflict of Interest**

An Employer shall not participate as a Committee member in decisions of the Joint Grievance Committee on grievances involving his own Company or a Company in which he has managerial interest. A Union Business Representative shall not participate as a Committee member in decisions of the Committee on a grievance which he handles in Step One of the bargaining contract's grievance procedures.

### 3. OTHER PARTICIPANTS

**Observers**

Only duly authorized Joint Committee members or alternate members shall be permitted in Committee sessions as observers unless otherwise agreed to by the Committee's Co-Chairmen.

**Court Reporters**

When a court reporter is requested by the Employer or Union in a grievance before the Committee, such request must be made in writing to both the Employer and Union Chairmen of the Committee at least 10 days prior to the scheduled hearing date. The Committee shall reserve the right to engage the court reporter service to be used at such hearing and the party requesting the court reporting service shall bear the total cost of the court reporter service engaged by the Committee including the transcript of such hearing. A copy shall be made available to the Committee at no cost.

**Legal Counsel, Advisors**

Parties to a grievance being heard before the Joint Grievance Committee may have present such advisors or counsel as they require but such outside advisors or counsel may not address or question the Committee, the parties or witnesses before the Committee.

# EXHIBIT F

## Exhibit F

dures of the American Arbitration Association. The cost of such arbitrator shall be borne equally by both parties to the arbitration, and the decision of the arbitrator shall be final and binding on all parties and individuals bound by this Agreement.

The time limits provided in this Section may be extended by mutual written consent of the Union, the Association and/or the Employer.

Neither the Joint Grievance Committee nor an arbitrator shall have any authority to add to, detract from, or in any way alter the provisions of this Agreement or make a new Agreement.

Decision of the Joint Grievance Committee and Arbitration Awards shall be complied with within seven (7) days of receipt of the decision by the losing party. A party which fails to comply with the seven (7) day period shall be required to pay an additional ten (10%) percent of the amounts as owed as liquidated damages for failure to comply with the decision or award. In the event the prevailing party is required to file suit to enforce the decision or award, and it prevails, it shall be entitled to recover its costs, including attorney's fees, from the losing party.

There shall be no lockout by an Employer during the term of this Agreement.

Except as provided in Article XX, Sections 1 and 2 and 4 of this Agreement, there shall be no strikes or work stoppages by the Union during the term of this Agreement.

### SECTION 2 - JURISDICTIONAL AWARD

Unless determined by Jurisdictional Award as hereinafter set forth, all work that has been heretofore performed under agreement or by custom or by area practice with any other local organization shall continue to be so performed until such Jurisdictional Award is made.

42

Whenever a jurisdictional dispute shall arise between local labor organizations, the provisions of this Agreement shall prevail until a Jurisdictional Award has been made by the proper Jurisdictional Board of International Unions of which the local disputing Labor Organizations are members. The Employer agrees to abide by such Jurisdictional Award, but there shall be no work stoppage while the settlement of the dispute is pending. It is further agreed that the Employer will abide by such mutual agreement reached between the Local Union and other Local Unions and the International Union, including, but not limited to the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry.

### ARTICLE XIV
### JOB STEWARD

The job steward shall be selected by the Union from among the members of the bargaining unit employed at the job site at the time of selection. The job steward shall be a working employee. The Union shall have the right to designate which employee shall be the steward or acting steward. The job steward shall have no special employment priority or security. In case of any minor difficulty, the steward shall be permitted reasonable time to adjust same without pay deduction.

43

47

# EXHIBIT G

## Exhibit G

## INTERNATIONAL UNION OF OPERATING ENGINEERS

LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M

AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

*06-30*



**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER

(708) 482-8500 · FAX (708) 482-7186
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

April 21, 2006

*Via Fax (815) 337-1766 and*
*CM 7004 1350 0005 2983 2117*

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE:  Violations of the MARBA Heavy and Highway and Underground Agreement
Article I, Section 1 – Bargaining Unit
Article I, Section 6 – No Discrimination
Article I, Section 11 – Assignment of Work
Article XII - Hiring
Union File No. 06-080

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but not limited to those captioned above, of the MARBA Heavy and Highway and Underground Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violations occurred on or about April 10 and April 11, 2006, and are ongoing on your construction site located in Wonder Lake, Illinois, within Local 150's jurisdictional territory. See attached Agent's Statement for further details, including damages owed in the current estimated amount of $822.88\*.

In compliance with Step 1 of the Grievances and Arbitration clause of our Agreement, Article XIII, Section 1, our Business Representative, Chuck August, spoke with your company attorney, Robert Hanlon, by telephone, but the grievance remains unresolved. Therefore, in a further attempt to resolve this dispute, I have designated James McNally, Assistant to the President, to meet with your designated company officials at the Local Union office, 6200 Joliet Road, Countryside, Illinois 60525, on Wednesday, May 17, 2006, at 9:15 a.m. If the Company Officer cannot attend, please send a representative.

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing and

---

\* Ongoing.



Exhibit G Continued

INTERNATIONAL UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
April 21, 2006
File No. 06-080
Page 2


this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William B. Dugan
PRESIDENT-BUSINESS MANAGER

*Steven M. Cisco/lmd*

By:     Steven M. Cisco
        Recording-Corresponding Secretary


SMC/lmd
Attachment

cc:     Charles A. August, Business Representative – Dist. 3
        James McNally, Assistant to the President
        Dale D. Pierson, General Counsel
        Mid-America Regional Bargaining Association

Exhibit G Continued

## INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

---

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 · FAX (708) 482-7185
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

---

### STATEMENT OF BUSINESS AGENT

**TO:**  Steven M. Cisco
Recording-Corresponding Secretary

**RE:**  Merryman Excavating – Violations of Article I, Section 1 – Bargaining Unit; Article I, Section 6 – No Discrimination; Article I, Section 11 – Assignment of Work; and Article XII – Hiring of the MARBA Heavy and Highway and Underground Agreement

*Monday, April 10, 2006 – Wonder Lake Project:*  Ryan Wilson, a 139 Apprentice, was running a 953C Cat loader for Merryman Excavating. He stated that he was related to the Merryman's and stated Bob Darling was transferring him into Local 150 in July. I explained the transfer process to him, and that there were too many qualified 150 Operators on the out-of-work list. He needed to go back up to Wisconsin. I called Robert Hanlon (847-577-1434) and made him aware of the situation.

