YIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERRYMAN EXCAVATION, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 5160 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| INTERNATIONAL UNION OF OPERATING | ) | |
| ENGINEERS, LOCAL 150, AFL-CIO, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants/Counter-plaintiffs, and | ) | |
| | ) | |
| MID AMERICA REGIONAL BARGAINING | ) | |
| ASSOCIATION, MIDWEST OPERATING | ) | |
| ENGINEERS FUND, LOCAL 150 | ) | |
| ASSISTANCE FUND, STEVEN CISCO, JOHN | ) | |
| RABINE, RAYMOND (RAY) HERRON, | ) | |
| MELINDA HENSEL, MICHAEL KRESGE, | ) | |
| RICHARD DUNLAP, TIM GORMAN, TIM | ) | |
| SCULLY, JOSEPH BENSON, JOHN | ) | |
| VIGNOCCHI, and CHARLES AUGUST, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Merryman Excavation, Inc. ("Merryman") filed a thirteen count Complaint against: (i)
International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150"); (ii) The Mid-
America Regional Bargaining Association, John Vignocchi, Tim Scully, and Joseph Benson
(collectively "the MARBA Defendants")[1] ; and (iii) Charles August, Melinda Hensel, John Rabine,
Ray Herron, Michael Kresge and Richard Dunlap (collectively "the Individual Union Defendants")

---

[1] On December 23, 2008, Merryman Excavation, Inc. filed a Stipulation of Dismissal with prejudice as to
the MARBA Defendants. *See* [D.E. 228]. Therefore, they are no longer parties to the above captioned case.

1

pursuant to § 301 of the Labor Management Relations Act (the "LMRA"). In Counts I through XI,

filed only against Local 150, Merryman seeks to vacate eleven grievance awards entered by the Joint

Grievance Committee ("JGC"). In Count XII, Merryman alleges an Illinois common law civil

conspiracy claim against the Individual Union Defendants.[2] Local 150 filed a Counterclaim against

Merryman seeking to enforce nine of the eleven awards entered by the JGC. Pursuant to Federal

Rule of Civil Procedure 56 and Local Rule 56.1, Local 150 and the Individual Union Defendants

(in one consolidated motion), filed a motion for summary judgment on Counts I through XII of

Merryman's Complaint and on its Counterclaim against Merryman. Merryman filed a cross-motion

for summary judgment on Counts I through XI of its Complaint and on Local 150's Counterclaim.

For the reasons stated herein, Local 150's[3] Motion for Summary Judgement is granted and

Merryman's Motion for Summary Judgment is denied.

## STATEMENT OF UNDISPUTED FACTS[4]

---

[2]Merryman's Complaint also alleged a violation of the civil Racketeering Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 (Count XIII); however, on February 25, 2008, this Court dismissed Count XIII of Merryman's Complaint with prejudice. *See* [D.E. 160].

[3]The Court will refer to Local 150 and the Individual Union Defendants collectively as "Local 150" for the remainder of this Opinion.

[4]Throughout this Opinion, the Court references the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Merryman's Response to Local 150's Statement of Facts have been abbreviated to "MM 56.1 Resp. ¶ __." ; citations to Local 150's Reply to Merryman's Statement of Additional Facts have been abbreviated to "Local 150's 56.1 Reply ¶ __."; citations to Local 150's Response to Merryman's Statement of Facts have been abbreviated to "Local 150's 56.1 Resp. ¶ __."; and citations to Merryman's Reply to Local 150's Statement of Additional Facts have been abbreviated to "MM 56.1 Reply ¶ __."

The Court notes that Local 150 failed to comply with L.R. 56.1. That rule allows parties to file a statement of undisputed material fact consisting of short numbered paragraphs. Ignoring that obligation, Local 150 filed numerous lengthy paragraphs many of which related to a variety of unrelated or irrelevant topics that one could not characterize as "short" and included inappropriate legal arguments and conjecture. *See Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (Rule 56.1 statements that contain "irrelevant information, legal arguments, and conjecture" do not comply with the Local Rules). Accordingly, Local 150 forced the Court to wade through convoluted, noncompliant Local Rule 56.1 submissions.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *See Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has

Merryman is an Illinois Corporation engaged in the business of installing underground sewer piping. MM 56.1 Resp. ¶ 3. Local 150 is a labor organization representing members throughout Illinois, Iowa and Indiana. MM 56.1 Resp. ¶ 4. MARBA is an Illinois corporation made up of multi-employer associations representing contractor-employers in the Chicago area. MM 56.1 Resp ¶ 7. On or about April 1, 2000, Merryman entered into a Memorandum of Agreement with Local 150 that incorporated an existing collective bargaining agreement (the "CBA") between Local 150 and MARBA. MM 56.1 Resp. ¶ 8. By virtue of the Memorandum, Merryman became bound by two substantially similar "Master Agreements" known as the Illinois Heavy Highway and Underground Agreements. *Id*.

The CBA provides a four-step procedure to resolve disputes between an employer and Local 150. MM 56.1 Resp. ¶ 16. In the first phase of the procedure, the CBA requires that the grievance be "taken up" between a Local 150 Business Agent and a representative of the employer ("Step One"). MM 56.1 Resp. ¶ 16. This is usually done through a face-to-face conversation at a jobsite or in a telephone call. MM 56.1 Resp. ¶ 17. There is no requirement that the Step One communication be in writing. MM 56.1 Resp. ¶ 18. In the event that the dispute cannot be resolved within seven days of the Step One conference, the parties are required to reduce the grievance to writing and conduct a conference between officials from Local 150 and the employer ("Step Two"). MM 56.1 Resp. ¶¶ 16, 19. If this fails to resolve the dispute, the parties must submit the written grievance to the Joint Grievance Committee ("JGC") for resolution within fifteen days ("Step

---

"repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)). "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005). This Court has not considered portions of Local 150's submissions that failed to conform to L.R. 56.1.

Three"). MM 56.1 Resp. ¶ 16.

As for the composition of the JGC, the CBA requires that there be an equal number of employer representatives and union representatives *on the Committee*. MM 56.1 Resp. ¶ 21. Specifically the CBA states that the "Committee shall consist of an equal number of members representing Employers and the Union." MM 56.1 Resp. ¶¶ 16, 21; MM Ex. J, CBA at Art. XIII, § 1, p. 41. The CBA also states that "The Union or Association may appoint alternate members." MM 56.1 Resp. ¶ 16. The JGC is empowered under the CBA to resolve grievances if it can do so by a majority vote. MM 56.1 Resp. ¶¶ 16, 21. If the JGC is unable to resolve a grievance by majority vote, the grievance may be submitted within thirty days for arbitration ("Step Four"). MM 56.1 Resp. ¶ 16. Pursuant to the CBA, the time limits that apply to the grievance procedures may be extended, but only by the written mutual consent of the Union, the Association and/or the Employer. MM 56.1 Resp. ¶ 16.

The JGC is to follow the Procedural Rules of the Joint Grievance Committee when conducting its hearings; and, "[n]either the Joint Grievance Committee nor an arbitrator shall have any authority to add to, detract from, or in any way alter the provisions of [the CBA] or make a new Agreement." MM 56.1 Resp. ¶¶ 16, 23. The Procedural Rules were negotiated and entered into by Local 150 and MARBA. MM 56.1 Reply ¶ 6. Under the Procedural Rules, there must be three members representing the Union and three members representing the Employer to constitute a quorum for transacting the business of the JGC; however, "by agreement of both parties, under extenuating circumstances, a lesser number of equal representatives may be used." MM 56.1 Resp. ¶ 24. The Procedural Rules also provide that "only duly authorized Joint Committee members or alternate members shall be permitted in Committee sessions as observers unless otherwise agreed

to by the Committee's Co-Chairmen." After the JGC has heard a grievance it shall exclude the interested parties and retire into "executive session" to dispose of the grievance. MM 56.1 Resp. ¶¶ 25, 26. In "disposing" of the grievance, each Committee member is required to render a vote. MM 56.1 Resp. ¶ 26. "In the event an equal number of Union and Employer Committee members are not present, the respective panels representing the Employers and the Union may cast votes in an amount equal to the number of members present on behalf of the panel having the fewer members present." MM 56.1 Resp. ¶ 26. If the JGC enters an award against an employer for a grievance alleging a violation based upon assignment of work to employees or labor organizations not affiliated with the bargaining unit covered by the parties' CBA, the CBA requires the employer "to compensate the bargaining unit member who would have worked but for the Employer's violation" double the rate for each hour that the aggrieved worker would have worked but for the employer's violation. Local 150's 56.1 Reply ¶ 17; MM Ex. J at Art. 1 § 11, p. 9.

In 2006, Local 150 filed thirteen grievances against Merryman: Nos. 06-30, 06-31, 06-32, 06-33, 06-34, 06-35, 06-36, 06-37, 06-38, 06-40, 06-51, 06-59, 06-60. MM 56.1 Resp. ¶¶ 43, 46, 49, 54, 58, 64, 68, 71, 76, 81, 91, 96, 100. The JGC convened two separate hearings to hear these grievances–one on August 2, 2006 and one on October 25, 2006. MM 56.1 Resp. ¶¶ 38, 87.