*Tuesday, April 11, 2006 – Wonder Lake Project:*  Ryan Wilson was running the 953C Cat loader again. I spoke to Mr. Wilson. He pulled out attorney Robert Hanlon's business card and said, "Call him." I informed Mr. Wilson I spoke to Mr. Hanlon yesterday and that I would be filing a grievance. Ryan Wilson stated he never complained about the 150 Operators working in Wisconsin. I said how could you, you just got into 139 in November.

On April 11, 2006, Robert Hanlon called and Merryman Excavating was transferring shares of stock to Ryan Wilson to make him an Owner in Merryman Excavating, and Local 150 had better not refuse induction as an Owner-Operator. I asked how Local 150 would have knowledge of this, possibly by osmosis, because I spoke to Mr. Hanlon yesterday and he did not say anything about ownership, just inquired about a transfer? Mr. Hanlon stated he was busy with a jury, but paperwork would be forthcoming.

**Violation Dates:**  April 10 and April 11, 2006, and ongoing

**Relief Sought:**  Wages and fringe benefits for *Class II/Track Loader*

|  |  |  |  |
|---|---|---|---|
| Wages | $37.20 x 8 Hours = | $297.60 | |
| Fringe Benefits | $14.23 x 8 Hours = | $113.84 | |
| | | $411.44 | Per day |
| | Times 2 days to date | x      2 | |
| | | $822.88* | To be paid to the IUOE Local 150 Assistance Fund |

*This amount will increase with each additional date of violation.

Charles A. August, Business Representative – Dist. 3
April 20, 2006
File No. 06-080

# EXHIBIT H

## Exhibit H

**INTERNATIONAL UNION OF OPERATING ENGINEERS**
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

06-31



| WILLIAM E. DUGAN | | (708) 482-8800 · FAX (708) 482-7185 |
| PRESIDENT-BUSINESS MANAGER | | 6200 JOLIET ROAD |
| | | COUNTRYSIDE, IL 60525-3992 |

April 21, 2006

*Via Fax (815) 337-1766 and*
*CM 7004 1350 0005 2983 2292*

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE:   Violations of the MARBA Heavy and Highway and Underground Agreement
        Article I, Section 1 – Bargaining Unit
        Article I, Section 6 – No Discrimination
        Article I, Section 11 – Assignment of Work
        Article XII - Hiring
        Union File No. 06-081

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but not limited to those captioned above, of the MARBA Heavy and Highway and Underground Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violations occurred on or about April 11, 2006, on your construction site located in Wonder Lake, Illinois, within Local 150's jurisdictional territory, where your company was performing work with a non-bargaining unit employee. See attached Agent's Statement for further details, including damages owed in the current aggregate amount of $374.24.

In compliance with Step 1 of the Grievances and Arbitration clause of our Agreement, Article XIII, Section 1, our Business Representative, Chuck August, left a telephone message with your company attorney, Robert Hanlon, but the grievance remains unresolved. Therefore, in a further attempt to resolve this dispute, I have designated James McNally, Assistant to the President, to meet with your designated company officials at the Local Union office, 6200 Joliet Road, Countryside, Illinois 60525, on Wednesday, May 17, 2006, at 9:25 a.m. If the Company Officer cannot attend, please send a representative.

Alternatively, you may mail your settlement check to the attention of Steven M. Cisco at the above address prior to the date of hearing in the full amount of $374.24 payable to IUOE Local 150 Assistance Fund.

51

Exhibit H Continued

INTERNATIONAL UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
April 21, 2006
File No. 06-081
Page 2

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing or mail us your settlement check prior to that date and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William E. Dugan
PRESIDENT-BUSINESS MANAGER

By:    Steven M. Cisco
       Recording-Corresponding Secretary

SMC/lmd
Attachment

cc:    Charles A. August, Business Representative – Dist. 3
       James McNally, Assistant to the President
       Dale D. Pierson, General Counsel
       Mid-America Regional Bargaining Association

Exhibit H Continued

## INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150S, 150M

AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

| WILLIAM E. DUGAN |  | (708) 482-8800 - FAX (708) 482-7168 |
| PRESIDENT-BUSINESS MANAGER | | 6300 JOLIET ROAD |
| | | COUNTRYSIDE, IL 60525-3991 |

### STATEMENT OF BUSINESS AGENT

**TO:**    Steven M. Cisco
        Recording-Corresponding Secretary

**RE:**    Merryman Excavating – Violations of Article I, Section 1 – Bargaining Unit; Article I, Section 6 – No Discrimination; Article I, Section 11 – Assignment of Work; and Article XII – Hiring of the MARBA Heavy and Highway and Underground Agreement

On Tuesday, April 11, 2006, at the Wonder Lake Project, Carl Matag, a Laborer, ran a John Deere 270 Skidsteer.