**August 2, 2006 JGC Hearing**

At the August 2, 2006 hearing, Local 150 and Merryman presented ten of the thirteen grievances to the JGC: Nos. 06-30, 06-31, 06-32, 06-33, 06-34, 06-35, 06-36, 06-37, 06-38, and 06-40. MM 56.1 Resp. ¶ 42. There were eight Local 150 members present during the JGC proceedings on August 2, 2006: 1) Steven Cisco ("Cisco"), the Union Co-Chairman of the JGC who participated in the proceedings; 2) Michael Kresge ("Kresge"), a member of the JGC who participated in the

proceedings; 3) Richard Dunlap ("Dunlap"), a member of the JGC who participated in the proceedings; 4) Tim Gorman ("Gorman"), a member of the JGC who participated in the proceedings; 5) John Rabine ("Rabine"); 6) Ray Herron ("Herron"); 7) Melinda Hensel ("Hensel"), Local 150's attorney who was present during the JGC's deliberations; and 8) Charles August ("August") who was present during the proceedings. MM 56.1 Resp. ¶ 5; Local 150's 56.1 Resp. ¶ 6; MM Ex. A ¶ 14-21. At least four of the Local 150 members present at the August 2 hearing were on the JGC as union representatives. MM Ex. A ¶ 14-21. While not all of these Local 150 members were present during each of the Committee's executive sessions, during every executive session held that day, there was at least one more Local 150 *member* present than there were JGC members representing the employer. Local 150's 56.1 Reply ¶ 30; MM Ex. D at p. 43; MM Ex. M at p. 184-91; MM Ex. E at ¶ 5; MM Ex. F at ¶ 5; MM Ex. G at ¶ 5.[5]

There were three JGC members representing Merryman at the August 2, 2006 grievance proceedings: 1) Tim Scully ("Scully"), an employee of Scully, Inc.; 2) Joseph Benson ("Benson"), an employee of Central Blacktop Company, Inc.; and 3) John Vignocchi ("Vignocchi"), an employee of John Keno and Company, Inc. MM 56.1 Resp. ¶ 7; Local 150 56.1 Reply ¶ 7. Both Scully and Vignocchi possessed a valid owner/operator card with Local 150 at the time of the August 2, 2006 hearing. Local 150's 56.1 Reply ¶ 7. They claim that they have had this card for over thirty years. MM Ex. E ¶¶ 8-10; MM Ex. G ¶¶ 8-10. The card allows them to operate their

---

[5]Local 150 objects to this Court considering Scully's, Benson's and Vignocchi's deposition testimony as support for the fact that there were more Local 150 members present in the executive sessions for the listed grievances than there were JGC members representing the employer because it asserts that the testimony provided by Scully, Benson and Vignocchi is merely a "conclusory allegation" and violates Fed.R.Civ.P. 56(e). This Court overrules Local 150's objection. Scully and Benson were present during all of the executive sessions on August 2, 2006 and Vignocchi was present during the executive sessions for grievance Nos. 06-30 and 06-31. Therefore, they have personal knowledge of who was present during the executive sessions and who represented whom and can testify as to whether there were more Local 150 members present than JGC members representing the Employer.

companies' machinery without violating their collective bargaining agreement with Local 150. Local 150's 56.1 Reply ¶ 7; MM Ex. E ¶¶ 8-10; MM Ex. G. ¶¶ 8-10. For Grievance Nos. 06-30 and 06-31, all three Employer representatives, Scully, Benson and Vignocchi, were present during the executive sessions. Local 150's 56.1 Reply ¶ 25. For the remainder of the grievances at issue in this case, Nos. 06-32, 06-33, 06-34, 06-35, 06-38 and 06-40, only two Employer representatives, Scully and Benson, were present during the executive sessions. Local 150's 56.1 Reply ¶ 29. At the hearing, Merryman was represented by Robert Hanlon ("Hanlon"), Merryman's attorney and business representative. MM 56.1 Resp. ¶¶ 27, 41. Hanlon was not present in any of the executive sessions when the JGC cast its votes. MM Ex. M at p. 190. Carol Lord ("Lord"), a MARBA employee, served as the JGC's Secretary for the August 2, 2006 hearing. MM 56.1 Resp. ¶ 39; MM 56.1 Reply ¶ 35.

The first grievance presented at the hearing was No. 06-30. MM 56.1 Resp. ¶ 43. Hanlon objected to the JGC's jurisdiction to hear the grievance alleging that the grievance was not timely raised because Step Two of the grievance procedure, filing a written grievance, did not take place within seven days of the Step One conference as mandated by the parties' CBA. MM 56.1 Resp. ¶ 44. After the parties finished presenting their evidence, all interested parties were asked to leave the room so that the JGC could go into executive session. MM 56.1 Resp. ¶ 45. The JGC entered an award on grievance No. 06-30 in favor of Local 150. MM 56.1 Resp. ¶ 45. The JGC directed payment of the award to Local 150's Assistance Fund. MM 56.1 Resp. ¶ 45. After the decision was announced, Hanlon objected to the JGC's award to the extent that it directed payment of the award to Local 150's Assistance Fund. MM 56.1 Resp. ¶ 45. Hanlon made no other objections regarding grievance No. 06-30 during the August 2 hearing. MM 56.1 Reply ¶ 10.

The second grievance presented was No. 06-31. MM 56.1 Resp. ¶ 46. Hanlon again objected to the JGC's jurisdiction to hear the grievance alleging that the grievance was not timely raised. MM 56.1 Resp. ¶ 47. Specifically, Hanlon asserted that Step Two of the grievance procedure, filing a written grievance, did not take place within the proscribed seven days of the Step One conference. Local 150's 56.1 Reply ¶ 11; MM Ex. B, 8.02.06 Tr. p. 33-34. Hanlon made no other objections regarding grievance No. 06-31 during the August 2 hearing. MM 56.1 Reply ¶ 11. After the parties presented their evidence, all interested parties were asked to leave the room so the Committee could go into executive session. MM 56.1 Resp. ¶ 48. The JGC was unable to reach a majority decision on this grievance and advised Local 150 that it could pursue the grievance further through arbitration. MM 56.1 Resp. ¶ 48. Local 150 did not seek arbitration for grievance No. 06-31. Local 150's 56.1 Reply ¶ 39; MM Ex. A at ¶ 72.

Before the next grievance was presented, Steve Cisco ("Cisco"), the Recording-Correspondent Secretary of Local 150 and a member of the August 2, 2006 JGC, made a motion to reduce the number of JGC votes to two for the remainder of grievances to be presented that day. Local 150's Exs. Tab 10, 8.2.06 Tr. at p. 35. Vignocchi, a member of the JGC there to represent Merryman, seconded the motion. Local 150's Exs. Tab 10, 8.2.06 Tr. at p. 35. Although the motion was carried with no dissent from the JGC members, Hanlon objected on behalf of Merryman. Local 150's 56.1 Reply ¶ 28; Local 150's Exs. Tab 10, 8.2.06 Tr. at p. 35. After Hanlon's objection, Cisco, the union co-chair of the Committee stated, "This is between the Committee. Any Objections?" MM Ex. B, 8.2.06 JGC Tr. at p. 35. After no objections were raised by the Committee members, Vignocchi left the JGC hearing without providing a reason for his departure on the record. Local 150's 56.1 Reply ¶ 27; MM Ex. B, 8.2.06 JGC Tr. at p. 35.

The third grievance presented was No. 06-32. MM 56.1 Resp. ¶ 49. Hanlon objected to the JGC's jurisdiction to hear this grievance based on his assertion that Local 150 did not make a meaningful attempt to settle the matter. MM 56.1 Resp. ¶ 51. Hanlon, however, specifically stated that he was not raising an objection to the timeliness of this grievance. Local 150 Exs. Tab 10, 8.2.06 Tr. at p. 40. After the parties presented their evidence, the interested parties were asked to leave the room so that the Committee could go into executive session. MM 56.1 Resp. ¶ 53. The JGC entered an award on grievance No. 06-32 in favor of Local 150. MM 56.1 Resp. ¶ 53. The JGC directed payment of the award to Local 150's Assistance Fund. MM 56.1 Resp. ¶ 53. Hanlon objected to the JGC award to the extent that it directed payment of the award to Local 150's Assistance Fund. MM 56.1 Resp. ¶ 53.

The fourth grievance presented was No. 06-33. MM 56.1 Resp ¶ 54. Hanlon objected to the jurisdiction of the JGC to hear this grievance asserting that there had been no Step One conference. MM 56.1 Resp. ¶ 56. Hanlon also made a blanket statement that Local 150 failed to adhere to the provisions within the grievance procedures. MM Ex. B 8.02.06 Tr. p. 48: lines 4-9. After the parties presented their evidence, the interested parties were asked to leave the room so that the Committee could go into executive session. MM 56.1 Resp. ¶ 57. The JGC entered an award on grievance No. 06-33 in favor of Local 150 and directed payment of the award to Local 150's Assistance Fund. MM 56.1 Resp. ¶ 57. Hanlon objected to the JGC's award to the extent that it directed payment to Local 150's Assistance Fund. MM 56.1 Resp. ¶ 57.

The fifth grievance presented was No. 06-34. MM 56.1 Resp. ¶ 58. Hanlon objected to the JGC's jurisdiction to hear the grievance asserting that there was no Step One conference because the Union representative attempted to meet with Mr. Merryman. The Union was aware that Mr.

Merryman was not authorized to deal with grievances. MM 56.1 Resp. ¶ 61. Hanlon also objected to the timeliness of the grievance asserting that: 1) Local 150 did not comply with Step Two of the grievance procedures because the grievance was not reduced to writing within seven days of the purported Step One conference as required by the parties' CBA; and 2) because he did not get notice of the Step Two conference until it was too late for him to attend. MM 56.1 Resp. ¶ 61. Lastly, Hanlon objected based on Local 150's lack of a meaningful attempt to settle the grievance. MM 56.1 Resp. ¶ 61. Hanlon made no other objections regarding grievance No. 06-34 during the August 2 hearing. MM 56.1 Reply ¶ 16. After presentation of the evidence, the interested parties were asked to leave the room in order for the Committee to convene in executive session. MM 56.1 Resp. ¶ 63. The JGC entered an award on grievance No. 06-34 in favor of Local 150 and directed payment to Local 150's Assistance Fund. MM. 56.1 Resp. ¶ 63. After the decision of the Committee, Hanlon objected to the JGC's award to the extent that it directed payment of the award to Local 150's Assistance Fund. MM 56.1 Resp. ¶ 63.

The sixth grievance presented was No. 06-35. MM 56.1 Resp. ¶ 64. Hanlon objected to the jurisdiction of the JGC to hear the grievance asserting that the grievance was untimely because it was not reduced to writing with seven days of the Step One conference and because there was "no notice." MM 56.1 Reply ¶ 18; Local 150's Exs. Tab 10 8.02.06 Tr. at p. 74. Hanlon did not elaborate on or explain what he meant by "no notice." MM 56.1 Reply ¶ 18. Hanlon made no other objections regarding grievance No. 06-35 at the August 2 hearing. MM 56.1 Reply ¶ 18. After presentation of the evidence, the interested parties were asked to leave the room in order for the Committee to convene in executive session. MM 56.1 Resp. ¶ 67. The JGC entered an award on grievance No. 06-35 in favor of Local 150 and directed payment of the award to Local 150's

Assistance Fund.  MM 56.1 Resp. ¶ 67; Local 150's Exs. Tab 10 8.02.06 Tr. at p. 88.

The seventh grievance (No. 06-36) and the eighth grievance (No. 06-37) were settled between the parties and Merryman drafted checks made payable to "IUOE Local 150 Assistance Fund."  MM 56.1 Resp. ¶¶ 68, 69, 70, 73.