**Violation Date:**    April 11, 2006

**Relief Sought:**    Wages and fringe benefits for *Class VI/Skidsteer* to be paid to the IUOE Local 150 Assistance Fund

| | | |
|---|---|---|
| Wages | $32.55 x 8 Hours = | $260.40 |
| Fringe Benefits | $14.23 x 8 Hours = | $113.84 |
| | | $374.24  To be paid to the IUOE Local 150 Assistance Fund |

Charles A. August, Business Representative – Dist. 3
April 20, 2006
File No. 06-081

# EXHIBIT I

## Exhibit I

### INTERNATIONAL UNION OF OPERATING ENGINEERS

LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150G, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

06-32

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 - FAX (708) 482-7185
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3982

April 24, 2006

*Via Fax (815) 337-1766 and*
*CM 7004 1350 0005 2983 2124*

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE: Violations of the MARBA Heavy and Highway and Underground Agreement
    Article I, Section 1 – Bargaining Unit
    Article I, Section 6 – No Discrimination
    Article I, Section 11 – Assignment of Work
    Article XII - Hiring
    Union File No. 06-082

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but not limited to those captioned above, of the MARBA Heavy and Highway and Underground Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violations occurred on or about April 18, 2006, on your construction site located on West Wonder Lake Road and Thompson Road in Wonder Lake, Illinois, within Local 150's jurisdictional territory, where your company was performing work with a non-bargaining unit employee. See attached Agent's Statement for further details, including damages owed in the current aggregate amount of **$451.28**.

In compliance with Step 1 of the Grievances and Arbitration clause of our Agreement, Article XIII, Section 1, our Business Representative, Chuck August, spoke with your company foreman, George, on the job site, and left a telephone message with your company attorney, Robert Hanlon, but the grievance remains unresolved. Therefore, in a further attempt to resolve this dispute, I have designated James McNally, Assistant to the President, to meet with your designated company officials at the Local Union office, 6200 Joliet Road, Countryside, Illinois 60525, on Wednesday, May 17, 2006, at 9:35 a.m. If the Company Officer cannot attend, please send a representative.

RECEIVED
APR 2 5 2006

## Exhibit I Continued

INTERNATIONAL UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
April 24, 2006
File No. 06-082
Page 2

Alternatively, you may mail your settlement check to the attention of Steven M. Cisco at the above address prior to the date of hearing in the full amount of $451.28 payable to IUOE Local 150 Assistance Fund.

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing or mail us your settlement check prior to that date and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William E. Dugan
PRESIDENT-BUSINESS MANAGER

*Steven M. Cisco/lmd*

By:     Steven M. Cisco
        Recording-Corresponding Secretary

SMC/lmd
Attachment

cc:     Charles A. August, Business Representative – Dist. 3
        James McNally, Assistant to the President
        Dale D. Pierson, General Counsel
        Mid-America Regional Bargaining Association

**Exhibit I Continued**



## INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150F, 150M

AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 · FAX (708) 482-7185
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

### STATEMENT OF BUSINESS AGENT

**TO:** Steven M. Cisco
Recording-Corresponding Secretary

**RE:** Merryman Excavating – Violations of Article I, Section 1 – Bargaining Unit; Article I, Section 6 – No Discrimination; Article I, Section 11 – Assignment of Work; and Article XII – Hiring of the MARBA Heavy and Highway and Underground Agreement

*Tuesday, April 18, 2006, West Wonder Lake Road:* Vincent White, a 1035 Laborer, ran a Volvo EC 210 B.L.C. Backhoe, backfilling the water main.

**Violation Date:** April 18, 2006

**Relief Sought:** Wages and fringe benefits for *Class I/Backhoe* to be paid to the IUOE Local 150 Assistance Fund

| | | |
|---|---|---|
| Wages | $37.75 x 8.0 Hours = | $302.00 |
| ½ Hour Grease Time | | $ 28.32 |
| Fringe Benefits | $14.23 x 8.5 Hours = | $120.96 |
| | | $451.28 |

$451.28    To be paid to the IUOE Local 150 Assistance Fund

Charles A. August, Business Representative – Dist. 3
April 21, 2006
File No. 06-082

56

# EXHIBIT J

**Exhibit J**



**INTERNATIONAL UNION OF OPERATING ENGINEERS**
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

06-33

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER

(708) 482-8800 - FAX (708) 482-7186
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

May 17, 2006

Via Fax (815) 337-1766 and
CM 7004 1350 0005 2983 1424

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE: Violations of the MARBA Heavy and Highway and Underground Agreement
Article XII – Hiring
Union File No. 06-102

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but not limited to that captioned above, of the MARBA Heavy and Highway and Underground Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violation occurred on or about May 10, 2006, on your construction site located on Golf Road one block east of Milwaukee, within Local 150's jurisdictional territory, where your company was performing work with a non-bargaining unit employee. See attached Agent's Statement for further details, including damages owed in the current aggregate amount of $451.28.

In compliance with Step 1 of the Grievances and Arbitration clause of our Agreement, Article XIII, Section 1, our Business Representative, Tim Gorman, left messages on the job site and by telephone but received no return call, and the grievance remains unresolved. Therefore, in a further attempt to resolve this dispute, I have designated James McNally, Assistant to the President, to meet with your designated company officials at the Local Union office, 6200 Joliet Road, Countryside, Illinois 60525, on Thursday, June 15, 2006, at 9:00 a.m. If the Company Officer cannot attend, please send a representative.

Alternatively, you may mail your settlement check to the attention of Steven M. Cisco at the above address prior to the date of hearing in the full amount of $451.28 payable to IUOE Local 150 Assistance Fund.



RECEIVED
MAY 22 2006

## Exhibit J Continued

INTL   ...L UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
May 17, 2006
File No. 06-102
Page 2

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing or mail us your settlement check prior to that date and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William B. Dugan
PRESIDENT-BUSINESS MANAGER

By:   Steven M. Cisco
      Recording-Corresponding Secretary

SMC/lmd
Attachment

cc:   Tim Gorman, Business Representative – Dist. 1
      James McNally, Assistant to the President
      Dale D. Pierson, General Counsel
      Mid-America Regional Bargaining Association

Exhibit J Continued

## INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 - FAX (708) 482-7186
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

### STATEMENT OF BUSINESS AGENT

**TO:** Steven M. Cisco
Recording-Corresponding Secretary

**RE:** Merryman Excavating -- Violation of Article XII -- Hiring of the MARBA Heavy and Highway
and Underground Agreement

I stopped by this jobsite for routine checks and found Merryman Excavating doing some
underground work. I carded the loader Operator, who was 150, and then walked to the backhoe
and carded him. He showed me a 139 card. His name is Andrew Vanderstappen, Register
#2441018. He had no permit and wasn't cleared into Local 150 jurisdiction as far as I knew. I
told Andy I would file charges against him if I caught him in our area again without having the
company going through the Hiring Hall according to the contract.