The ninth grievance presented was No. 06-38.  MM 56.1 Resp. ¶76.  Hanlon objected to the jurisdiction of the JGC to hear the grievance based upon its interpretation of whether the contract affords backpay.  MM 56.1 Reply ¶ 19; MM Ex. B, 8.02.06 Tr. p. 128: lines 17-24.  Hanlon made no other objections regarding grievance 06-38 at the August 2 hearing.  MM 56.1 Reply ¶ 19.  After presentation of the evidence the interested parties were asked to leave the room in order for the Committee to convene in executive session.  MM 56.1 Resp. ¶ 80.  The JGC entered an award in favor of Local 150 and directed partial payment to John Rabine, a former employer of Merryman, and partial payment to the "Midwest Operating Engineers Fund."  MM 56.1 Resp. ¶ 80; Local 150's Exs. Tab 10 8.02.06 Tr. 132.

The tenth and final grievance presented at the August 2, 2006 hearing was No. 06-40.  MM 56.1 Resp. ¶ 81.  Hanlon objected to the JGC's jurisdiction asserting that the grievance was untimely.  MM 56.1 Resp. ¶ 81.  Hanlon made no other objections regarding grievance 06-40 at the August 2 hearing.  MM 56.1 Reply ¶ 20.  After presentation of the evidence, the interested parties were asked to leave the room so that the Committee could go into executive session.  MM 56.1 Resp. ¶ 82.  The JGC was unable to reach a majority decision on grievance No. 06-40 and advised Local 150 that it could pursue this grievance further through arbitration.  MM 56.1 Resp. ¶ 82.  Pursuant to the parties' CBA, grievance No. 06-40 was submitted for arbitration and the arbitrator ruled in favor of Merryman and denied the grievance.  MM 56.1 Resp. ¶ 82-83.  Merryman asserts

that it spent $4,759.30 in attorneys' fees and costs on the arbitration proceeding. MM 56.1 Resp. ¶ 84. The CBA does not provide that the prevailing party in an arbitration is entitled to its attorneys' fees and costs incurred in the arbitration; rather, it states that each party is to bear its own fees and costs. MM 56.1 Resp. ¶ 84.

Although aware of the case *MJ Electric Inc. v. Int'l Union of Operating Engineers Local 150*, No. 02 C 6541, 2003 WL 21640474 (N.D. Ill. July 10, 2003) at the time of the August 2, 2006 hearing, Hanlon did not refer to or cite to the *MJ Electric* case at any time during the proceedings. MM 56.1 Resp. ¶¶ 34, 35.

Merryman refused to pay the grievance awards entered by the August 2, 2006 JGC. Local 150 subsequently demanded payment of the six unpaid grievances. MM 56.1 Resp. ¶¶ 45, 53, 57, 63, 67, 80. On September 22, 2006, Merryman filed suit against Local 150, MARBA, Midwest Operating Engineers Fund, Cisco, August, Hensel, Rabine, Herron, Kresge, Dunlap, Gorman, Scully, Benson and Vignocchi alleging violations of Section 301 of the LMRA and seeking, in part, a declaratory judgment that the six monetary awards and two deadlocks reached by the JGC on August 2, 2006 be declared void as partial and outside the scope of the CBA. MM 56.1 Resp. ¶ 85.

### October 25, 2006 JGC Hearing

On October 25, 2006, after Merryman filed suit against Local 150, a second JGC meeting was held to address Local 150's three remaining grievances: Nos. 06-51, 06-59, and 06-60. MM 56.1 Resp. ¶ 90. There were three JGC members representing Local 150 at the October 25, 2006 proceedings: 1) Gary Benefield, a member of Local 150; 2) Tom Ferrallo, a member of Local 150; and 3) Cisco, a member of Local 150 and union co-chairman for the JGC. MM 56.1 Resp. ¶ 5; Local 150's 56.1 Resp. ¶¶ 7, 8; Local 150's 56.1 Reply ¶¶ 3, 4, 5, 37. There were also three JGC

members representing the employer at the October 25, 2006, proceedings: 1) Benson; 2) Scully; and 3) Ralph Pound ("Pound"), an employee of James McHugh Construction Company. Local 150's 56.1 Reply ¶¶ 8, 9. Scully possessed a valid owners/operators card with Local 150 at the time of the hearing. Local 150's 56.1 Reply ¶ 8. Heidi Adams, Cisco's secretary, was also present during the JGC proceedings to take notes for Cisco. MM 56.1 Reply ¶ 27. Adams served as Cisco's secretary at the October 25th hearing, but is not a member of Local 150. MM 56.1 Reply ¶ 27. In addition to the JGC members, Adams was also present during the Committee's executive sessions for the grievances presented that day. Local 150's 56.1 Reply ¶ 37; Local 150's Exs. Tab 13 10.25.06 Tr. 16. As the JGC began to retire into executive session after the first grievance was presented Hanlon, who represented Merryman during the hearing, stated, "So the four of you are staying?" referring to the three union Committee members and Adams. Cisco responded, "She's my secretary. She takes my notes, if I have any notes." MM 56.1 Reply ¶ 27; MM Ex. B, Tr. 10.25.06, p. 16; MM 56.1 Resp. ¶¶ 27, 41. Carol Lord, a MARBA employee served as the secretary for the JGC and was also present during the Committee's executive sessions. MM 56.1 Reply ¶ 35; MM Ex. C, 10.25.06 Tr. 5.

As each grievance was presented, Hanlon, on behalf of Merryman, made an objection to the jurisdiction of the JGC to hear the grievances. MM 56.1 Reply ¶¶ 21, 23, 24. Specifically, Hanlon complained that the JGC failed to comply with the provisions of the CBA and the JGC's Procedural Rules because the composition of the Committee did not comply with the CBA, the Committee members were biased because they are named defendants in Merryman's previously filed lawsuit against Local 150, Local 150 failed to comply with the grievance procedures set out in the parties CBA, and Local 150 did not engage in a meaningful attempt to resolve the grievances. MM 56.1

Reply ¶¶ 21, 23, 24; MM 56.1 Resp. ¶¶ 93, 98, 101; Local 150's Exs. Tab 13 10.25.06 Tr. 14-15, 20-22, 30.

Although aware of the case *MJ Electric Inc. v. Int'l Union of Operating Engineers Local 150*, No. 02 C 6541, 2003 WL 21640474 (N.D. Ill July 10, 2003) at the time of the hearing, Hanlon did not refer to or cite to this case at any time during the proceedings. MM 56.1 Resp. ¶¶ 34, 36. The JGC awarded damages against Merryman on all three grievances and directed payment to Local 150's Assistance Fund for grievances Nos. 51 and 60 and to Pat Latrofa and "Midwest Operating Engineers Fund" for grievance No. 59. MM 56.1 Resp. ¶¶ 95, 99, 103; Local 150's Exs. Tab 13 10.25.06 Tr. 16, 23, 36. Merryman refused to pay the grievance awards entered by the JGC, and Local 150 subsequently demanded payment of the three unpaid grievances. MM 56.1 Resp. ¶¶ 95, 99, 103.

The Assistance Funds to which the JGC directed the payment of various awards are funds maintained by Local 150. MM 56.1 Resp. ¶ 104; MM 56.1 Reply ¶ 25. The Assistance Funds are maintained to pay out funds, upon formal application, to union members who meet certain criteria–typically those that have fallen on "hard times." MM 56.1 Resp. ¶ 104; MM 56.1 Reply ¶ 25. The MARBA JGC frequently fashions grievance awards to be paid to Assistance Funds where it would be impossible to identify precisely which Local 150 member was harmed as a result of the signatory contractor's contract violation. MM 56.1 Resp. ¶ 105; MM 56.1 Reply ¶ 26.

Merryman now seeks a declaratory judgment that the nine monetary awards for grievance Nos. 06-30, 06-32, 06-33, 06-34, 06-35, 06-38, 06-51, 06-59 and 06-60 and the two deadlocks reached by the JGC, grievance Nos. 06-31 and 06-40 be declared void and unenforceable because the JGC exceeded the scope of its authority in rendering the awards. MM 56.1 Resp. ¶ 1. In

response, Local 150 has filed a counter-claim seeking enforcement of nine of the eleven awards Merryman seeks to vacate.  MM 56.1 Resp. ¶ 2.

## STANDARD OF REVIEW

On cross-motions for summary judgment, each movant must satisfy Federal Rule of Civil Procedure 56's requirements.  *See Cont'l Cos. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).  Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

## I. Waiver of Arguments

As an initial matter, Local 150 asserts that Merryman has waived many of the arguments it relies on to vacate the JGC's grievance awards because it failed to raise objections based upon these grounds at the JGC hearings. Objections to procedural issues relating to grievances and the arbitration process are to be decided by the arbitrator. *See John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964) ("Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator."). The failure to present an available argument or objection before an arbitrator waives that argument or objection in collateral proceedings to enforce or vacate the arbitration award. *See United Food & Commercial Workers 100A, AFL-CIO &CLC v. John Hofmeister & Son, Inc.*, 950 F.2d 1340, 1343-44 (7th Cir. 1991); *see also United Steelworkers of America, AFL-CIO-CLC v. Danly Mach. Corp.*, 852 F.2d 1024, 1027 (7th Cir. 1988) ("it was incumbent upon [the employer] to raise all arguments . . . at the arbitration proceeding"). A party to arbitration is not permitted to keep silent during arbitration and then raise an argument or objection in federal court upon losing the arbitration. *See Dean v. Sullivan*, 118 F.3d 1170, 1172 (7th Cir. 1997) (argument that procedural error spoiled the validity of the award was waived because it was not raised before arbitration board); s*ee also United Steelworkers of America v. Smoke -Craft, Inc.*, 652 F.2d 1356, 1360 (9th Cir. 1981) (failure to raise certain claims before arbitrator waives them in confirmation proceeding), *cert. denied*, 455 U.S. 1021 (1982); *Cook Industries, Inc. v. C. Itoh & Co.*, 449 F.2d 106, 107-08 (2nd Cir. 1971) (failure to object to arbitrator's bias in arbitration proceeding waives the objection on appeal), *cert denied*, 405 U.S. 921 (1972); *Washington-Baltimore Newspaper Guild v. Washington Post Co.*, 367 F.Supp. 917, 919

(D.D.C. 1973) (failure to raise defense of set-off before arbitrator bars employer from asserting it to resist enforcement); *Automobile Mechanics, Local 701 v. Holiday Oldsmobile*, 356 F.Supp. 1325, 1328 (N.D. Ill. 1972) (failure to raise issue of oral agreement between parties before arbitrator waives argument in enforcement proceeding). To indulge a party's late arguments that were not brought to the attention of the arbitrator below would undermine the purpose of arbitration; namely, to be a cost-effective method of resolving labor disputes. *See National Wrecking Co. v. International broth. of Teamsters, Local 731*, 990 F.2d 957, 960-61 (7th Cir. 1993). An arbitrator's need to be informed of all pertinent information is no less crucial when deciding if the procedural steps of the parties' arbitration agreement have been satisfied or if the composition of the Committee is in compliance with the parties' CBA as when substantively deciding if a grievance occurred. *See Chicago Newspaper Guild v. Field Enterprises, Inc.*, 747 F.2d 1153, 1158 (7th Cir. 1984) (to avoid waiver, parties must "present . . . arguments to the arbitrator below.").