**Violation Date:** May 10, 2006

**Relief Sought:** Wages and fringe benefits for *Class I/Backhoe* to be paid to the IUOE Local 150
Assistance Fund

| | | |
|---|---|---|
| Wages | $37.75 x 8.0 Hours = | $302.00 |
| ½ Hour Grease Time | | $ 28.32 |
| Fringe Benefits | $14.23 x 8.5 Hours = | $120.96 |
| | | **$451.28** |

To be paid to the
IUOE Local 150
Assistance Fund

Tim Gorman, Business Representative -- Dist. 1
May 12, 2006
File No. 06-102

# EXHIBIT K

## Exhibit K

**INTERNATIONAL UNION OF OPERATING ENGINEERS**
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

06-34



**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER

(708) 482-8800 · FAX (708) 482-7195
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

May 17, 2006

*Via Fax (815) 337-1766 and*
*CM 7004 1350 0005 2983 1431*

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE:   Violation of the MARBA Heavy and Highway and Underground Agreement
       Article VIII, Section 2 – Machinery Operation
       Union File No. 06-105

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but not limited to that captioned above, of the MARBA Heavy and Highway and Underground Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violation occurred on or about May 1, 2006, and is ongoing on your construction site located at the Hampshire Waste Treatment Plant, within Local 150's jurisdictional territory, where your company was operating a Komatsu 600 Excavator without an oiler. See attached Agent's Statement for further details, including damages owed in the current estimated amount of $2,501.70.*

In compliance with Step 1 of the Grievances and Arbitration clause of our Agreement, Article XIII, Section 1, our Business Representative, Mike Kresge, spoke with you on the job site, but the grievance remains unresolved. Therefore, in a further attempt to resolve this dispute, I have designated James McNally, Assistant to the President, to meet with your designated company officials at the Local Union office, 6200 Joliet Road, Countryside, Illinois 60525, on **Thursday, June 15, 2006, at 9:10 a.m.** If the Company Officer cannot attend, please send a representative.

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

---
* Ongoing.

RECEIVED
MAY 2 2 2006

## Exhibit K Continued

INTE.    NAL UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
May 17, 2006
File No. 06-105
Page 2

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William E. Dugan
PRESIDENT-BUSINESS MANAGER

By:     Steven M. Cisco
          Recording-Corresponding Secretary

SMC/lmd
Attachment

cc:     Mike Kresge, Business Representative – Dist. 2
          James McNally, Assistant to the President
          Dale D. Pierson, General Counsel
          Mid-America Regional Bargaining Association

## Exhibit K Continued

INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150Q, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 - FAX (708) 482-7185
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3982

### STATEMENT OF BUSINESS AGENT

**TO:** Steven M. Cisco
Recording-Corresponding Secretary

**RE:** Merryman Excavating – Violation of Article VIII, Section 2 – Machinery Operation of the MARBA Heavy and Highway and Underground Agreement

I was checking the Hampshire Waste Treatment Plant job on May 1, 2006. Merryman was doing deep cuts sewer job on site. Merryman was running a Komatsu 600 Excavator without an oiler.

Took pictures.

**Violation Date:** May 1, 2006 and ongoing

**Relief Sought:** Wages and fringe benefits for Class VI/Oiler to be paid to the IUOE Local 150 Assistance Fund

| | | | |
|---|---|---|---|
| Regular Wages | $32.55 x 8 Hours = | $ 260.40 | |
| Overtime Wages (1½) | $48.82 x 2 Hours = | $ 97.64 | |
| Fringe Benefits | $14.23 x 10 Hours = | $ 142.30 | Per day |
| | Subtotal | $ 500.34 | |
| | Times 5 days | x 5 | |
| | Total | $2,501.70* | Per week to be paid to the IUOE Local 150 Assistance Fund |

*This amount will increase with each additional week of violation.

Mike Kresge, Business Representative – Dist. 2
May 12, 2006
File No. 06-105

# EXHIBIT L

## Exhibit L

**INTERNATIONAL UNION OF OPERATING ENGINEERS**
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

WILLIAM E. DUGAN
PRESIDENT-BUSINESS MANAGER



06-35

(708) 482-8800 - FAX (708) 482-7286
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

May 17, 2006

Via Fax (815) 337-1766 and
CM 7004 1350 0005 2983 1448

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE:     Violations of the MARBA Heavy and Highway and Underground Agreement
        Article I, Section 11 – Assignment of Work
        Article XV, Section 1 – Wage Rates and Fringe Benefits
        Union File No. 06-106

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but not limited to those captioned above, of the MARBA Heavy and Highway and Underground Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violations occurred on or about May 1, 2006, and are ongoing on your construction site located at the Hampshire Waste Treatment Plant, within Local 150's jurisdictional territory, where your company failed to assign work to employees in the bargaining unit covered by our Agreement. See attached Agent's Statement for further details, including damages owed in the current estimated amount of $5,955.92.*

In compliance with Step 1 of the Grievances and Arbitration clause of our Agreement, Article XIII, Section 1, our Business Representative, Mike Kresge, spoke with you on the job site, but the grievance remains unresolved. Therefore, in a further attempt to resolve this dispute, I have designated James McNally, Assistant to the President, to meet with your designated company officials at the Local Union office, 6200 Joliet Road, Countryside, Illinois 60525, on Thursday, June 15, 2006, at 9:20 a.m. If the Company Officer cannot attend, please send a representative.