### A. MJ Electric and Unequal Composition

Local 150 asserts that Merryman's failure to raise an objection based on *MJ Electric, Inc v. International Union of Operating Engineers, Local 150*, 2003 WL 21640474 at both the August and October 2006 JGC hearings constitutes a waiver of those arguments based on the *MJ Electric* case. Merryman relies on the *MJ Electric* case to further its argument that the awards of the JGC are void and unenforceable because of the unequal composition of JCG at both the August and October 2006 hearings.

### i. August 2, 2006 JGC hearing

Grievance Nos. 06-30, 06-31, 06-32, 06-33, 06-34, 06-35, 06-38, and 06-40 were presented at the August 2, 2006 hearing. Merryman, through its counsel, Hanlon, did not object to the

"composition" of the JGC at any time during the proceedings. Merryman made objections regarding the jurisdiction of the JGC but not due to the alleged unequal composition of the Committee. Additionally, none of the objections presented were general jurisdictional objections that could be interpreted to be an objection to the composition of the JGC. Instead, the objections were directed at Local 150's failure to follow the various grievance procedures proscribed in the parties' CBA and Local's failure to engage in a meaningful attempt to resolve the grievances. None of the objections mentioned the composition of the Committee. Although the facts and the law now argued by Merryman regarding the composition of the JGC were known by Merryman at the time the Committee heard the grievances, they were not presented. As such, Merryman has waived any argument that the August 2, 2006 JGC awards (Nos. 06-30, 06-31, 06-32, 06-33, 06-34, 06-35, 06-38, 06-40) are void and unenforceable based on the unequal composition of the JGC. *See Dean*, 118 F.3d 1170, (employer waived argument that changes in arbitration board voided arbitration decision by not making argument at arbitration); *see also Teamsters Local Union No. 764 v. J.H. Merritt & Co.*, 770 F.2d 40, 42 (3rd Cir. 1985) (A party waives its right to contest arbitration committee jurisdiction in court when it fails to raise the jurisdictional objection before the committee).

### ii. October 25, 2006 JGC hearing

Grievance Nos. 06-51, 06-59 and 06-60 were presented at the October 25, 2006 hearing. Unlike the August 2, 2006 hearing, before each of these grievances were presented to the JGC, Merryman made an objection to the jurisdiction of the committee to hear the grievances based on the "composition" of the committee. While Local 150 argues that Merryman's failure to cite *MJ Electric* to support its objection means that its reliance on the case is waived, Local 150 has provided no caselaw to support this assertion. To preserve it's objection to the unequal composition of the

JGC, Merryman was simply required to make the objection at the JGC hearing, which it did. Local 150 cannot reasonably argue that it is has been "sandbagged" by Merryman's reliance on the *MJ Electric* decision seeing as Local 150 was a party to that case. *See Hofmeister*, 950 F.2d at 1344. In support of its contention that Merryman has waived any arguments based on *MJ Electric*, Local 150 relies on *National Wrecking Co.*, 990 F.2d at 961, which held that *National Wrecking* waived its argument that the arbitration award was invalid because it failed to present its objection to the arbitrator despite the fact that it had ample opportunity to do so during the arbitration process. Unlike the plaintiff in *National Wrecking*, however, Merryman objected to the composition of the JGC throughout the hearings on October 25, 2006. Merryman has not waived its argument that the grievance awards entered by the JGC on October 25, 2006 (Nos. 06-51, 06-59 and 06-60) are void and unenforceable based on the unequal composition of the committee nor should it be prevented from relying on relevant case law to support its position.

**B. Non-Mutual Offensive Collateral Estoppel based on *MJ Electric***

In its Motion for Summary Judgment, Merryman asserts that the equal representation clause in the parties' CBA means that there must be an equal number of union representatives and employer representatives in the JGC's executive session and that Local 150 should be estopped from arguing an alternative interpretation because this very same issue was decided in *MJ Electric, Inc. v. International Union of Operating Engineers, Local 150*, to which Local 150 was a party. Merryman, however, has waived its argument regarding the *collateral estoppel* effect of the *MJ Electric* decision.

"Procedural issues, including . . . the *res judicata* effect of a prior arbitration award . . . are for the arbitrator, so long as the subject matter of the dispute is within the arbitration clause."

*Chicago Typographical Union No. 16 v. Chicago Sun Times*, 860 F.2d 1420, 1424 (7th Cir. 1998); *see also Little Six Corp. v. UMW*, 701 F.2d 26 (4th Cir. 1983) (issue of whether prior arbitration award had preclusive effect on the grievance was subject to arbitration).

Here, Merryman has not argued or presented any evidence that either the subject matter of Local 150's grievances or the composition requirements of the JGC were not within the scope of the parties' arbitration clause and therefore, Merryman was required to raise its argument regarding the preclusive effect of *MJ Electric* to the JGC panels at the August 2, 2006 and October 25, 2006 hearings. As stated previously, Merryman was aware of the *MJ Electric* decision prior to the August 2, 2006 hearing and the October 25, 2006 hearing; however, Merryman never mentioned, cited or objected to the composition of the JGC based on *MJ Electric* and never argued its preclusive effect. *See e.g., Ganton Technologies, Inc. v. International Union, United Auto., Aerospace and Agricultural Implement Workers of America, U.A.W., Local 627*, 358 F.3d 459 (7th Cir. 2004) (waiver is effectuated by failing to furnish pertinent information to the arbitrator). The long-established federal policy of settling labor disputes through arbitration would be "seriously undermined" if a party kept available information from the arbitrator and then attempted to use the information as a defense to compliance with an adverse award. *Chicago Newspaper Guild*, 747 F.2d at 1157. Here, Merryman could have presented its position regarding the *MJ Electric* decision but did not and now seeks to argue that the JGCs lacked authority to hear the grievances. This is the type of behavior discouraged by the doctrine of waiver. *See AGCO Corp. v. Anglin*, 216 F.3d 589, 593 (7th Cir. 2000) ("If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter."). Therefore, Merryman is barred from relying on the defense of collateral

estoppel, based on the *MJ Electric* decision, to support its argument that there was unequal representation on the JGC.

The Court notes that even if Merryman had not waived its *MJ Electric* collateral estoppel argument, it is without merit. Merryman attempts to use the doctrine of nonmutual offensive collateral estoppel to bar Local 150 from "arguing any alternative interpretations of the CBA's equal representation requirement and from disputing that a violation of the requirement destroys the jurisdiction of a JGC and renders a grievance decision void and unenforceable." MM Br. [D.E. 218] at 5. To invoke the doctrine of non-mutual offensive collateral estoppel Merryman must prove that: 1) the issue sought to be precluded must be the same as that involved in the prior action; 2) the issue was fully litigated; 3) the determination of the issue was essential to the final judgment; 4) Local 150 was fully represented in the prior action; and 5) it would not be unfair to Local 150 to apply the doctrine. *See Chicago Truck Drivers v. Century Motor Freight*, 125 F.3d 526, 530-31 (7th Cir. 1997).

Here, in *MJ Electric*, the determination of the unequal composition of the JGC was not "essential to the final judgment." In *MJ Electric* the plaintiffs attempted to vacate an arbitration award alleging that the JGC that rendered the award did not have jurisdiction to consider the grievances, the plaintiff's were *not* challenging the composition of the JGC. *See* 2003 WL 21640474 at *3 ("MJ is not challenging the *composition of the JGC or any other procedural matter*; rather it is challenging the jurisdiction of the JGC that rendered an award against it.") (Emphasis added). After the court analyzed the jurisdictional issue and found that the awards were unenforceable because the JGC exceeded its contractually-delegated authority in finding the plaintiff in violation of the CBA that it was not empowered to interpret, it stated that the JGC "did not,

contrary to the [parties' CBA], 'consist of an equal number of members representing the Employers and the Union,'" because there were five JGC members present representing the union when the grievance hearing was conducted and only two JGC members present representing the employer. *Id*. at *5. The court stated that the parties' CBA required that the JGC "consist" of an equal number of employer and union representatives, not that an equal number of employer and union representatives vote on the grievance. *Id*. The court held: "Because the HHUA Joint Committee was not established pursuant to the IBA and thus lacked any authority to interpret the IBA or to exercise jurisdiction over [the plaintiff], which is not a signatory to the Excavators HHUA, the awards are unenforceable." *Id*. The courts' statement about the equal composition of the JGC was not essential to the final judgment in the case, and therefore Merryman's contention that the doctrine of non-mutual offensive collateral estoppel precludes Local 150 from relitigating the meaning of equal representation in the parties CBA fails. Furthermore, as stated below, the Court finds that Merryman's interpretation of the court's equal composition analysis in *MJ Electric* is flawed. Because the five requirements of non-mutual offensive collateral estoppel function in the conjunctive there is no need to consider the remaining requirements.

### C. Non-Compliance With Grievance Procedures

Next, Local 150 asserts that Merryman has waived many of its arguments concerning Local 150's compliance with the CBA's grievance procedures because it did not raise the majority of these objections at the JGC hearings. In its Motion for Summary Judgment, Merryman asserts that the JGCs' awards are void and unenforceable because the JGCs exceeded their authority by deciding the grievances despite Local 150's non-compliance with the CBA's grievance procedures. Specifically, with respect to grievance Nos. 06-30, 06-31 and 06-32, Merryman asserts that: 1) Local

150 did not engage in a Step One conference with Merryman; 2) Local 150's request for a Step Two conference was not within seven business days of the "purported" Step One conference; and 3) Local 150's request for a Step Three conference was not within fifteen days of the "purported" Step Two conference. With respect to grievance Nos. 06-33, 06-34, 06-35, 06-38, 06-40, 06-51, 06-59 and 06-60, Merryman asserts the same three violations listed above and adds that Local 150 did not participate in any type of Step Two conference with Merryman.