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

* Ongoing.

RECEIVED
MAY 3 2 2006

## Exhibit L Continued

INTERNATIONAL UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
May 17, 2006
File No. 06-106
Page 2

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William E. Dugan
PRESIDENT-BUSINESS MANAGER

By:    Steven M. Cisco
       Recording-Corresponding Secretary

SMC/lmd
Attachment

cc:    Mike Kresge, Business Representative – Dist. 2
       James McNally, Assistant to the President
       Dale D. Pierson, General Counsel
       Mid-America Regional Bargaining Association

## Exhibit L Continued

**INTERNATIONAL UNION OF OPERATING ENGINEERS**
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE AFL-CIO, AND BUILDING TRADES DEPARTMENT

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 • FAX (708) 482-7184
6200 JOLIET ROAD
COUNTRYSIDE IL 60825-3892

### STATEMENT OF BUSINESS AGENT

**TO:** Steven M. Cisco
Recording-Corresponding Secretary

**RE:** Merryman Excavating – Violations of Article I, Section 11 – Assignment of Work and Article XV, Section 1 – Wage Rates and Fringe Benefits of the MARBA Heavy and Highway and Underground Agreement

I received a complaint about Merryman Excavating on a job site at the Hampshire Waste Treatment Plant. The company was running three 89KW generators and two power submersible electric pumps. I went to the job site on Monday, May 1, 2006, and found no operators on the generators or pumps at night.

Took pictures.

**Violation Date:** May 1, 2006 and ongoing

**Relief Sought:** Wages and fringe benefits for *Class IV/Generator* to be paid to the IUOE Local 150 Assistance Fund

| | | | |
|---|---|---|---|
| Regular Wages | $33.75 x 8 Hours = | $ 270.00 | |
| Overtime Wages (1½) | $50.62 x 4 Hours = | $ 202.48 | |
| | | $ 472.48 | |
| | Times 5 days | x 5 | |
| | Subtotal | $2,362.40 | |
| Saturday Wages (1½) | $50.62 x 12 Hours = | $ 607.44 | |
| Sunday Wages (Double) | $67.50 x 24 Hours = | $1,620.00 | |
| Fringe Benefits | $14.23 x 96 Hours = | $1,366.08 | |
| | Total | $5,955.92* | Per week to be paid to the IUOE Local 150 Assistance Fund |

*This amount will increase with each additional week of violation.

Mike Kresge, Business Representative – Dist. 2
May 12, 2006
File No. 06-106

# EXHIBIT M

## Exhibit M – (John Rabine)

### INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

06-38



| WILLIAM E. DUGAN | | (708) 482-9800 · FAX (708) 482-7186 |
| PRESIDENT-BUSINESS MANAGER | | 6200 JOLIET ROAD |
| | | COUNTRYSIDE, IL 60525-3992 |

May 30, 2006

*Via Fax (815) 337-1766 and*
*CM 7004 1350 0005 2983 1646*

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE:  Violations of the MARBA Heavy and Highway and Underground Agreement
Article I, Section 1 – Bargaining Unit, Section 3 – Recognition, Section 6 – No
Discrimination, Section 7 – Scope of Work; Section 9 – Prevailing Wage Scale, and
Section 11 – Assignment of Work; Article IX, Section 1 – Discharge and Section 3 –
Regular Assigned Engineers; Article XII – Hiring
Union File No. 06-118

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but
not limited to those captioned above, of the MARBA Heavy and Highway and Underground
Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a
Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violations occurred on or about April 21, 2006, and
are ongoing on your various construction sites within Local 150's jurisdictional territory.  See
attached Agent's Statement and accompanying exhibits for further details, including damages
owed in the current estimated amount of $451.27 per day.*

In compliance with Step 1 of the Grievances and Arbitration clause of our Agreement, Article
XIII, Section 1, our Business Representative, Chuck August, left a telephone message with your
company attorney, Robert Hanlon, but has received no return call, and the grievance remains
unresolved.  Therefore, in a further attempt to resolve this dispute, I have designated James
McNally, Assistant to the President, to meet with your designated company officials at the Local
Union office, 6200 Joliet Road, Countryside, Illinois 60525, on Thursday, June 15, 2006, at
8:30 a.m. If the Company Officer cannot attend, please send a representative.

---
* Ongoing.

66

**Exhibit M continued (Re: John Rabine)**

INTERNATIONAL UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
May 30, 2006
File No. 06-118
Page 2

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by this and all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William E. Dugan
PRESIDENT-BUSINESS MANAGER

By: Steven M. Cisco
Recording-Corresponding Secretary

SMC/lmd
Attachment

cc:  John Rabine, Member/Grievant
Charles A. August, Business Representative – Dist. 3
James McNally, Assistant to the President
Dale D. Pierson, General Counsel
Ron Selby, Jr., MOE Delinquency
Mid-America Regional Bargaining Association

**Exhibit M continued (Re: John Rabine)**

## INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150H
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 - FAX (708) 482-7106
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

### STATEMENT OF BUSINESS AGENT
[Revised]

**TO:** Steven M. Cisco
Recording-Corresponding Secretary

**RE:** Merryman Excavation, Inc. -- Violations of the MARBA Heavy and Highway and Underground Agreement

The Company is in violation of the following articles and sections:

| Article I | Section 1 | Bargaining Unit |
| | Section 3 | Recognition |
| | Section 6 | No Discrimination |
| | Section 7 | Scope of Work |
| | Section 9 | Prevailing Wage Scale |
| | Section 11 | Assignment of Work |
| Article IX | Section 1 | Discharge |
| | Section 3 | Regular Assigned Engineers |
| Article XII | Hiring | |

See attached Exhibits 1 through 5.