### a.  Local 150 failed to engage in a Step One conference with Merryman

The undisputed facts show that Merryman objected to grievance Nos. 33[6], 34, 59 and 60 on the grounds that Local 150 failed to engage in a Step One conference. The undisputed facts also show that Merryman did not raise this specific objection to grievance Nos. 30, 31, 32[7], 35, 38, 40[8] or 51.

### b.  Local 150's request for a Step Two conference was not within seven days of the "purported" Step One conference

The undisputed facts show that Merryman objected to grievance Nos. 30, 31, 34 and 35 on

---

[6]Merryman also made a blanket objection to grievance No. 33 stating that Local 150 failed to adhere to the provisions within the grievance procedures; however, blanket objections are insufficient to preserve specific arguments before the Court regarding Local 150's failure to comply with specific steps in the grievance procedures. *See Ganton Technologies*, 358 F.3d at 463 (holding employer waived argument before district court when it failed to make specific argument before arbitrator even though employer presented information at arbitration proceeding that formed basis for argument); *Chicago Newspaper Guild*, 747 F.2d at 1158 (party must present *arguments* to arbitrator below to avoid waiver). Merryman provided no explanation as to what provisions were not complied with and provided no further information to support its objection.

[7]Merryman objected to grievance No. 32 stating that Local 150 did not make a meaningful attempt to settle the matter but provided no further explanation for the basis of its objection. This is insufficient to preserve all arguments relating to Local 150's failure to follow specific steps in the grievance procedure. *See Ganton Technologies*, 358 F.3d at 463; *Chicago Newspaper Guild*, 747 F.2d at 1158. Additionally, Merryman went on to state that it was not raising an objection to the timeliness of the grievance.

[8]Merryman made a blanket objection to grievance No. 06-40 stating that it was "untimely." Merryman provided no explanation or information to support its objection and did not indicate what aspect of the grievance procedure was untimely. This is insufficient to preserve a specific argument that Local 150 failed to comply with a specific step in the grievance procedures. *See Ganton Technologies*, 358 F.3d at 463; *Chicago Newspaper Guild*, 747 F.2d at 1158.

the grounds that Local 150's request for a Step Two conference was not within the required seven business days of the Step One conference. The undisputed facts also show that Merryman did not raise this specific objection to grievance Nos. 32, 33, 38, 40, 51, 59 or 60.

**c. Local 150's failed to engage in a Step Two conference with Merryman**

The undisputed facts show that Merryman did not object to any of the grievances on the basis that Local 150 failed to engage in a Step Two conference with Merryman.

**d. Local 150's request for a Step Three conference was not within fifteen days of the "purported" Step Two conference**

The undisputed facts show that Merryman did not object to any of the grievances on the basis that Merryman's request for a Step Three conference was not within the required fifteen days of the Step Two conference.

Merryman has waived all of the procedural objections that it failed to raise before the JGCs. *See Dean*, 118 F.3d at 1172 (argument that procedural error spoiled the validity of the award was waived because it was not raised before arbitration board); *AFL-CIO v. U.S. Postal Serv.*, 751 F.2d 834, 842 (6th Cir. 1985) (explaining that one who fails to object promptly to procedural errors made at an arbitration hearing waives the right to later assert those errors).[9]

In short, where Merryman failed to alert the JGC to the concerns it now raises about the composition of the JGC, the preclusive effect of *MJ Electric* and Local 150's failure to follow the grievance procedures set forth in the parties' CBA, and thus failed to give the JGC an opportunity

---

[9]It should be noted that even if the Court were to find that Merryman has not technically "waived" these procedural arguments, they would fail nonetheless. Merryman asserts that the JGC exceeded its authority by rendering awards despite Local 150's non-compliance with the procedural steps in the CBA. Judicial review of an arbitrator's *decision* is limited to determining whether the arbitrator based his decision on "some body of thought, or feeling, or policy, or law that is outside of the [CBA]." *Ethyl Corp. v. United Steelworkers*, 768 F.2d 180, 184-85 (7th Cir. 1985). The JGC cannot ignore Merryman's procedural objections or allegations that Local 150 failed to comply with the grievance steps if there were no objections to "ignore" and there were no decisions to review because Merryman did not present the objections to the JGC for consideration.

to rule on any of the alleged errors, it has not properly preserved these matters for appeal, and therefore has waived the issue for review by the Court.

## II. Grievance Awards (Counts I through XI)

Merryman claims that the grievance awards entered by the JGC on August 2, 2006 (Nos. 06-30, 06-31, 06-32, 06-33, 06-34, 06-35, 06-38,06-40) and October 25, 2006 (Nos. 06-51, 06-59, 06-60) must be vacated because the JGC exceeded its authority in issuing the awards by: 1) deciding the grievances in the absence of equal representation for Merryman and Local 150; 2) deciding the grievances with less than the required number of employer and union representatives (only as to the August 2, 2006 JGC); 3) deciding the grievances despite Local 150's noncompliance with the parties CBA grievance procedures; and 4) directing payment of the grievance awards to the Local 150 Assistance Fund and the Midwest Operating Engineers Fund.[10]  Local 150 counters that the grievance awards entered in its favor by the JGC must be enforced because the awards drew their essence from the collective bargaining agreement.

Section 301 of the Labor-Management Relations Act ("LMRA") creates a federal judicial remedy for breach of a collective bargaining agreement.  *See* 29 U.S.C. § 185; *see also Smart v. IBEW, Local 702*, 315 F.3d 721, 724 (7th Cir. 2002).  A grievance decision by a JGC is reviewable under Section 301, even though it is not an "arbitration" decision, if the decision of the JGC is final and binding under the collective bargaining agreement.  *See Gen. Drivers Local Union No. 89 v. Riss & Co.*, 372 U.S. 517, 519-20 (1963).

The awards of JGCs are reviewed under the same standards as those applied to arbitrations.

---

[10]In its Motion for Summary Judgment on Counts I through XI of Merryman's Complaint, Local 150 argues that there is no basis to vacate the grievance awards in part because there is no evidence of bias or partiality in the record to support that the JGC was partial towards Local 150.  This argument was not, however, raised by Merryman in its Motion for Summary Judgment on Counts I through XI of its Complaint.

*See General Drivers, Warehousemen & Helpers Local 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963). The Court's review of an JGC's award which arises out of a collective bargaining agreement is extremely limited. *See John Hofmeister and Son, Inc.*, 950 F.2d at 1343. A JGC's award is evaluated under a deferential standard of review because arbitration is intended to be the final resolution of disputes. *See Monee Nursery & Landscaping Co., v. Int'l Union of Operating Eng'rs, Local 150*, 348 F.3d 671, 675 (7th Cir. 2003). The Court may not "consider the disputants' arguments afresh." *Dean*, 118 F.3d at 1171. When reviewing a JGC's decision, the issue is whether the Committee interpreted the contract at all, not whether the Committee erred, or even grossly erred, in interpreting the contract. *Bhd. of Locomotive Eng'rs v. Union Pac. R.R. Co.*, 522 F.3d 746, 757 (7th Cir. 2008) (quotations and citations omitted). An award may be overturned only if the JGC *was not* interpreting the agreement, but instead resolved the dispute according to private notions of justice. *Id.* (quotations and citations omitted). A JGC's decision will be enforced when it is arguably acting within the scope of its authority. *See Monee Nursery & Landscaping*, 348 F.3d at 675. The relevant inquiry is whether the JGC's award "draws its essence from the collective bargaining agreement;" if it does, then the Court must enforce the award. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). As the party challenging the JGC's award, Merryman bears the substantial burden of proving grounds for vacation. *See IDS Life Ins. Co. v. Royal Alliance Associates, Inc.*, 266 F.3d 645, 649-50 (7th Cir. 2001); *see also Tamari v. Bache Halsey Stuart Inc.*, 619 F.2d 1196 (7th Cir. 1980).

## A. Composition of the JGC-Unequal Representation

### i. August 2, 2006 Hearing (Counts I-VIII; Grievance Nos. 06-30, 06-31, 06-32, 06-33, 06-34, 06-35, 06-38 and 06-40)

As mentioned above, Merryman has waived its argument that the August 2, 2006 JGC's

awards must be vacated because the JGC exceeded its authority in issuing the awards by deciding the grievances in the absence of equal representation for Merryman and Local 150.

### ii. October 25, 2006 Hearing (Counts IX-XI; Grievance Nos. 06-51, 06-59 and 06-60)

Merryman asserts that the grievance awards entered by the JGC on October 25, 2006 must be vacated because the JGC exceeded its authority by deciding the grievances without an equal number of members representing the employer and the Union in violation of the parties' CBA. The CBA states

> The Union and the Association have together created a Joint Grievance Committee to resolve grievances arising under this Agreement. *This Committee shall consist of an equal number of members representing Employers and the Union.* The Union or Association may appoint alternate members.

MM Ex. J, Art. XIII, § 1 p. 41. (Emphasis added). Under the plain language of the CBA, the *JGC* must "consist" of an equal number of employer and union representatives. "Consist" is defined as "[t]o be made up or composed." American Heritage Dictionary 313 (2d College ed. 1982). Therefore, there must be the same number of union representatives as employer representatives on the JGC. At the October 25, 2006 JGC hearing there were three members on the JGC that represented the employer: Benson, Scully, and Pound; and three members on the JGC that represented the union: Cisco, Benefield and Ferrallo. There is no evidence in the record that the October 25, 2006 JGC itself was improperly constituted. All three employer representatives and all three union representatives were present throughout the October 25, 2006 grievance proceedings. In addition to the six members of the JGC, Adams, Cisco's secretary, and Lord, a MARBA representative and the secretary for the JGC, were also present during the proceedings and in the Committee's executive sessions.

Merryman contends that where the CBA states, the "Committee shall consist of an equal number of members representing the Employer and the Union," it means that there must be an equal number of JGC members in the Committee's executive sessions and that an individual's status as a JGC member is determined by his mere presence in an executive session. Based on this interpretation, Merryman asserts that because Adams was present during the JGC's executive sessions, she must be counted as a JGC member. Put another way, Merryman's argument is essentially that Adams was not a member of the JGC during the open sessions of the hearing but once she stepped foot in the executive sessions she became a member of the Committee. If Merryman's interpretation of the parties' CBA is correct it would mean that there were four JGC members on behalf of the union and only three JGC members on behalf of Merryman present at the October 25th hearing resulting in an unequal number of union representatives and employer representatives on the JGC.