**Violation Date:** April 21, 2006 and ongoing

**Relief Sought:** Wages and fringe benefits for *Class I/Excavator*

| | | | | |
|---|---|---|---|---|
| Regular Wages | $37.75 x 8.0 Hours = | $302.00 | | |
| Overtime Wages | $56.63 x .5 Hours = | $ 28.31 | | |
| | | $330.31 | Per day to John Rabine | |
| Fringe Benefits | $14.23 x 8.5 Hours = | $120.96 | Per day to Midwest Operating Engineers Fund | |
| | | $451.27* | Total per day | |

*This amount will increase with each additional date of violation.

Charles A. August, Business Representative -- Dist. 3
May 24, 2006
File No. 06-118

68

# EXHIBIT N

## **Exhibit N**

**INTERNATIONAL UNION OF OPERATING ENGINEERS**
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

WILLIAM E. DUGAN
PRESIDENT-BUSINESS MANAGER



06-40

(708) 482-8800 - FAX (708) 482-7186
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

May 30, 2006

*Via Fax (815) 337-1766 and*
*CM 7004 1350 0005 2983 1677*

Mr. Patrick Merryman, President
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, Illinois 60098

RE:  Violations of the MARBA Heavy and Highway and Underground Agreement
Article I, Section 1 – Bargaining Unit, Section 3 – Recognition, Section 6 – No
Discrimination, Section 7 – Scope of Work; Section 9 – Prevailing Wage Scale, and
Section 11 – Assignment of Work; Article IX, Section 1 – Discharge and Section 3 –
Regular Assigned Engineers; Article XII – Hiring
Union File No. 06-119

Dear Mr. Merryman:

We are advised that your company is in violation of various articles and sections, including but
not limited to those captioned above, of the MARBA Heavy and Highway and Underground
Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a
Memorandum of Agreement signed April 1, 2000.

We are further advised that the above-stated violations occurred on or about April 20, 2006, and
are ongoing on your various construction sites within Local 150's jurisdictional territory. See
attached Agent's Statement and accompanying exhibits for further details, including damages
owed in the current estimated amount of $451.27 per day.*

In compliance with Step I of the Grievances and Arbitration clause of our Agreement, Article
XIII, Section I, our Business Representative, Chuck August, left a telephone message with your
company attorney, Robert Hanlon, but has received no return call, and the grievance remains
unresolved.  Therefore, in a further attempt to resolve this dispute, I have designated James
McNally, Assistant to the President, to meet with your designated company officials at the Local
Union office, 6200 Joliet Road, Countryside, Illinois 60525, on Thursday, June 15, 2006, at
8:45 a.m.  If the Company Officer cannot attend, please send a representative.

---
* Ongoing.

RECEIVED
JUN 0 5 2006

69

Exhibit N Continued – Re Ray Herron

INTERNATIONAL UNION OF OPERATING ENGINEERS

Merryman Excavation, Inc.
May 30, 2006
File No. 06-119
Page 2

It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by this and all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William E. Dugan
PRESIDENT-BUSINESS MANAGER

By:    Steven M. Cisco
       Recording-Corresponding Secretary

SMC/lmd
Attachment

cc:    Raymond Herron, Member/Grievant
       Charles A. August, Business Representative – Dist. 3
       James McNally, Assistant to the President
       Dale D. Pierson, General Counsel
       Ron Selby, Jr., MOE Delinquency
       Mid-America Regional Bargaining Association

Exhibit N Continued – Re Ray Herron

**INTERNATIONAL UNION OF OPERATING ENGINEERS**
LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M
AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

WILLIAM E. DUGAN
PRESIDENT-BUSINESS MANAGER



(708) 482-8800 · FAX (708) 482-7185
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

## STATEMENT OF BUSINESS AGENT

**TO:** Steven M. Cisco
Recording-Corresponding Secretary

**RE:** Merryman Excavation, Inc. – Violations of the MARBA Heavy and Highway and Underground Agreement

The Company is in violation of the following articles and sections:

| | | |
|---|---|---|
| Article I | Section 1 | Bargaining Unit |
| | Section 3 | Recognition |
| | Section 6 | No Discrimination |
| | Section 7 | Scope of Work |
| | Section 9 | Prevailing Wage Scale |
| | Section 11 | Assignment of Work |
| Article IX | Section 1 | Discharge |
| | Section 3 | Regular Assigned Engineers |
| Article XII | Hiring | |

See attached Exhibits 1 and 2.

**Violation Date:** April 20, 2006 and ongoing

**Relief Sought:** Wages and fringe benefits for *Class I/Combination Backhoe*

| | | |
|---|---|---|
| Regular Wages | $37.75 x 8.0 Hours = | $302.00 |
| Overtime Wages | $56.63 x .5 Hours = | $ 28.31 |
| | | $330.31 | Per day to Raymond Herron |
| Fringe Benefits | $14.23 x 8.5 Hours = | $120.96 | Per day to Midwest Operating Engineers Fund |
| | | **$451.27*** | Total per day |

*This amount will increase with each additional date of violation.

Charles A. August, Business Representative – Dist. 3
May 24, 2006
File No. 06-119

# EXHIBIT O

## Exhibit O

**JOINT GRIEVANCE COMMITTEE**
**OPERATING ENGINEERS, LOCAL 150**

**CO-CHAIRMAN**
John Vignocchi/Joseph Benson
Mid-America Regional
  Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois 60018
Telephone: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President-Business Manager
Local 150, International Union
  of Operating Engineers
6200 Joliet Road
Countryside, Illinois 60525
Telephone: (708) 482-8800

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

Mr. Patrick Merryman
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, IL 60098

Mr. Chuck August
Operating Engineers Local 150
28874 Route 120
Lakemoor, IL 60050

SUBJECT:  **Grievance Hearing No. 06-30**
              **Union File No. 06-080**

Gentlemen:

A hearing of the above grievance will be held at the offices of the **Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois**, at the time and date indicated below:

DATE:  **Wednesday, August 2, 2006**

TIME:  **9:00 A. M.**

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol Q. Lord*

Carol A. Lord
Committee Secretary

cc:    Co-Chairmen
       Lisa Dombro
       Robert T. Hanlon, Esq.