The parties' CBA states that the *JGC* "*shall consist of an equal number of members representing Employers and the Union.*" MM Ex. J, Art. XIII, § 1 p. 41. Based on the CBA's plain language, at all times during a grievance hearing there must be an equal number of union and employer JGC members. Nowhere does the CBA limit the equal representation requirement of the JGC to open sessions or executive sessions; the plain language of the CBA indicates that there must be equal representation on the JGC throughout the pendency of the grievance proceedings. Additionally, there is nothing in the record to support Merryman's position that the parties' CBA mandates that a third-party's mere presence in the JGC's executive sessions elevates an individuals status to a JGC member, and that they therefore must be counted in determining whether the JGC was comprised of an equal number of employer representatives and union representatives.

Furthermore, it is undisputed that Adams *was not* a member of Local 150, was not assigned to be a JGC member, and did not at any time during the October 25th hearings claim to be a union representative; she was simply present during the hearings and in the executive sessions to take notes for Cisco. Beyond performing this ministerial function, Adams took no other part in the deliberations; she did not vote on the grievances or participate in the Committee's discussions regarding the grievances. To be sure, the record demonstrates that Cisco, the union co-chair of the JGC, explicitly explained why Adams was staying with the JGC in its executive session after Hanlon questioned the situation. As the JGC was about to retire into executive session after hearing the first grievance Hanlon stated, "So the four of you are staying," referring to the three Committee members and Adams, and Cisco responded, "She's my secretary. She takes my notes, if I have any notes." MM 56.1 Reply ¶ 27; MM Ex. B, Tr. 10.25.06, p. 16. Lastly, it is also undisputed that Lord, a MARBA employee, was also present during the JGC's executive sessions but that she was not designated an employer representative or a member of the JGC.

To support its interpretation of the parties CBA equal composition requirement, Merryman relies on *MJ Electric, Inc. v. International Union of Operating Engineers, Local 150*, No. 02 C 6541, 2003 WL 216404474 (N.D. Ill. July 10, 2003). In *MJ Electric*, MJ moved to vacate a series of grievance awards on the grounds that the JGC had no jurisdiction to consider the grievances. *Id*. The court held that because the JGC exceeded its contractually-delegated authority in finding MJ in violation of a CBA it was not empowered to interpret, the awards were unenforceable and must be vacated. *Id*. at *4. In the course of its decision, the court commented on the composition of the JGC, stating that it did not, contrary to the parties' CBA, "consist of an equal number of members representing Employers and the Union" because the JGC consisted of two employer representatives

and five union representatives. *Id*. at * 5. Local 150 argued that there was actually equal representation on the JGC despite the unequal number of members because only two employer representatives and two union representatives voted on the grievances and the remaining three union representatives did not participate. The court stated that Local 150's argument "flies in the face of the plain language of the CBAs . . . " because the CBAs "require that the JGC 'consist' of an equal number of employer and union representatives, not that an equal number of employer and union representatives vote on the grievance." *Id*.

The situation here is not analogous to the situation presented in *MJ Electric* where it was undisputed that there was an unequal number of union and employer representatives on the JGC and present during the hearings, but where an equal number of union and employer representatives voted on the grievances. Here, unlike the situation in the *MJ Electric* case, there is no evidence in the record that there was an unequal number of union representatives and employer representatives on the JGC. Furthermore, contrary to Merryman's assertion, the *MJ Electric* case does not stand for the proposition that an individual's mere presence in a JGC's executive session elevates their status from non-Committee member to Committee member. The *MJ Electric* court's interpretation of the CBA's equal representation language, the same language that is at issue here, is consistent with this Court's interpretation; that the CBA requires that the JGC consist of an equal number of members representing the employer and the union period.

Additionally, even if the decision of the JGC to allow Adams into the executive session violated one of the JGC's Procedural Rules, Merryman has not shown that the Committee deliberately disregarded the language in the parties' CBA, and the Court's review is limited to violations of the parties' collective bargaining agreement. *See Clear Channel Outdoor Inc., v.*

*International Union of Painters and Allied Trades, Local 770*, No. 07-2609, 2009 WL 615401 at *4 (7th Cir. March 12, 2009) ("Our review is . . . limited to determining whether the arbitrator exceeded the powers delegated to him by the parties, ' i.e., whether he failed to arbitrate the dispute in accord with the agreement.") (Internal quotations and citations omitted); *see also Holden v. Deloitte and Touche LLP*, 390 F.Supp.2d 752, 779 (N.D. Ill. 2005) (Filip, J.) (where parties–via amendment to the arbitration agreement–opted for application of the Federal Rules of Evidence, plaintiff's contention that the arbitrators openly ignored the applicable rules did not justify vacating the arbitral awards).

On October 25, 2006, there were an equal number of employer and union representatives on the JGC; there were three representatives for each side. The fact that Adams, Cisco's secretary, was present during the JGC's executive sessions does not mean that the JGC did not *"consist of an equal number of members representing Employers and the Union."* MM Ex. J, Art. XIII, § 1 p. 41. Merryman has set forth no facts to support its assertion that Adams' presence during the JGC's executive session rendered her a member of the Joint Grievance Committee. Merryman's contention that the equal representation clause refers to the number of people present in the Committee's executive session does not coincide with the plain language of the CBA. Therefore, Merryman's position that the JGC exceeded its authority by deciding the grievances presented at the October 25, 2006 hearing in violation of the equal representation provision in the parties' CBA is untenable.

Merryman makes one final argument with respect to the composition of the October 25, 2006 JGC. Merryman contends that Scully, an employer representative JGC member, carried a Local 150 owners/operators card at the time of the October 25th hearing, and therefore he was really a union representative. Merryman cites no case law to support its contention that the mere possession of a

valid union owners/operators card prevents an individual from being an employer representative on a JGC. Scully owned his own contracting company and served as the company's president. The record does not reflect that Scully was a union employee. Moreover, it is undisputed that Scully was at the grievance hearings on October 25, 2006 to represent the employer. Scully owned a Local 150 owners/operators card only so that he could operate *his own company's* machinery without violating his collective bargaining agreement with Local 150. As the record stands, Scully's mere possession of a Local 150 owners/operators card did not preclude him from serving an employer representative on the JGC and Merryman has provided no support to indicate otherwise.

**B.** **Less than required number of employer and union representatives (Counts III-VIII; grievance Nos. 06-32, 06-33, 06-34, 06-35, 06-38 and 06-40)**

Next, Merryman asserts that the awards for grievance Nos. 06-32, 06-33, 06-34, 06-35, 06-38 and 06-40 must be vacated because the August 2, 2006 JGC exceeded its authority by deciding these grievances with less than the required number of employer and union representatives. Specifically, Merryman alleges that the JGC's Procedural Rules were violated when Vignocchi, a voting member of the JGC, left the August 2, 2006 proceedings early thereby reducing the required quota of three to two. There is no evidence in the record that the parties' CBA provides the number of employer and union representatives that must be present to constitute a quorum for transacting the business of the JGC; however, under the Procedural Rules of the JGC, there must be three Committee members representing the Union and three Committee members representing the Employer to constitute a quorum. The Committee may operate with less than three members per side "by agreement of both parties" and "under extenuating circumstances." MM Exs. Tab 9, Procedural Rules. It is undisputed that Vignocchi left the August 2, 2006 JGC proceedings after the JGC's consideration of Grievance Nos. 06-30 and 06-31, dropping the number of voting Committee

members per side down to two, as opposed to the required three. It is also undisputed that Merryman, through Hanlon, objected to Vignocchi's departure at which point Cisco explained that, "this is between the Committee." MM Exs. Tab 10, 08.02.06 Tr. at 35. The Committee members then all agreed that Vignocchi could leave early and that they would proceed with only two voting members per side.

Merryman claims that Vignocchi's departure, over its objection, rendered the JGC structurally defective because the Procedural Rules' criteria for reducing the number of employer and union representatives was not met. The problem with Merryman's assertion is that, as stated previously, the Court's review of an arbitrators award is extremely limited. *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001). The Court's review is confined to determining whether the arbitrator failed to arbitrate the dispute in accord with the *parties' CBA*. *See Clear Channel Outdoor Inc.,* 2009 WL 615401 at *4. Merryman's argument that the JGC exceeded its authority in issuing grievance awards with only two employer representatives and two union representatives stems from the JGC's application or, as Merryman would assert, misapplication, of the *Procedural Rules* used during the hearing. There is no evidence in the record that the Procedural Rules of the JGC are incorporated by reference into the parties' CBA; they are simply a separate body of rules that are to be followed at the JGC's hearings. Because the Court can only vacate an arbitrators award when the JGC's decision does not "draw its essence from *the collective bargaining agreement,*" it cannot vacate a JGC's awards based only on an incorrect interpretation or application of procedural rules that are not contained in the CBA. *See Enterprise Wheel & Car Corp.*, 363 U.S. at 597. Furthermore, Merryman has not cited any case where non-compliance with the Procedural Rules in an arbitration hearing was seen as a basis to vacate an

award; nor any case in which the Seventh Circuit even entertained such a claim.