**CERTIFIED MAIL #7004 1350 0005 3487 4591**

# EXHIBIT P

## Exhibit P

writing not later than ten (10) days after the occurrence of any of the events relating to the Employer, occurring after the date hereof:

1. Sale, assignment, transfer, or other change in name or ownership;
2. Formation of partnerships;
3. Termination of business;
4. Changes of name commonly used in business operation;
5. Change in form of business organization;
6. Incorporation of business;
7. Dissolution of corporation;
8. Name and business organization of successor;
9. Admission to or withdrawal from any association operating as a multi-employer bargaining agent.

### SECTION 11 - ASSIGNMENT OF WORK

a) The Employer hereby agrees to assign ALL work that is to be performed in the categories described in Article I, Section 7, Article VIII, Article XI, and/or Article XV to employees in the bargaining unit covered by this Agreement.

b) The Employer, by entering into this Agreement hereby states and affirms that it is the Employer's preference to have ALL work identified or described in Article I, Section 7, Article VIII, Article XI, and/or Article XV be performed by employees in the bargaining unit represented by the Union covered by this Agreement.

c) Grievances alleging a violation of this Section, based upon assignment of work to employees and or labor organizations not affiliated with the Building and

Construction Trades Department A.F.L.-C.I.O. shall be processed through the Grievance Procedure in Article XIII of this Agreement and shall not be considered to be a jurisdictional dispute and thereby excluded from the Grievance Procedure.

d) The Employer agrees to compensate the bargaining unit member who would have worked but for the Employer's violation of this Section at the double (2x) time rate for all hours the bargaining unit member would have worked but for the Employer's violation.

### ARTICLE II

#### A. UNION SHOP

All employees shall be obligated to become members of the Union after the seventh (7th) day of employment as a condition of continued employment. Any employee who fails to become a member of the Union by his own choice and not by refusal of the Union, or who fails to maintain his Union membership shall forfeit his right of employment.

The Union by written notice served by registered mail upon the Employer may demand the discharge of said employee, specifically stating the basis of said demand, and subject at all times to the Union guarantee to defend, save harmless and indemnify the Employer from any claims or damages accruing to the employee as a result of the wrongful discharge demand by the Union. The foregoing in all other aspects shall be subject to existing and applicable Federal and State laws governing labor management relations. This Union security provision shall be subject to immediate negotiation with the Employer as to any further changes permissible under future legal authority.

#### B. MANAGEMENT RIGHTS

The right to manage and conduct the business, including the right to determine what operations are to be con-

8

9

# EXHIBIT Q

## Exhibit Q

**JOINT GRIEVANCE COMMITTEE**
**OPERATING ENGINEERS, LOCAL 150**

| | |
|---|---|
| **CO-CHAIRMAN** | **CO-CHAIRMAN** |
| John Vignocchi/Joseph Benson | William E. Dugan |
| Mid-America Regional | President-Business Manager |
| Bargaining Association | Local 150, International Union |
| 2720 River Road | of Operating Engineers |
| Suite 222 | 6200 Joliet Road |
| Des Plaines, Illinois 60018 | Countryside, Illinois 60525 |
| Telephone: (847) 699-1283 | Telephone: (708) 482-8800 |

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

| | |
|---|---|
| Mr. Patrick Merryman | Mr. Chuck August |
| Merryman Excavation, Inc. | Operating Engineers Local 150 |
| 1501 Lamb Road | 28874 Route 120 |
| Woodstock, IL 60098 | Lakemoor, IL 60050 |

SUBJECT:   Grievance Hearing No. 06-31
                   Union File No. 06-081

Gentlemen:

A hearing of the above grievance will be held at the offices of the Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois, at the time and date indicated below:

DATE:   Wednesday, August 2, 2006

TIME:   9:10 A. M.

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol A. Lord*

Carol A. Lord
Committee Secretary

cc:   Co-Chairmen
       Lisa Dombro
       Robert T. Hanlon, Esq.

**CERTIFIED MAIL #7004 1350 0005 3487 4591**

# EXHIBIT R

## Exhibit R

**JOINT GRIEVANCE COMMITTEE**
OPERATING ENGINEERS, LOCAL 150

**CO-CHAIRMAN**
John Vignocchi/Joseph Benson
Mid-America Regional
 Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois 60018
Telephone: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President-Business Manager
Local 150, International Union
 of Operating Engineers
6200 Joliet Road
Countryside, Illinois 60525
Telephone: (708) 482-8800

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

Mr. Patrick Merryman
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, IL 60098

Mr. Chuck August
Operating Engineers Local 150
28874 Route 120
Lakemoor, IL 60050

SUBJECT: Grievance Hearing No. 06-32
 Union File No. 06-082

Gentlemen:

A hearing of the above grievance will be held at the offices of the **Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois,** at the time and date indicated below:

DATE: **Wednesday, August 2, 2006**

TIME: **9:20 A. M.**

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol A. Lord*

Carol A. Lord
Committee Secretary

cc: Co-Chairmen
 Lisa Dombro
 Robert T. Hanlon, Esq.