Additionally, even if the Court could vacate an award where the JGC deliberately disregarded its Procedural Rules, Merryman has not carried its burden of demonstrating that the JGC made a decision to ignore the plain language of the Procedural Rules. *See e.g.*, *Dean*, 118 F.3d at 1173 (arbitral litigants may not seek judicial review of "all but the most exceptional errors at arbitration"); *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1506 (7th Cir. 1991) ("a noncontractual basis can be inferred and the award set aside" when "there is no possible interpretive route to the award"); s*ee also Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir. 2004) ("It must be clear from the record that the arbitrators recognized the applicable law and then ignored it."). The JGC did not simply disregard or ignore the language of the Procedural Rules, it interpreted them. The record demonstrates that the JGC interpreted the language, "by agreement of *both parties* . . . a lesser number of equal representatives may be used," to mean, by agreement of both the Local 150 representatives and the employer representatives on the JGC. MM 56.1 Resp. at ¶ 24. To be sure, it is undisputed that when Merryman objected to Vignocchi's departure, Cisco, a member of the JGC, stated, "This is between the Committee. Any objections?" (MM Ex. B at p. 35). Even if the Court were to disagree with the JGC's interpretation and find that "by agreement of both parties" meant both Local 150 and Merryman, it is not a basis for this Court to overturn the Committee's awards. *See Garvey*, 532 U.S. at 509-10 ("if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision."); *Clear Channel Outdoor, Inc.*, 2009 WL 615401 at *7 (even if the court is "convinced that the arbitrator's error in interpreting the parties' agreement was plain, we lack the authority to

intervene."). What Merryman's argument boils down to is that the JGC's decision to allow Vignocchi to leave early over Merryman's objection is contrary to the plain meaning of the JGC's Procedural Rules; however this is simply another way of saying that the Committee's decision is wrong on the merits, and that is exactly the type of argument that is outside the scope of the Court's review. *See Flexible Mfg. Systems Pty. Ltd. V. Super Products Corp.*, 86 F.3d 96, 100 (7th Cir. 1996) ("Factual or legal errors by arbitrators-even clear or gross errors-do not authorize courts to annul awards . . . "). Therefore, Merryman's assertion the August 2, 2006 JGC exceeded its authority in deciding the grievances in violation of the Procedural Rules is not a basis for the Court to vacate the Committee's awards.

## C. Compliance with Grievance Procedures

Next, Merryman asserts that the August 2, 2006 and October 25, 2006 JGCs exceeded their authority in rendering the grievance awards because Local 150 did not comply with various steps of the grievance procedure set out in the parties' CBA. Merryman further asserts that the JGC must have "ignored" its procedural objections because it decided to hear the merits of the grievances despite Local 150's alleged non-compliance. As mentioned previously, Merryman has waived all grievance procedure objections that it failed to raise before the JGCs.

While questions of "substantive arbitrability" of labor disputes are to be determined by the courts, procedural questions, such as if a party failed to comply with the grievance steps in a collective bargaining agreement, are to be decided by the arbitrator. *See John Wiley & Sons*, 376 U.S. at 557. The decision rendered by the arbitrator on procedural issues is generally non-reviewable by the courts, the exceptions to this rule being very limited. *See Enterprise Wheel & Car Corp.*, 363 U.S. at 597. It is only when an award manifests the arbitrator's infidelity to his

obligation to interpret and apply the collective bargaining agreement, that the courts may not enforce the award. *Id.* All doubts are to be resolved in favor of enforcing the award. *See Am. Postal Workers Union, Milwaukee Local v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999).

At both the August 2, 2006 and October 25, 2006 grievance hearings, Merryman objected to several grievances asserting that Local 150 failed to comply with Step One of the CBA's grievance procedures which requires that "a grievance shall first be taken up between the Union's business Representative assigned to the job and a designated representative of the Employer." MM 56.1 Resp. ¶ 16. Merryman asserts that there is no meaningful attempt to "take up" a grievance where a union representative simply leaves a voicemail for an employer representative. MM Br. [D.E. 239] at 11. It is undisputed, however, that there is no requirement in the CBA that Step One communications be in writing; they are typically done in face to face communications at a jobsite or by telephone. Additionally, it is undisputed that the parties CBA does not define what it means to "take up" a grievance. The phrase "take up" is subject to interpretation and if the JGC, after hearing evidence on the matter, found that Local 150 had satisfactorily "taken up" the grievance with Merryman, and therefore complied with Step One, then its interpretation is not to be disturbed by the Court. *See Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006) ("[T]he issue for the court is not whether the contract interpretation is incorrect or even wacky but whether the arbitrator has failed to interpret the contract at all . . . "); *Hill v. Norfolk & W. Ry.*, 814 F.2d 1192, 1194-95 (7th Cir. 1987) ("the question for decision by a federal court asked to set aside an arbitration award . . . is not whether the arbitrators . . . erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract.").

Merryman also objected to several grievances at the August 2 and October 25, 2006 hearings alleging that Local 150 did not reduce its grievances to writing within seven days of the Step One conference as required by Step Two of the grievance procedures. Step Two of the grievance procedures provides: "In the event the grievance cannot be resolved within seven working days of the Step One conference, it shall be reduced to writing and referred for conference and resolution . . . at a pre-grievance hearing." MM 56.1 Resp. ¶ 16. The plain language in Step Two does not mandate that a grievance must be reduced to writing within seven days of a Step One conference; rather it states that if a grievance cannot be resolved *within* seven days of a Step One conference then it is to be reduced to writing. After hearing evidence and argument on Local 150's compliance with Step Two, the JGCs decided to overrule Merryman's objection by hearing the merits of the grievances. The seven day requirement outlined in Step Two of the grievance procedures is subject to interpretation and the Court will not interfere with the JGCs' interpretation of the rules so long as their decision "draws its essence from the collective bargaining agreement." *See Ethyl Corp.*, 768 F.2d at 184; *see also United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 569 (1960) (explaining that when the judiciary weighs the merits of the grievance or considers whether there is equity in a particular claim "it usurps a function which . . . is entrusted to the arbitration tribunal"); *Chicago Typographical Union No. 16*, 935 F.2d at 1506 ("a noncontractual basis can be inferred and the award set aside" when "there is no possible interpretive route to the award"). Although Merryman may disagree with the JGCs' decisions, there are no facts in the record to indicate that they did not interpret the CBA in deciding that Local 150 complied with the seven day requirement set forth in Step Two of the parties' CBA.

Additionally, Merryman has failed to provide factual support for its position that the JGCs

*must* have based their decision on something other than the parties' CBA when they overruled Merryman's objections to Local 150's non-compliance with the CBA's grievance procedures. *See Ethyl Corp.*, 768 F.2d at 184-85.   Merryman asserts the JGC must have based their decisions "on some other source than the Master Agreement itself" because no actual attempt to interpret the language of the Master Agreement could have led the JGCs to determine that Local 150 had complied with the grievance procedures.   In support of its position, Merryman relies, in part, on *Anheuser-Busch, Inc., v. Local Union No. 744*, 280 F.3d 1133 (7th Cir. 2002); however, *Anheuser-Busch* involves a materially different scenario from the instant case, with an arbitrator who expressly stated that he was ignoring a collective bargaining agreement that he was bound to follow in favor of a "long-standing practice."   *Id.* at 1136.   In this case, by way of contrast, the undisputed facts show that the JGC gave no indication that it was ignoring the CBA in favor of another authority. Moreover, *Anheuser-Busch*, which produced a fractured decision with three opinions, including a dissent, certainly did not purport to question the principle that the Court's review of JGC's decision is extremely limited.   *See id.* at 1137 ("The Supreme Court recently reiterated that judicial review of an arbitrator's decision is limited, stating that 'the fact that a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision.'") (quoting *Garvey*, 532 U.S. at 509)).   Even if the Court were to disagree with the JGC's interpretation and application of the CBA's procedural steps and Local 150's compliance with those steps, it is not a basis for the Court to overturn the Committee' awards.   *See id*; *see also id.* at 1148-49 (Easterbrook, J., dissenting) (gross error is not a basis to vacate an arbitral award).   Whether this Court believes the JGC's decision to be right or wrong is immaterial; what matters is that the JGCs' decisions drew their essence from the collective bargaining agreement.   *See Garvey*, 532 U.S. at 509-10.   Simply put, the

JGC heard testimony and argument during both the August 2, 2006 and October 25, 2006 hearings regarding Local 150's compliance with the grievance procedures. Here, unlike *Anheuser-Busch*, the JGC did not effectively repudiate its adjudicatory role and manifest that it was going to simply render an award "rooted in [its] own personal idea of industrial justice." 280 F.3d at 1144.

Merryman also claims that the JGCs must have "ignored" its procedural objections because they went on to render substantive awards on the grievances despite Merryman's protestation. Merryman is correct that the JGCs decided to hear the merits of the grievances and rendered substantive awards on the grievances despite Merryman's assertion that Local 150 failed to comply with the procedural requirements of the CBA. Simply because the JGCs did not sustain Merryman's objections, however, does not mean that they "ignored" them. Additionally, Merryman offers no evidence in the record to support its position that the JGCs "ignored" its procedural objections. *See Kozuszek v. Brewer*, 546 F.3d 485, 488 (7th Cir. 2008) (unsupported conjecture has no place in summary judgment analysis).

There are no facts in the record to support Merryman's assertion that the JGCs knew of the procedural steps in the parties' CBA and ignored them based on personal whim or on the basis of willful or manifest disregard for the applicable provisions. The record indicates that the JGCs interpreted the procedural steps in the CBA and that they did not exceed their authority when they decided to hear the merits of the grievances despite Merryman's procedural objections. Therefore, Merryman's contention that the JGCs' awards are void and unenforceable fails.

## D. Payment to Assistance Fund

Lastly, Merryman asserts that the JGC's awards are void and unenforceable to the extent that they direct payment of the awards to the Local 150 Assistance Fund and the Midwest Operating

Engineers Fund, instead of to individual members of Local 150. The parties' CBA states that if the JGC enters an award against an employer for a grievance alleging a violation based upon assignment of work to employees or labor organizations not affiliated with the bargaining unit covered by the parties' CBA, the employer agrees to "compensate the bargaining unit member who would have worked but for the Employer's violation . . . ." Local 150's 56.1 Reply at ¶ 17; MM Ex. J at Art. 1 § 11, p. 8. Merryman asserts that payment of an award to a Local 150 Assistance Fund does not qualify as compensating "the bargaining unit member," and therefore the JGCs' awards did not draw their essence from the parties' CBA.

"[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *United Paperworkers Int'l Union v. Misco*, 484 U.S. 29, 38 (1987). When a collective bargaining agreement is silent on the question of remedies, as it is here, the JGC is implicitly empowered to fashion a remedy that will redress a breach. *See International Union of Operating Engineers, Local 103 v. Indiana Construction Corp.*, 910 F.2d 450, 454 (7th Cir. 1990) (the inclusion of "an arbitration clause in a collective bargaining agreement necessarily implies the authority of the [arbitrator] to find that there has been a breach of the agreement and further implies the authority to prescribe a remedy which can be said to reasonably cure the breach.") (internal quotations and citations omitted).