**CERTIFIED MAIL #7004 1350 0005 3487 4591**

# EXHIBIT S

## Exhibit S

**JOINT GRIEVANCE COMMITTEE**
OPERATING ENGINEERS, LOCAL 150

**CO-CHAIRMAN**
John Vignocchi/Joseph Benson
Mid-America Regional
  Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois 60018
Telephone: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President-Business Manager
Local 150, International Union
  of Operating Engineers
6200 Joliet Road
Countryside, Illinois 60525
Telephone: (708) 482-8800

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

Mr. Patrick Merryman
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, IL 60098

Mr. Tim Gorman
Operating Engineers Local 150
6200 Joliet Road
Countryside, IL 60098

SUBJECT: **Grievance Hearing No. 06-33**
            **Union File No. 06-102**

Gentlemen:

A hearing of the above grievance will be held at the offices of the **Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois**, at the time and date indicated below:

DATE: **Wednesday, August 2, 2006**

TIME: 9:30 A. M.

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol A. Lord*

Carol A. Lord
Committee Secretary

cc:    Co-Chairmen
        Lisa Dombro
        Robert T. Hanlon, Esq.

**CERTIFIED MAIL #7004 1350 0005 3487 4591**

# EXHIBIT T

## Exhibit T

**JOINT GRIEVANCE COMMITTEE**
OPERATING ENGINEERS, LOCAL 150

**CO-CHAIRMAN**
John Vignocchi/Joseph Benson
Mid-America Regional
   Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois 60018
Telephone: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President-Business Manager
Local 150, International Union
   of Operating Engineers
6200 Joliet Road
Countryside, Illinois 60525
Telephone: (708) 482-8800

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

Mr. Patrick Merryman
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, IL 60098

Mr. Mike Kresge
Operating Engineers Local 150
1050 E. Frontage Road
Joliet, IL 60431

SUBJECT:   **Grievance Hearing No. 06-34**
                **Union File No. 06-105**

Gentlemen:

A hearing of the above grievance will be held at the offices of the Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois, at the time and date indicated below:

DATE:  **Wednesday, August 2, 2006**

TIME:  **9:40 A.M.**

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol A. Lord*

Carol A. Lord
Committee Secretary

cc:   Co-Chairmen
        Lisa Dombro
        Robert T. Hanlon, Esq.

**CERTIFIED MAIL #7004 1350 0005 3487 4591**

# EXHIBIT U

## Exhibit U

**JOINT GRIEVANCE COMMITTEE**
OPERATING ENGINEERS, LOCAL 150

| | |
|---|---|
| **CO-CHAIRMAN** | **CO-CHAIRMAN** |
| John Vignocchi/Joseph Benson | William E. Dugan |
| Mid-America Regional | President-Business Manager |
| Bargaining Association | Local 150, International Union |
| 2720 River Road | of Operating Engineers |
| Suite 222 | 6200 Joliet Road |
| Des Plaines, Illinois 60018 | Countryside, Illinois 60525 |
| Telephone: (847) 699-1283 | Telephone: (708) 482-8800 |

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

| | |
|---|---|
| Mr. Patrick Merryman | Mr. Mike Kresge |
| Merryman Excavation, Inc. | Operating Engineers Local 150 |
| 1501 Lamb Road | 1050 E. Frontage Road |
| Woodstock, IL 60098 | Joliet, IL 60431 |

SUBJECT:    Grievance Hearing No. 06-35
                   Union File No. 06-106

Gentlemen:

A hearing of the above grievance will be held at the offices of the **Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois,** at the time and date indicated below:

**DATE:  Wednesday, August 2, 2006**

**TIME:  9:50 A.M.**

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol A. Lord*

Carol A. Lord
Committee Secretary

cc:    Co-Chairmen
       Lisa Dombro
       Robert T. Hanlon, Esq.

**CERTIFIED MAIL #7004 1350 0005 3487 4591**

# EXHIBIT V

## EXHIBIT V

### JOINT GRIEVANCE COMMITTEE
OPERATING ENGINEERS, LOCAL 150

**CO-CHAIRMAN**
John Vignocchi/Joseph Benson
Mid-America Regional
 Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois 60018
Telephone: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President-Business Manager
Local 150, International Union
 of Operating Engineers
6200 Joliet Road
Countryside, Illinois 60525
Telephone: (708) 482-8800

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

Mr. Patrick Merryman
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, IL 60098

Mr. Chuck August
Operating Engineers Local 150
28874 Route 120
Lakemoor, IL 60050

SUBJECT: **Grievance Hearing No. 06-38**
**Union File No. 06-118**

Gentlemen:

A hearing of the above grievance will be held at the offices of the **Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois**, at the time and date indicated below:

DATE: **Wednesday, August 2, 2006**

TIME: **10:20 A. M.**

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol A. Lord*

Carol A. Lord
Committee Secretary

cc: Co-Chairmen
Lisa Dombro
Robert T. Hanlon, Esq.

**CERTIFIED MAIL #7004 1350 0005 3487 4591**

79

# EXHIBIT W

## Exhibit W

**JOINT GRIEVANCE COMMITTEE**
OPERATING ENGINEERS, LOCAL 150

**CO-CHAIRMAN**
John Vignocchi/Joseph Benson
Mid-America Regional
  Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois 60018
Telephone: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President-Business Manager
Local 150, International Union
  of Operating Engineers
6200 Joliet Road
Countryside, Illinois 60525
Telephone: (708) 482-8800

**VIA CERTIFIED & REGULAR MAIL**

July 20, 2006

Mr. Patrick Merryman
Merryman Excavation, Inc.
1501 Lamb Road
Woodstock, IL 60098

Mr. Chuck August
Operating Engineers Local 150
28874 Route 120
Lakemoor, IL 60050

SUBJECT:     Grievance Hearing No. 06-40
                    Union File No. 06-119
Gentlemen:

A hearing of the above grievance will be held at the offices of the Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois, at the time and date indicated below:

DATE:   Wednesday, August 2, 2006

TIME:   10:40 A. M.

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party. The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown. The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

Carol A. Lord

Carol A. Lord
Committee Secretary

cc:     Co-Chairmen
          Lisa Dombro
          Robert T. Hanlon, Esq.

CERTIFIED MAIL #7004 1350 0005 3487 4591