Here, the parties' CBA provides that "[t]he Joint Grievance Committee shall have the power to resolve all grievances before it . . . ." MM Ex. J, Article XIII, p. 41. Beyond this broad grant of authority to resolve grievances, the CBA does not identify any specific remedies to be utilized by the JGC. The portion of the parties' CBA that states that the Employer agrees "to compensate the

bargaining unit member" does not state that the JGC shall direct payment of an award directly to the bargaining unit member, it simply states that the Employer agrees to compensate the bargaining unit member. Likewise, it does not limit the possible remedies to be accorded a union member who would have worked but for Merryman's violation, and it does not preclude payment of an award to an Assistance Fund. The MARBA JGC frequently fashions grievance awards to be paid to Assistance Funds where it would be impossible to identify precisely which Local 150 member was harmed as a result of the signatory contractor's contract violation. The Assistance Funds to which the JGC directed the payment of various awards are funds maintained by Local 150 that are paid out, upon formal application, to Union members. Payment to Local 150's assistance funds is an indirect payment to Local 150's members. Moreover, there is nothing in the record to suggest that the parties' CBA identifies any specific remedies that may be awarded by an arbitrator or the JGC. Similarly, there is nothing in the record that establishes that there was another provision in the parties' CBA that would prevent the JGC from directing whole or partial payment of an award to an Assistance Fund. Under the circumstances, it is not clear to this Court that such a remedy was not within the contemplation of the parties at the time they entered into the collective bargaining agreement. *See Independent Employees' Union of Hillshire Farm Co. v. Hillshire Farm Co.*, 826 F.2d 530, 534 (7th Cir. 1987). Lastly, Merryman has cited no cases supporting the proposition that directing payment of a grievance award to a fund, as opposed to a aggrieved worker, is a basis for vacating an award. The JGC's decision to direct payment of the grievance awards to Local 150's Assistance Fund and the Midwest Operating Engineers Fund[11] was a "remedy which can be said to reasonably cure the breach," and therefore does not render the grievance awards void and

---

[11] Local 150 has represented that there is no "Midwest Operating Engineers Fund." There was a scrivener's error on the awards; the actual name of the fund is "Midwest Operating Engineers Fringe Benefit Fund."

unenforceable.  *See IUOE, Local 130*, 910 F.2d at 454.

## E.  Bias

Local 150 asserts that the JGC awards must be enforced because the JGC was not biased against or predisposed to rule against Merryman.[12] At the October 25, 2006 JGC hearing, Merryman objected to the Committee hearing the grievances on the ground that the individual Committee members were biased as a result of being named defendants in the lawsuit that Merryman filed before this Court. "Evident partiality" exists when an arbitrator's bias is "direct, definite and capable of demonstration rather than remote, uncertain, or speculative." *Harter v. Iowa Grain Co.*, 220 F.3d 544, 553 (7th Cir. 2000).  The Court is to presume that the JGC was competent and impartial until Merryman presents evidence to the contrary.  *See Mitsubishi Motors v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 633-34 (1985).

Here, the record does not demonstrate that the JGC had direct bias against Merryman and there is no genuine issue of material fact related to this issue.  As stated above, the record shows that the October 25, 2006 JGC was comprised of three members representing the union and three members representing the employer.  The mere fact that Merryman filed a federal lawsuit against the JGC members in their official capacity is insufficient to establish direct, definite bias that is capable of demonstration. *See Tamari v. Bache Halsey Stuart, Inc.*, 619 F.2d 1196, 1201 (7th Cir. 1980) (refusing to set aside an award rendered in favor or a financial services company by a panel whose members were "drawn from persons in the commodities business."); *see also Sheet Metal Workers Int'l Ass'n v. Kinney Air Conditioning*, 756 F.2d 742, 745-46 (9th Cir. 1985) ("The appearance of impropriety, standing alone, is insufficient.").  Merryman fails to support its

---

[12] It should be noted that Merryman did not assert bias as a ground to vacate the October 25, 2006 JGC's awards in its Motion for Summary Judgment.

conclusory allegations of bias. Instead of providing the Court with case law and evidence to support its assertion, Merryman asserts that "Local 150 has presented no evidence that the JGC members deliberated the merits fairly and honestly." MM Br. [D.E. 234] at 7. The problem with Merryman's contention is that the burden of proof as to a clam of bias or evident partiality rests upon Merryman, the party asserting the claim. *See Health Serv. Mgmt. Corp. V. Hughes*, 975 F.2d 1253, 1258 n. 3 (7th Cir. 1992). The Court will only vacate an arbitration award if Merryman can show the October 25, 2006 JGC had "direct" bias against it, a standard that is difficult to meet. *See Harter*, 220 F.3d 556.

Furthermore, the Court has "scanned the record," as it must when a party claims arbitral bias, and finds that the record is void of any manifestations of partiality. *See e.g., Health Servs.*, 975 F.2d at 1258. Therefore, as the record stands, the facts do not support Merryman's contention that the October 15, 2006 JGC was biased against Merryman and therefore Merryman's allegations of evident partiality are insufficient for the Court to vacate the Committee's awards.

## III. Section 301 Preemption (Count XII)

Local 150 and the Individual Union defendants assert that Count XII of Merryman's Third-Amended Complaint, the state law civil conspiracy claim, is preempted by § 301 of the LMRA. Section 301(a) of the LMRA states, in relevant part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Section 301 authorizes federal courts to "fashion a body of federal common law to be used to address disputes arising out of labor contracts," including suits to enforce or vacate

arbitration awards. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985); *General Drivers, Warehousemen & Helpers Local 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963). "The preemptive force of § 301 displaces any independent federal or state cause of action when the claim concerns a legitimate labor dispute and involves the breach of a collective bargaining agreement." *U.S. v. Palumbo*, 145 F.3d 850, 864 (7th Cir. 1998), *citing Allis-Chalmers*, 471 U.S. at 211. A state claim is independent of a CBA for § 301 preemption purposes "as long as the state-law claim can be resolved without interpreting the agreement itself." *Lingle v. Norge Div. Magic Chef*, 486 U.S. 399, 410 (1988).

The preemptive effect of Section 301 of the LMRA is broad. *See, e.g. Allis-Chalmers*, 471 U.S. 202. Yet, not every allegation that involves a provision of the CBA is automatically preempted by Section 301. *Id.* at 211. For example, when "the meaning of contract terms is not the subject of dispute, the bare fact that a collective bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *See Lividas v. Bradshaw*, 512 U.S. 107, 129 (1994). Therefore, the question is whether the dispute is "substantially dependent" upon an analysis of the terms of the CBA. *See Loewen Group Int'l, Inc. V. Haberichter*, 65 F.3d 1417, 1421 (7th Cir. 1995). The Court must look to the facts alleged and make a determination as to whether the CBA is merely referenced or requires interpretation. *See e.g. Atchley v. Heritage Cable Vision Associates*, 101 F.3d 495, 499 (7th Cir. 1996) (Determining wage increases and bonuses required interpretation of CBA's provisions).

In support of its civil conspiracy claim, Merryman alleges that the Individual Union Defendants "had a duty to both Merryman and Defendant Local 150 to adjudicate the grievances in a fair, impartial and honest manner, and consistent with the grievance procedures set forth in the

Master Agreement," and that the they "participated in a scheme and artifice to defraud and deny Merryman its rights to fair, impartial and honest services as fiduciaries under the Master Agreement by purposely and intentionally disregarding the grievance procedures set forth in the Master Agreement to Merryman's detriment, and by otherwise conducting the grievance proceedings in an arbitrary and capricious manner." Third Am. Compl. at ¶¶ 223, 226. Whether the Individual Union Defendants violated their fiduciary duties or not depends on whether they disregarded the grievance procedures set forth in the parties' CBA. The only way to determine if they disregarded the grievance procedures outlined in the CBA is to interpret the CBA. Put another way, whether the Individual Union Defendants engaged in a civil conspiracy to breach their fiduciary duty to Merryman hinges upon a finding that the underlying decisions of the JGC were invalid or were otherwise inconsistent with the terms and spirit of the CBA. Merryman itself concedes that "Count XII is predicted on a finding by the Court that Merryman is entitled to judgment on Counts I-XI." Merryman Br. [D.E. 234] at 12. Counts I through XI all stem from allegations that the JGC disregarded the terms of the CBA and that Local 150 violated the terms of the CBA. Reference to the parties' CBA is central and not collateral to Merryman's civil conspiracy claim; therefore, Merryman's civil conspiracy claim is "substantially dependent" on an analysis of the parties' CBA.

Additionally, the resolution of Merryman's claim requires interpretation of the CBA, and not "a mere glance at it." *See In re Bentz Metal Products Co.*, 253 F.3d 283, 289 (7th Cir. 2001). Merryman's civil conspiracy claim is based on breach of a duty devolved upon the Individual Union Defendants from the express terms of the CBA, the scope of which, crucially, is ascertained from a consideration of the contract itself. *See Alis-Chalmers Corp. v. Lueck*, 471 U.S. at 216. The parties' obligation under the CBA to arbitrate disputes arising out of the application or interpretation

of the CBA forms the basis for Merryman's civil conspiracy claim. The fiduciary duties, if any, that the Individual Union Defendants owed to Merryman are rooted firmly in the parties' CBA, and therefore, any attempt to assess liability will involve interpretation of the CBA. *See Alis-Chalmers Corp*, 471 U.S. at 202 (applying § 301 pre-emption to a state law claim for bad-faith handling of a worker's compensation claim because the duties the employer owed the employee, including the duty of good faith, were rooted firmly in the CBA).

Furthermore, the CBA provides the basis for Merryman's assertion that the Individual Union Defendants conspired to breach their fiduciary duty. The allegations set forth in Merryman's Illinois civil conspiracy claim focus significantly upon the composition of the JGC and the procedures set forth for filing grievances. The CBA sets forth the requirements for the composition of the JGC and sets forth the grievance procedures that the parties must follow. Therefore, each of these allegations requires interpretation of a separate provision of the CBA. *See e.g., Chicago Dist. Council of Carpenters Pension Fund v. Ceiling Wall Systems, Inc.*, 915 F. Supp. 939, 944 (N.D. Ill. 1996) (Section 301 preempts where the "obligation at issue was created by a collective bargaining agreement.").

Because Merryman's civil conspiracy is premised on a violation of the parties' CBA and cannot be resolved without interpreting the parties' CBA, it is preempted by § 301. Additionally, because this Court finds that Merryman's civil conspiracy claim is preempted by § 301, there is not need to consider the remainder of Local 150's arguments associated with its Motion for Summary Judgment on Count XII.

## <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, Local 150's Motion for Summary Judgment is granted and

Merryman's Motion for Summary Judgement is denied.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   August 17, 2009